UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | **:** | Chapter 11 |
| | **:** | |
| MICHAEL G. TYSON, et al., | **:** | Case No. 03-41900 (ALG) |
| | **:** | |
| Debtors. | **:** | Jointly Administered |

**JOINT PLAN OF REORGANIZATION PROPOSED BY DEBTORS AND THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

PACHULSKI, STANG, ZIEHL, YOUNG
JONES & WEINTRAUB P.C.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777

Attorneys for the Debtors and Debtors in Possession

And

BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
Telephone:    (617) 856-8200
Facsimile:    (617) 856-8201

Attorneys for Official Committee of Unsecured
Creditors

Dated: New York, New York
        June 24, 2004

# TABLE OF CONTENTS

Page

ARTICLE I .................................................................................................................2
DEFINITION AND CONSTRUCTION OF TERMS.......................................................2
1.1    Administrative Expense Claim ...............................................................2
1.2    Administrative Tax Claim .......................................................................2
1.3    Advisor Actions ......................................................................................2
1.4    Allowed...................................................................................................2
1.5    Allowed Claim or Allowed [Class designation or other designation] Claim ....................2
1.6    Assets......................................................................................................2
1.7    Avoidance Actions ..................................................................................2
1.8    Ballot......................................................................................................3
1.9    Bankruptcy Cases ...................................................................................3
1.10   Bankruptcy Code ....................................................................................3
1.11   Bankruptcy Court....................................................................................3
1.12   Bankruptcy Rules....................................................................................3
1.13   Base Interest ...........................................................................................3
1.14   Bout .......................................................................................................3
1.15   Bout Expenses ........................................................................................3
1.16   Bout Expenses Cap .................................................................................3
1.17   Business Day ...........................................................................................3
1.18   Cash........................................................................................................3
1.19   Children ..................................................................................................4
1.20   Claim.......................................................................................................4
1.21   Claims Resolution Reserve .....................................................................4
1.22   Class........................................................................................................4
1.23   Collection Costs ......................................................................................4
1.24   Committee...............................................................................................4
1.25   Committee Carve-out ..............................................................................4
1.26   Confirmation...........................................................................................4
1.27   Confirmation Date ..................................................................................4
1.28   Confirmation Hearing .............................................................................4
1.29   Confirmation Order.................................................................................4
1.30   Connecticut Escrow ................................................................................4
1.31   Connecticut Proceeds..............................................................................4
1.32   Connecticut Property ..............................................................................5
1.33   Contribution Agreement .........................................................................5
1.34   Creditor ..................................................................................................5
1.35   Creditors' Additional Payment ...............................................................5
1.36   Creditors' Representative ........................................................................5
1.37   Creditors' Trust.......................................................................................5
1.38   Creditors' Trust Agreement ....................................................................5
1.39   Creditors' Trustee ...................................................................................5
1.40   Cure........................................................................................................5
1.41   Debtors....................................................................................................5
1.42   Debtors in Possession .............................................................................6

1.43   Default Interest ....................................................................................................6
1.44   Disallowed ...........................................................................................................6
1.45   Disclosure Statement ...........................................................................................6
1.46   Disputed Claim .....................................................................................................6
1.47   Disputed Claims Reserve ......................................................................................6
1.48   Distribution ..........................................................................................................6
1.49   District Court ........................................................................................................6
1.50   Effective Date .......................................................................................................7
1.51   Estates .................................................................................................................7
1.52   Final Order ...........................................................................................................7
1.53   Financial Event .....................................................................................................7
1.54   Full Creditor Payment Date ...................................................................................7
1.55   Full Tax Payment Date ..........................................................................................7
1.56   Future Tyson Fight Income ....................................................................................7
1.57   General Unsecured Claims .....................................................................................8
1.58   Higher Priority Claims ...........................................................................................8
1.59   Holder ..................................................................................................................8
1.60   Impaired ...............................................................................................................8
1.61   Interdebtor Claim ..................................................................................................8
1.62   Interest .................................................................................................................8
1.63   IRS .......................................................................................................................8
1.64   King .....................................................................................................................8
1.65   King Litigation .......................................................................................................8
1.66   King Settlement .....................................................................................................8
1.67   Litigation Actions ..................................................................................................8
1.68   Lower Revenue Bout ..............................................................................................8
1.69   MTE .....................................................................................................................8
1.70   MTE Common Stock ...............................................................................................9
1.71   MTE Estate ...........................................................................................................9
1.72   Net Future Tyson Fight Income ...............................................................................9
1.73   Net Vegas Sale Proceeds .......................................................................................9
1.74   Non-Scheduled Assets ...........................................................................................9
1.75   Person ..................................................................................................................9
1.76   Petition Date .........................................................................................................9
1.77   Plan .....................................................................................................................9
1.78   Plan Administrator .................................................................................................9
1.79   Plan Assets ...........................................................................................................9
1.80   Plan Proponents ....................................................................................................9
1.81   Plan Supplement ...................................................................................................9
1.82   Plan Trust ...........................................................................................................10
1.83   Plan Trust Agreement ..........................................................................................10
1.84   Plan Trust Disputed Claims Reserve ......................................................................10
1.85   Post-Petition Earnings .........................................................................................10
1.86   Priority Non-Tax Claim .........................................................................................10
1.87   Priority Tax Claim ................................................................................................10
1.88   Pro Rata Share ....................................................................................................10

1.89    Professionals or Professional Persons ................................................................10
1.90    Reorganized Debtor ..............................................................................................10
1.91    Restructuring Expenses ........................................................................................10
1.92    Restructuring Expenses Cap .................................................................................11
1.93    Schedules ..............................................................................................................11
1.94    Secured Claim .......................................................................................................11
1.95    Showtime ...............................................................................................................11
1.96    Subsequent King Settlement Payments ................................................................11
1.97    Turner ....................................................................................................................11
1.98    Turner Claims ........................................................................................................11
1.99    Turner Fight Payment ...........................................................................................11
1.100   Turner Gross Claim ...............................................................................................11
1.101   Turner Non-Dischargeable Claim .........................................................................11
1.102   Turner Remaining Claim .......................................................................................11
1.103   Turner Settlement ..................................................................................................11
1.104   Tyson .....................................................................................................................11
1.105   Tyson Estate ..........................................................................................................12
1.106   Tyson Additional Fight Payment ..........................................................................12
1.107   Tyson Fight Payment .............................................................................................12
1.108   Unclaimed Property ...............................................................................................12
1.109   United States Trustee ............................................................................................12
1.110   Vegas Properties ....................................................................................................12
ARTICLE II TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
ADMINISTRATIVE TAX CLAIMS AND PRIORITY TAX CLAIMS .....................................13
2.1     Bar Date for Administrative Tax Claims. ..............................................................13
2.2     Bar Date for All Other Administrative Expense Claims. ......................................13
2.3     Administrative Expense Claims. ...........................................................................14
2.4     Priority Tax Claims. ..............................................................................................14
ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS ........................................15
3.1     Class 1 ....................................................................................................................15
3.2     Class 2 ....................................................................................................................16
3.3     Class 3 ....................................................................................................................16
3.4     Class 4 ....................................................................................................................16
3.5     Class 5 ....................................................................................................................16
3.6     Class 6 ....................................................................................................................16
ARTICLE IV TREATMENT OF CLAIMS AND INTERESTS ...............................................16
4.1     Class 1 – Priority Non-Tax Claims .......................................................................16
4.2     Classes 2 and 3 – Turner Claims and the Turner Settlement.................................16
        4.2.1   The Connecticut Escrow ...........................................................................16
        4.2.2   The Vegas Sale Proceeds ..........................................................................17
        4.2.3   The Turner Remaining Claim ....................................................................17
        4.2.4   The Turner Non-Dischargeable Claim ......................................................18
        4.2.5   Committee Carve-out and the Creditors' Trust .........................................18
        4.2.6   Other Provisions of the Turner Settlement ...............................................19
4.3     (Intentionally Omitted) .........................................................................................21
4.4     Class 4 – Other Secured Claims ............................................................................21

4.5     Class 5 – General Unsecured Claims..........................................................................21
4.6     Class 6 – MTE and Tyson Interests ............................................................................22
ARTICLE V MEANS OF IMPLEMENTATION.........................................................................23
5.1     Substantive Consolidation. ........................................................................................23
5.2     Plan Trust ...................................................................................................................24
5.3     Contribution Agreement .............................................................................................30
5.4     The King Settlement. ..................................................................................................32
ARTICLE VI PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE
PLAN, AND TREATMENT OF DISPUTED, CONTINGENT, AND UNLIQUIDATED
ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS, AND INTERESTS .................................34
6.1     Voting of Claims and Interests. ..................................................................................34
        6.1.1   In General ......................................................................................................34
        6.1.2   Controversy Concerning Impairment .............................................................34
6.2     Distributions to Holders of Claims .............................................................................34
        6.2.1   In General ......................................................................................................34
        6.2.2   Distributions on Account of Allowed Claims Only ...........................................34
        6.2.3   No Recourse...................................................................................................34
        6.2.4   Method of Cash Distributions .........................................................................34
        6.2.5   Minimum Distributions ...................................................................................34
        6.2.6   Distributions on Non-Business Days ..............................................................34
        6.2.7   No Distribution in Excess of Allowed Amount of Claim...................................34
6.3     Objections to Claims...................................................................................................35
6.4     Unclaimed Property. ...................................................................................................35
6.5     Disputed Claims..........................................................................................................35
6.6     Withholding Taxes.......................................................................................................35
6.7     Exemption from Certain Transfer Taxes. ....................................................................35
6.8     Setoffs. .......................................................................................................................36
6.9     Not Severable. ............................................................................................................36
6.10    Insurance Preservation and Proceeds........................................................................36
ARTICLE VII EFFECT OF CONFIRMATION OF PLAN .........................................................36
7.1     Discharge ....................................................................................................................36
        7.1.1   Scope..............................................................................................................36
        7.1.2   Injunction........................................................................................................37
7.2     Release of Claims. ......................................................................................................37
        7.2.1   Satisfaction of Claims and Interests ..............................................................37
        7.2.2   Exculpation .....................................................................................................37
7.3     Preservation of Litigation Actions and Objections to Claims. .....................................37
ARTICLE VIII EXECUTORY CONTRACTS............................................................................38
8.1     Executory Contracts and Unexpired Leases ...............................................................38
8.2     Bar Date for Rejection Damages. ...............................................................................38
8.3     Cure.............................................................................................................................39
ARTICLE IX EFFECTIVENESS OF THE PLAN .....................................................................39
9.1     Conditions Precedent. .................................................................................................39
9.2     Effective Date Transactions.........................................................................................40
9.3     Failure of Conditions/Non-Occurrence of Effective Date............................................40
9.4     Waiver of Conditions....................................................................................................41

9.5      Revocation of the Plan. ...................................................................................................41

ARTICLE X ADMINISTRATIVE PROVISIONS.......................................................................41

10.1    Retention of Jurisdiction. ......................................................................................................41

10.2    Failure of the Bankruptcy Court to Exercise Jurisdiction. ..............................................42

10.3    Amendment............................................................................................................................42

10.4    Governing Law. ....................................................................................................................43

10.5    Effectuating Documents and Further Transactions. .......................................................43

10.6    Notices. .................................................................................................................................43

10.7    No Admissions.......................................................................................................................44

10.8    Termination of Committee. .................................................................................................45

EXHIBITS

SCHEDULES

Schedule 1.16 – Bout Expenses Cap

Schedule 8.1 – Schedule of Executory Contracts

Michael G. Tyson ("Tyson") and Mike Tyson Enterprises, Inc. ("MTE," and collectively with Tyson, the "Debtors"), together with the Official Committee of Unsecured Creditors appointed in connection with the Debtors' chapter 11 cases (collectively, the "Plan Proponents") hereby propose the following Joint Plan of Reorganization (the "Plan") pursuant to section 1121(a) of Title 11 of the United States Code (the "Bankruptcy Code"):

All Holders of Claims and Interests are encouraged to read the Plan and the accompanying Disclosure Statement in their entireties before voting to accept or reject the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and those restrictions on modifications set forth in Article X of the Plan, the Plan Proponents reserve their right to alter, amend or modify the Plan one or more times before its substantial consummation.

# ARTICLE I

## DEFINITION AND CONSTRUCTION OF TERMS

The capitalized terms set forth below shall have the following meanings:

1.1     Administrative Expense Claim means any right of payment of cost or expense of administration specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code.

1.2     Administrative Tax Claim means a General Unsecured Claim by a governmental unit for taxes (and for interest or penalties related to such taxes) for any tax year or period, all or a portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date.

1.3     Advisor Actions means all actions, causes of action and claims of the Debtors against any former advisors or consultants to Tyson, MTE or their affiliates, together with insurance coverage related thereto and causes of action against insurers on account thereof.

1.4     Allowed means with respect to a Claim to the extent such Claim: (a)(i) is either: (A) scheduled by either of the Debtors in their respective Schedules pursuant to the Bankruptcy Code and Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated or disputed; or (B) has been timely filed, or deemed timely filed, with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable orders of the Bankruptcy Court, or late filed with leave of Bankruptcy Court; and (ii) is not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Bankruptcy Court; or (b) has otherwise been Allowed by a Final Order or pursuant to this Plan. An Allowed Claim: (A) includes a previously Disputed Claim to the extent such Disputed Claim becomes Allowed; and (B) shall be net of any setoff amount of any claim that may be asserted by the Debtors against the Holder of such Claim, which shall be deemed to have been setoff in accordance with the provisions of this Plan.  Without limiting the foregoing, no Claim shall be considered an Allowed Claim before the time that an objection has been or may be filed with regard to such Claim if: (x) the amount or classification of the Claim specified in the relevant proof of claim exceeds the amount of or has a classification that differs from any corresponding Claim scheduled by either of the Debtors in their respective Schedules; (y) any corresponding Claim scheduled by either of the Debtors has been scheduled as disputed, contingent or unliquidated; or (z) no corresponding Claim has been scheduled by either of the Debtors in their respective Schedules; and with respect to an MTE Common Stock Interest, any such Interest as is properly reflected in the records of MTE at the close of business on the Effective Date.

1.5     Allowed Claim or Allowed [Class designation or other designation] Claim means a Claim that is Allowed in the Class in which such Claim is classified.

1.6     Assets means all assets of the relevant Estate, including property of the estate as described in section 541 of the Bankruptcy Code.

1.7     Avoidance Actions means all claims or causes of action arising from or pursuant to the Debtors' avoiding powers, and all claims, actions, causes of action, rights and remedies

arising under, relating to, or similar to chapter 5 of the Bankruptcy Code, or any other fraudulent conveyance, fraudulent transfer or preference laws.

1.8      Ballot means each of the voting forms to be distributed with the Plan and the Disclosure Statement to Holders of Claims in Classes that are impaired under the terms of the Plan and are entitled to vote to accept or reject the Plan.

1.9      Bankruptcy Cases means the jointly administered cases commenced by the filing of voluntary petitions on the Petition Date by each of the Debtors under chapter 11 of the Bankruptcy Code, which cases are pending before the Bankruptcy Court.

1.10     Bankruptcy Code means Title 11 of the United States Code, as now in effect or hereafter amended, as applicable to the Bankruptcy Cases.

1.11     Bankruptcy Court means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Bankruptcy Cases and, to the extent of any reference made pursuant to section 157 of Title 28 of the United States Code, the unit of the United States District Court for the Southern District of New York pursuant to section 151 of Title 28 of the United States Code.

1.12     Bankruptcy Rules means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court (including any applicable local rules of the United States Bankruptcy Court for the Southern District of New York), as applicable to the Bankruptcy Cases.

1.13     Base Interest means interest accruing at the rate per annum as set forth in 28 U.S.C. § 1961 (as such rate may change from time to time) and compounding as set forth therein.

1.14     Bout means any professional boxing match or similar event in which Tyson engages from and after January 1, 2004.

1.15     Bout Expenses means training, management, accounting, legal, travel, and lodging expenses reasonably incurred by Tyson in connection with any Bout, and Restructuring Expenses provided, however, that, solely for purposes of calculating payments pursuant to the Contribution Agreement, for any Bout all Bout Expenses incurred in connection therewith, excluding the Restructuring Expenses, shall not exceed the Bout Expenses Cap, and the Restructuring Expenses, in the aggregate, shall not exceed the Restructuring Expenses Cap.

1.16     Bout Expenses Cap means, for each Bout, the amount of Bout Expenses corresponding to the amount of Future Tyson Fight Income generated by such Bout, as described in Schedule 1.16 hereto.

1.17     Business Day means any day except a Saturday, Sunday, or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

1.18     Cash means cash and cash equivalents, including but not limited to bank deposits, checks, and other similar items.

1.19     Children means the two minor children who are the product of the dissolved marriage between Tyson and Turner.

1.20     Claim means a claim against any of the Debtors and their Estates, whether or not asserted, known or unknown, as such term is defined in section 101(5) of the Bankruptcy Code. For the purposes of the Plan, the term "Claim" includes (unless otherwise designated) Administrative Expense Claims, General Unsecured Claims, Priority Tax Claims, Priority Non-Tax Claims, Administrative Tax Claims, Secured Claims and the Turner Remaining Claim.

1.21     Claims Resolution Reserve means the $250,000 reserve to be used to fund investigation, litigation and disposition of Claims (but not in respect of the dischargeability of any debts or Claims) by the Plan Administrator.

1.22     Class means a group of Claims or Interests described in Article III of the Plan.

1.23     Collection Costs means all reasonable costs of collecting payments due or enforcing obligations under this Plan (or any related agreements), including reasonable attorneys' fees and expenses. Collection Costs shall be paid pro rata to whomever has borne the burden of the costs that resulted in such Collection Costs.

1.24     Committee means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases by the Office of the United States Trustee on August 22, 2003, pursuant to section 1102 of the Bankruptcy Code, as the same may be composed from time to time.

1.25     Committee Carve-out means the carve-out from Distributions or other amounts received by Turner for or on account of the Turner Claims in accordance with section 4.2.5 hereof.

1.26     Confirmation means the approval by the Bankruptcy Court of the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, as effectuated by the Confirmation Order.

1.27     Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.28     Confirmation Hearing means the hearing pursuant to which the Bankruptcy Court enters the Confirmation Order.

1.29     Confirmation Order means the order of the Bankruptcy Court, in form and substance acceptable to the Plan Proponents, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.30     Connecticut Escrow means the escrow of net proceeds from the sale of the Connecticut Property in the approximate amount of $2,500,000.

1.31     Connecticut Proceeds means the net proceeds of sale of the Connecticut Property.

1.32    Connecticut Property means that certain parcel of real property located at 46 Poplar Bars Road, Farmington, Connecticut and all improvements located thereon.

1.33    Contribution Agreement means the contribution agreement to be entered into by Tyson and the Plan Administrator in conjunction with the Plan, as set forth in and subject to the terms and conditions of section 5.3 hereof.

1.34    Creditor means the Holder of a Claim.

1.35    Creditors' Additional Payment means for any Bout: (i) prior to the Full Tax Payment Date, (A) 100% of the Net Future Tyson Fight Income for such Bout, less the Tyson Fight Payment and less the Turner Fight Payment (if any), until the Creditors' Additional Payment equals the Tyson Fight Payment less the Turner Fight Payment (if any), plus (B) 50% of the Net Future Tyson Fight Income (net of the aggregate amount of the Tyson Fight Payment, the Turner Fight Payment (if any) and the amount of the Creditors' Additional Payment described in subsection (A) immediately above, with the remaining 50% of such net amount retained by Tyson (the "Tyson Additional Fight Payment")); and (ii) on and after the Full Tax Payment Date until the Full Creditor Payment Date, subject to the last proviso in section 1.54 hereof in the definition of the term "Full Creditor Payment Date," 20% of any Future Tyson Fight Income.

1.36    Creditors' Representative means any individual or entity selected by the Committee who may, in the Committee's sole discretion, also be the Creditors' Trustee.

1.37    Creditors' Trust means the liquidating trust to be established to receive, enforce, administer, and distribute the Committee Carve-out, the trustee of which shall be the Creditors' Trustee and the beneficiaries of which shall be all Holders of Allowed General Unsecured Claims.

1.38    Creditors' Trust Agreement means the agreement that establishes and governs the Creditors' Trust, which shall be subject to the prior approval of the Committee and the consent of the Debtors, which consent shall not be unreasonably withheld.

1.39    Creditors' Trustee means the trustee of the Creditors' Trust to be selected by the Committee.

1.40    Cure means the distribution of Cash, or such other property as may be agreed upon by the Debtors and the recipient thereof or ordered by the Bankruptcy Court, as and to the extent required for the assumption of an unexpired lease or executory contract pursuant to the provisions of section 365(b) of the Bankruptcy Code in an amount equal to all accrued, due, and unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties or ordered by the Bankruptcy Court, under such executory contract or unexpired lease to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

1.41    Debtors means Tyson and MTE.

1.42    Debtors in Possession means the Debtors as debtors in possession in the Bankruptcy Cases.

1.43    Default Interest means Base Interest plus ten percent (10%) per annum. Default Interest shall be paid pro rata to whomever has borne the burden of the delay(s) that resulted in such Default Interest.

1.44    Disallowed means a Claim (including, without limitation, any General Unsecured Claim, Priority Tax Claim, Priority Non-Tax Claim, Administrative Tax Claim, and Administrative Expense Claim), Interest, or portion thereof, that is not allowed under Bankruptcy Code sections 502 or 503 either by a Final Order or under a stipulation or settlement with either of the Debtors entered into after the Effective Date.

1.45    Disclosure Statement means the Disclosure Statement that relates to this Plan and is approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be amended, modified, or supplemented (and all exhibits and schedules annexed thereto or referred to therein).

1.46    Disputed Claim means that portion (including, when appropriate, the whole) of a Claim (including, without limitation, any Secured Claim, General Unsecured Claim, Priority Tax Claim, Priority Non-Tax Claim, Administrative Tax Claim, and Administrative Expense Claim) that is not an Allowed Claim. For purposes of the Plan, a Claim shall be considered a Disputed Claim in a particular Class as to which a proof of claim has been filed or is deemed to have been filed under applicable law or an Administrative Expense Claim, as to which an objection has been or is filed by the Debtors, the Plan Administrator, the Committee or any other party in interest in accordance with this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, which objection has not been withdrawn or determined by a Final Order. At such time as a Disputed Claim is disallowed by a Final Order, such Claim shall no longer be considered a Claim for any purpose under this Plan. Prior to the time that an objection has been or is filed, for the purposes of this Plan, a Claim (including, without limitation, any Secured Claim, General Unsecured Claim, Priority Tax Claim, Priority Non-Tax Claim, Administrative Tax Claim, and Administrative Expense Claim) may be considered a Disputed Claim to the extent that: (i) the amount of a Claim specified in a proof of claim exceeds the amount of any corresponding Claim scheduled by either of the Debtors in the Schedules; (ii) any corresponding Claim scheduled by either of the Debtors in Schedules has been scheduled as disputed, contingent or unliquidated, irrespective of the amount scheduled; or (iii) no corresponding Claim has been scheduled by either of the Debtors in the Schedules.

1.47    Disputed Claims Reserve means a separate reserve of Cash within the Plan Trust established by the Plan Administrator for the payment of Disputed Claims that become Allowed Claims after the Effective Date, which reserve is the Plan Trust Disputed Claims Reserve.

1.48    Distribution means the distributions to Creditors in accordance with this Plan.

1.49    District Court means the United States District Court for the Southern District of New York presiding over the King Litigation.

1.50    Effective Date means the first Business Day upon which all conditions to effectiveness of the Plan are satisfied or waived as provided in Article IX hereof.

1.51    Estates means, collectively, the Tyson Estate and the MTE Estate.

1.52    Final Order means an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, seek review or rehearing, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, any analogous rule under the Bankruptcy Rules, or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.53    Financial Event means either of the following: (i) a Bout, other than the first such Bout; and (ii) a Subsequent King Settlement Payment, but no other receipt of money or property by Tyson after the Effective Date.

1.54    Full Creditor Payment Date means the earlier to occur of:  (i) the date by which Holders of Allowed General Unsecured Claims have received, on account of their Allowed General Unsecured Claims, an aggregate amount (including funds received by the Creditors' Trust on account of the Committee Carve-out) of 25% of the aggregate amount of Allowed General Unsecured Claims, and (ii) the fourth anniversary of the date of the first Bout; provided, however, that such time period in this subsection (ii) shall be tolled for any period(s) of time (A) that Tyson is disabled or injured, (B) that Tyson is unable to secure a boxing license, (C) that Tyson is otherwise legally prohibited from boxing for a period longer than 90 days (provided that the tolling period resulting from the institution of such legal prohibition shall include the initial 90 days of the period of such legal prohibition), and/or (D) during which any scheduled Bout is postponed due to an opponent's injury (which period shall not exceed 90 days), provided that a Bout with such opponent or substitute opponent occurs within 180 days of the date of injury and provided further, however, that the Plan Trust shall be entitled to receive the Creditors' Additional Payment that otherwise may be due, notwithstanding the passage of such fourth anniversary (as may be tolled as provided above), from Future Tyson Fight Income earned from any Bout that occurs after such fourth anniversary (as may be tolled as provided above), if before the passage of such fourth anniversary (as may be tolled as provided above) Tyson enters into a contract or other arrangement to engage in such Bout.

1.55    Full Tax Payment Date means the date on which Tyson has earned sufficient income from Future Tyson Fight Income to pay through Creditors' Additional Payments (in accordance with the terms hereof) in full the aggregate amount of Allowed Priority Tax Claims, net of all Distributions received by the Holders of Allowed Priority Tax Claims from assets of the Debtors' Estates (but not the Creditors' Additional Payments).

1.56    Future Tyson Fight Income means all gross cash income (e.g., the entire "purse") received by or for Tyson for any Bout.

1.57　General Unsecured Claims means all Claims against any of the Debtors and their Estates other than Secured Claims, Administrative Expense Claims, Administrative Tax Claims, Priority Non-Tax Claims, the Turner Claims, Priority Tax Claims and Interdebtor Claims.

1.58　Higher Priority Claims means Allowed Claims and Allowed Administrative Expense Claims, excluding the Turner Remaining Claim, having a priority under section 507(a) of the Bankruptcy Code higher than Priority Tax Claims.

1.59　Holder means the owner of any Claim or Interest.

1.60　Impaired has the meaning set forth in section 1124 of the Bankruptcy Code.

1.61　Interdebtor Claim means any Claim against either Debtor by the other Debtor.

1.62　Interest means an equity security, within the meaning of section 101(16) of the Bankruptcy Code, of MTE.

1.63　IRS means the Internal Revenue Service.

1.64　King means, collectively, Don King, Don King Productions, Inc., DKP Corporation, and KingVision Pay Per View, Ltd.

1.65　King Litigation means the case pending in the District Court captioned Mike Tyson v. Don King, an individual, Don King Productions, Inc., a New York Corporation, DKP Corporation, a Delaware Corporation, and KingVision Pay Per View Ltd., a Delaware Corporation, Case No. 98 CIV 1628 (GBD).

1.66　King Settlement means the settlement of any and all claims and causes of action arising out of, relating to or raised in the King Litigation, together with all Claims of King against the Estates (whether or not asserted), as described in and incorporated into this Plan.

1.67　Litigation Actions means any and all claims, debts, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, setoffs, powers, privileges, licenses, and franchises of any kind or character whatsoever, known or unknown, suspected or unsuspected, matured or unmatured, direct or derivative, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, of the Debtors or their Estates, including but not limited to (i) rights of setoff, counterclaim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (ii) the right to object to Claims, except as provided in this Plan; (iii) claims pursuant to Bankruptcy Code section 362; (iv) such claims and defenses as fraud, mistake, duress, and usury; (v) all Avoidance Actions; (vi) all Advisor Actions; and (vii) claims against Showtime.

1.68　Lower Revenue Bout means a Bout that does not generate sufficient Net Future Tyson Fight Income to pay in full (after payment in full of the Tyson Fight Payment) the Turner Fight Payment and the Creditors' Additional Payment (equal to the amount of the Tyson Fight Payment less the Turner Fight Payment (if any)).

1.69　MTE means Mike Tyson Enterprises, Inc.

8

1.70    <u>MTE Common Stock</u> means the Common Stock of MTE issued and outstanding prior to the Effective Date.

1.71    <u>MTE Estate</u> means, pursuant to section 541 of the Bankruptcy Code, the estate created as a result of the commencement of MTE's Bankruptcy Case.

1.72    <u>Net Future Tyson Fight Income</u> means, for any Bout: (i) Future Tyson Fight Income, less (ii) Bout Expenses incurred in connection with such Bout, less (iii) reasonably estimated income taxes and other taxes arising from or incurred in connection with the Bout.

1.73    <u>Net Vegas Sale Proceeds</u> means the proceeds generated from the sale(s) of the Vegas Properties, net of the amounts reasonably and actually paid to third parties constituting costs of sale, brokers' commissions and expenses, closing expenses, closing adjustments, and other amounts necessary to repay obligations, debts, or liabilities secured by mortgages or other valid, unavoidable, and perfected mortgages and liens against the Vegas Properties with priority over Turner's liens against the Vegas Properties.

1.74    <u>Non-Scheduled Assets</u> means any assets, property, and cash (but not (i) intellectual property, or (ii) Litigation Actions listed in either the Schedules or in the Disclosure Statement) constituting property of the Estates that was not disclosed in the Schedules (without including any amendments, supplements or other modifications thereto made or filed after December 18, 2003) and all proceeds thereof.

1.75    <u>Person</u> means any individual, corporation, partnership, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit, or any political subdivision thereof, Interest Holders, current or former employees of either of the Debtors, or any other entity.

1.76    <u>Petition Date</u> means August 1, 2003, the date on which the Debtors commenced the Bankruptcy Cases.

1.77    <u>Plan</u> means this Joint Plan of Reorganization together with any amendments or modifications hereto as the Plan Proponents may jointly file hereafter (such amendments or modifications only being effective if approved by order of the Bankruptcy Court).

1.78    <u>Plan Administrator</u> means the administrator of the Plan Trust appointed pursuant to section 5.2.1 of the Plan.

1.79    <u>Plan Assets</u> shall have the meaning ascribed to such term in section 5.2.2 of the Plan.

1.80    <u>Plan Proponents</u> means, collectively, the Debtors and the Committee.

1.81    <u>Plan Supplement</u> means the forms of documents specified in section 10.5.2 hereof to be filed by the Plan Proponents with the Bankruptcy Court at least fifteen (15) days prior to the Confirmation Hearing.

1.82    Plan Trust means the liquidating trust to be established pursuant to the Plan to hold the Plan Assets, which shall be administered by the Plan Administrator in accordance with the terms and conditions hereof and the beneficiaries of which shall be all Holders of Allowed Claims (including, without limitation, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the Turner Claims (solely in respect of the proceeds from the King Settlement), Allowed Administrative Tax Claims, Allowed Administrative Expense Claims and Allowed General Unsecured Claims).

1.83    Plan Trust Agreement means the agreement that establishes and governs the Plan Trust, which shall be subject to the approval of the Plan Proponents and filed with the Bankruptcy Court as part of the Plan Supplement at least fifteen (15) days prior to the Confirmation Hearing.

1.84    Plan Trust Disputed Claims Reserve shall have the meaning ascribed to such term in section 5.2.7(b)(iii) hereof.

1.85    Post-Petition Earnings means all earnings earned by Tyson after the Petition Date through the Effective Date.

1.86    Priority Non-Tax Claim means any Claim, if and to the extent Allowed, entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Expense Claim, (b) an Administrative Tax Claim, or (c) a Priority Tax Claim.

1.87    Priority Tax Claim means a Claim, if and to the extent Allowed, entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code, including interest (whether accrued before or after the Effective Date) and penalties (whether assessed before or after the Effective Date), if any, to the extent entitled to such priority.

1.88    Pro Rata Share means, with respect to the Holder of any Claim or Interest in a particular Class, a fraction equal to such Holder's Claim or Interest divided by the total amount of all Claims or Interests, as the case may be, in such Class.

1.89    Professionals or Professional Persons means Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b) or 1103 of the Bankruptcy Code.

1.90    Reorganized Debtor means Tyson as of the Effective Date.

1.91    Restructuring Expenses means the following legal or restructuring-related accounting expenses incurred by Tyson since the Petition Date through the Effective Date: (i) any fee enhancement owed to Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. by Tyson personally, but only to the extent allowed by the Bankruptcy Court by entry of a final non-appealable order in connection with the Bankruptcy Cases; (ii) any fee enhancement owed to Neilson Elggren LLP by Tyson personally, but only to the extent allowed by the Bankruptcy Court by entry of a final non-appealable order in connection with the Bankruptcy Cases; and (iii) fees payable to attorneys for Tyson in connection with pre-Effective Date criminal matters.

1.92     Restructuring Expenses Cap means (i) for each Bout that generates Future Tyson Fight Income of less than $15,000,000, the sum of $300,000, and (ii) for each Bout that generates Future Tyson Fight Income equal to or in excess of $15,000,000, the sum of $400,000.

1.93     Schedules means the schedule of assets and liabilities and statement of financial affairs of the relevant Debtor filed with the Bankruptcy Court on December 18, 2003 pursuant to sections 521(1) and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

1.94     Secured Claim means, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the relevant Debtor in and to property of the relevant Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date. The defined term Secured Claim includes any Claim that is: (i) subject to a setoff right under applicable law; and (ii) a secured claim against the relevant Debtor pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.95     Showtime means Showtime Networks, Inc.

1.96     Subsequent King Settlement Payments means the subsequent payments from King on account of the King Settlement, as set forth in sections 5.4.1(b) and (c) hereof.

1.97     Turner means Dr. Monica Turner.

1.98     Turner Claims means collectively the Turner Remaining Claim and the Turner Non-Dischargeable Claim.

1.99     Turner Fight Payment shall mean $750,000 per Bout, until the date that the Turner Non-Dischargeable Claim is paid in full.

1.100    Turner Gross Claim means $8,000,000, plus $250,000 upon the occurrence of each Financial Event, up to a maximum of $9,000,000.

1.101    Turner Non-Dischargeable Claim means Turner's non-dischargeable alimony and support claim that is allowed against Tyson individually, pursuant to section 4.2.4 hereof.

1.102    Turner Remaining Claim means Turner's Priority Non-Tax Claim that is allowed, calculated and treated as set forth in section 4.2.3 hereof.

1.103    Turner Settlement means, collectively, the settlement of any and all causes of action held by the Estates against Turner or the Children and any and all Claims held by Turner and Turner on behalf of the Children against the Debtors and the Estates, together with the settlement of the Turner Non-Dischargeable Claim, which settlements are incorporated into the terms of this Plan at section 4.2.

1.104    Tyson means Michael Gerard Tyson in his individual capacity, not in his capacity as Debtor in Possession.

1.105    Tyson Estate means, pursuant to section 541 of the Bankruptcy Code, the estate created as a result of the commencement of Tyson's Bankruptcy Case.

1.106    Tyson Additional Fight Payment shall have the meaning ascribed to such term in the definition of the term "Creditors' Additional Payment."

1.107    Tyson Fight Payment means $2,000,000 per Bout until the Full Tax Payment Date.

1.108    Unclaimed Property means any Cash or other property unclaimed on or after the Effective Date or any date on which a Distribution would have been made in respect of the relevant Allowed Claim. Unclaimed Property shall include: (a) checks (and the funds represented thereby) and other property returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; and (c) checks (and the funds represented thereby) not mailed or delivered because no address to mail or deliver such property was available.

1.109    United States Trustee means the Office of the United States Trustee for the Southern District of New York.

1.110    Vegas Properties means the real property and improvements thereon owned by Tyson as of the Petition Date and located at 6740 and 6760 Tomiyasu Lane in Las Vegas, Nevada.

Other terms.  Any term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

Construction of Certain Terms.

(a)    The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

(b)    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.

(c)    Captions and headings to articles and sections of the Plan are inserted for convenience of reference only and are not intended to be a part or to affect the interpretation of the Plan.

(d)    The rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order.

(e)    Any reference in the Plan to an existing document or exhibit means such document or exhibit as it may have been amended, restated, modified or supplemented as permitted hereunder.

(f)     In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(g)     Whenever the Plan provides that a payment or other Distribution shall occur "on" any date (except as provided in section 9.2 hereof, all of which shall be made no later than the Effective Date), it shall mean "on or as soon as reasonably practicable after" such date.

## ARTICLE II

## TREATMENT OF ADMINISTRATIVE EXPENSE
## CLAIMS, ADMINISTRATIVE TAX CLAIMS AND PRIORITY TAX CLAIMS

2.1     Bar Date for Administrative Tax Claims.  All requests for payment of Administrative Tax Claims and for which no earlier bar date has been or is established outside of this Plan, such as may be established by requesting an expedited audit under Bankruptcy Code section 505, must be filed with the Bankruptcy Court and served on (i) the Plan Administrator, Neilson Elggren LLP, 10100 Santa Monica Blvd., Ste. 410, Los Angeles, CA 90067, Attn: R. Todd Neilson, (ii) counsel for the pre-Effective Date Debtors, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Attn: Robert J. Feinstein, Esq., 780 Third Avenue, New York, New York 10017, (iii) counsel for the Committee, Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, MA 02111, Attn: Anthony L. Gray, Esq., and (iv) the United States Trustee, Attn: Pamela Jean Lustrin, Esq., 33 Whitehall Street, 21st Floor, New York, New York, 10004 on or before the later of (a) sixty (60) days following the Effective Date and (b) sixty (60) days following the filing of any required tax return for such taxes for such year or period with the applicable governmental unit.  Any Holder of any Administrative Tax Claim that is required to file a request for payment of such taxes and does not file such a request by the applicable bar date will be forever barred from asserting any such Administrative Tax Claim against the Debtors, the Plan Trust, the Creditors' Trust, the Plan Administrator, the Creditors' Trustee, the Creditors' Representative, the Estates, or any of their property, successors, or assigns.  Any party in interest shall have thirty (30) days from the date an Administrative Tax Claim is filed to bring an objection to such Claim.

2.2     Bar Date for All Other Administrative Expense Claims.  Except as otherwise provided in this Plan, requests for payment of Administrative Expense Claims (other than Administrative Tax Claims and statutory fees) must be filed with the Bankruptcy Court and served on the (i) the Plan Administrator, Neilson Elggren LLP, 10100 Santa Monica Blvd., Ste. 410, Los Angeles, CA 90067, Attn: R. Todd Neilson, (ii) counsel for the pre-Effective Date Debtors, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Attn: Robert J. Feinstein, Esq., 780 Third Avenue, New York, New York 10017, (iii) counsel for the Committee, Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, MA 02111, Attn: Anthony L. Gray, Esq., and (iv) the United States Trustee, Attn: Pamela Jean Lustrin, Esq., 33 Whitehall Street, 21st Floor, New York, New York, 10004 no later than sixty (60) days after the Effective Date. Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) or 1103 for services rendered prior to the Effective Date will file and serve on all parties entitled to notice thereof, an application for

final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such requests for payment of Administrative Expense Claims and applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. Holders of Administrative Expense Claims (including, without limitation, Professionals) requesting compensation or reimbursement of expenses that do not file such requests by the applicable bar date will be forever barred from asserting such Claims against the Debtors, the Plan Trust, the Creditors' Trust, the Plan Administrator, the Creditors' Trustee, the Creditors' Representative, the Estates, or any of their property, successors or assigns. Any party in interest shall have thirty (30) days from the date an Administrative Expense Claim is filed to bring an objection to such Claim.

2.3    Administrative Expense Claims.  Except to the extent that the Holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Plan Administrator shall provide to each Holder of an Allowed Administrative Expense Claim (a) Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of (i) the Effective Date, (ii) the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the date such Allowed Administrative Expense Claim is due in accordance with the terms and conditions of the particular transactions or governing documents or (b) such other treatment as the Plan Administrator and such Holder shall have agreed upon in writing; provided, however, that Allowed Administrative Expense Claims (other than Administrative Expense Claims under section 330 of the Bankruptcy Code) representing obligations incurred in the ordinary course of business of or assumed by the Reorganized Debtor shall be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

2.4    Priority Tax Claims.

2.4.1    Except to the extent that the Holder of an Allowed Priority Tax Claim agrees to a different treatment, the Plan Administrator shall pay to each Holder of an Allowed Priority Tax Claim from the Plan Trust, at the sole option of the Plan Administrator:

(a)    on the Effective Date, its Pro Rata share of the available Cash in the Plan Trust after full payment of or reserve for:

(i)    Cash needed to fund the Claims Resolution Reserve and other reasonably necessary reserves to be established by the Plan Administrator in accordance with the terms hereof, and

(ii)    (A) reasonable market-based fees and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses and post-Effective Date taxes) of the Plan Administrator and (B) until the Full Creditor Payment Date, the fees (which shall equal $5,000 per month) and reasonable out-of-pocket expenses (including reasonable

14

legal and accounting expenses[1]) of the Creditors'
Representative, and

    (iii)      Allowed Higher Priority Claims, and

    (iv)      the Turner Remaining Claim (solely from proceeds of the
King Settlement), and

following the Effective Date, equal annual cash payments, in
arrears, in an aggregate amount equal to the outstanding balance of
such Allowed Priority Tax Claim, together with interest to accrue
as of the Effective Date at a fixed annual rate equal to five percent
(5%), over a period through the sixth anniversary of the date of
assessment of such Allowed Priority Tax Claim; provided,
however, that the Plan Administrator may prepay without penalty
the outstanding balance of such Allowed Priority Tax Claim at any
time; or either of

    (b)      upon such other terms determined by the Bankruptcy Court to
provide the Holder of such Allowed Priority Tax Claim, deferred
Cash payments having a value, as of the Effective Date, equal to
such Allowed Priority Tax Claim; or

    (c)      such other, less favorable treatment as the Plan Administrator and
such Holder shall have agreed upon in writing.

Any claim or demand for penalty relating to any Priority Tax Claims shall be disallowed,
and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such
penalty from the Plan Trust, the Creditors' Trust or the Reorganized Debtor.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

The following is a designation of the Classes of Claims and Interests in the Plan.
Administrative Expense Claims and Priority Tax Claims have not been classified and are
excluded from the following Classes, in accordance with the provisions of section 1123(a)(1) of
the Bankruptcy Code. The treatment accorded Administrative Expense Claims and Priority Tax
Claims is set forth in Article II, above. Consistent with section 1122 of the Bankruptcy Code, a
Claim or Interest is classified by the Plan in a particular Class only to the extent that the Claim or
Interest is within the description of the Class and is classified in a different Class to the extent the
Claim or Interest is within the description of that different Class.

The following is the designation of the Classes of Claims and Interests under the Plan:

3.1     Class 1 consists of all Priority Non-Tax Claims asserted against any of Tyson,
MTE, the Tyson Estate and the MTE Estate, except the Turner Claims. Class 1 is impaired.

---

[1] Subject to the restrictions set forth in section 5.2.5(b) hereof.

3.2     Class 2 consists of the portion of the Turner Remaining Claim that is a Priority Non-Tax Claim against Tyson and the Tyson Estate.  Class 2 is impaired.

3.3     Class 3 consists of the portion of the Turner Gross Claim that is a Secured Claim against Tyson and the Tyson Estate.  Class 3 is impaired.

3.4     Class 4 consists of all Secured Claims other than the Class 3 Claims, whether validly perfected under applicable state law prior to the Petition Date or validly perfected after the Petition Date in accordance with section 546(b) of the Bankruptcy Code.  Class 4 is not impaired.

3.5     Class 5 consists of all General Unsecured Claims asserted against any of Tyson, MTE, the Tyson Estate and the MTE Estate.  Class 5 is impaired.

3.6     Class 6 consists of MTE Common Stock Interests and the Tyson Interest.  Class 6 is impaired.


# ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

4.1     Class 1 – Priority Non-Tax Claims

4.1.1    Class 1 is impaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim in Class 1 is entitled to vote to accept or reject the Plan.

4.1.2    Each Holder of an Allowed Class 1 Priority Non-Tax Claim against any of Tyson, MTE, the Tyson Estate and the MTE Estate shall receive 100% of the unpaid Allowed amount of such Claim in Cash on the later of (i) the Effective Date and (ii) the date such Priority Non-Tax Claim becomes an Allowed Claim.  Notwithstanding the foregoing, the Holder of an Allowed Class 1 Priority Non-Tax Claim may receive such other, less favorable treatment as may be agreed upon by the claimant and the Plan Administrator.

4.2     Classes 2 and 3  – Turner Claims and the Turner Settlement

The Debtors, the Committee, Turner and Tyson have agreed to the Turner Settlement set forth in this section 4.2, which provides for the following settlement and treatment of the Class 2 and Class 3 Claims and the settlement of the Turner Non-Dischargeable Claim as described below.  Thus, in full satisfaction of the Turner Gross Claim, the Turner Remaining Claim and the Turner Non-Dischargeable Claim:

4.2.1    The Connecticut Escrow.  Unless otherwise agreed by the Plan Proponents and Turner and approved by the Bankruptcy Court, on the Effective Date, the Connecticut Escrow shall be broken and such proceeds shall be distributed as follows:

(a)      $2,000,000 shall be paid to Turner; and

(b)      the balance of the Connecticut Escrow funds (in the amount of approximately $500,000), together with any earnings generated by all funds in the Connecticut Escrow before the Effective Date (but after deducting any fees and expenses actually incurred by the escrow agent up to a maximum of $2,500), shall be paid to the Plan Trust.

Turner shall have no right of distribution on account of or claim to any Connecticut Escrow funds in excess of the $2,000,000 paid to her as provided above.

In the event that the Connecticut Escrow was broken and the proceeds distributed pursuant to an agreement entered into by the Plan Proponents and Turner and approved by the Bankruptcy Court prior to the Effective Date, the Committee shall promptly surrender any letter of credit delivered by Turner to the Committee in conjunction with such agreement within five (5) calendar days of the Effective Date.

4.2.2    The Vegas Sale Proceeds.  Upon sale or disposition of the Vegas Properties (or either of them), Turner shall receive $1,500,000 of the Net Vegas Sale Proceeds on account of her liens against the Vegas Properties.  The amount of Net Vegas Sale Proceeds, if any, in excess of such $1,500,000 of the Net Vegas Sale Proceeds paid to Turner shall be paid to the Plan Trust.  Turner shall have no right of distribution on account of or claim to any remaining Net Vegas Sale Proceeds in excess of the $1,500,000 paid to her from the Net Vegas Sale Proceeds.

4.2.3    The Turner Remaining Claim.

(a)      Calculation:  The Turner Remaining Claim against the Plan Trust shall be calculated as follows:

(i)      the Turner Gross Claim, less

(ii)      $879,000, representing the payments received by Turner from November 23, 2002, to the Petition Date, less

(iii)      $309,000, representing the payment received by Turner in September 2003 from the proceeds of the sale of the Connecticut Property, less

(iv)      all funds received by Turner from the Connecticut Escrow and the Net Vegas Sale Proceeds, as set forth above.

(b)      Allowance and Payment:

Subject to the terms set forth below, the Turner Remaining Claim shall be deemed Allowed as a Class 2 Claim pursuant to Bankruptcy Code section 507(a)(7). Notwithstanding the foregoing, Turner agrees to forego immediate full payment of the Turner Remaining Claim and will accept payment on the Turner Remaining Claim from the Plan Trust or from Tyson through a Turner Fight Payment (or from both sources) in the aggregate amount of $2,312,000 on the Effective Date and, thereafter, $750,000 for each Financial Event, until the Turner Remaining Claim is fully satisfied.  If, however, no Bout, other than the first Bout, occurs by the date the Plan Trust receives the final

17

Subsequent King Settlement Payment, Turner shall be paid the then outstanding balance of the Turner Remaining Claim, less $500,000, from such final Subsequent King Settlement Payment and will not be entitled to receive any other payments on account of the Turner Remaining Claim, unless a Bout occurs after the final Subsequent King Settlement Payment but before the Full Creditor Payment Date (in which case the balance of the Turner Remaining Claim shall increase by $750,000, i.e., $500,000 plus $250,000 as required under the definition of the term "Turner Gross Claim" upon the occurrence of a Financial Event). Thus, Turner shall not be entitled to share (except as otherwise specified herein) in any proceeds received by the Plan Trust from the Connecticut Escrow or from the Vegas Properties or from any other Plan Assets.

4.2.4 The Turner Non-Dischargeable Claim. The Turner Remaining Claim shall also be deemed a non-dischargeable alimony and support claim (i.e., the Turner Non-Dischargeable Claim) against Tyson individually (and not against the Estates or the Plan Trust), provided, however, that if no Bout, other than the first Bout, occurs by the Full Creditor Payment Date, then the Turner Non-Dischargeable Claim shall be reduced by $500,000. The Turner Non-Dischargeable Claim shall only be paid as expressly provided for herein or in another manner that does not impair in any way the Committee Carve-out.

4.2.5 Committee Carve-out and the Creditors' Trust: In consideration of obtaining the support of Holders of General Unsecured Claims to the terms and conditions reflected in this Plan and the releases to be provided to her and the Children in connection with the transactions set forth herein, Turner shall pay to the Creditors' Trustee on behalf of the Creditors' Trust the Committee Carve-out only from any Distributions or other amounts she receives for or on account of the Turner Remaining Claim or the Turner Non-Dischargeable Claim in accordance with the terms set forth below, up to a maximum of $2,000,000; provided, however, that such maximum amount shall be reduced to $1,500,000 if no Bout, other than the first Bout, occurs by the Full Creditor Payment Date. The Creditors' Trust shall hold the Committee Carve-out funds in trust for the benefit of Holders of Allowed General Unsecured Claims. Any reasonable out-of-pocket expenses of the Creditors' Trustee incurred on behalf of the Creditors' Trust shall be paid solely from Committee Carve-out funds before their distribution to the Holders of Allowed General Unsecured Claims. The Creditors' Trust shall administer, hold, liquidate and distribute net Cash proceeds of assets held by the Creditors' Trust to Holders of Allowed General Unsecured Claims in accordance with the terms of the Creditors' Trust Agreement. Pursuant to the terms of the Creditors' Trust Agreement, the Creditors' Trustee shall have the right to enforce Turner's obligations under the Turner Settlement. As provided in the Creditors' Trust Agreement, the sole purpose of the Creditors' Trust will be to liquidate its assets (which shall consist of the rights to the Committee Carve-out to be paid by Turner and all proceeds thereof, income thereon and payments on account thereof) for the benefit of Holders of General Unsecured Claims, in accordance with U.S. Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

Turner shall pay the Committee Carve-out to the Creditors' Trustee on behalf of the Creditors' Trust only from any Distributions or other amounts she receives

for or on account of the Turner Remaining Claim or the Turner Non-Dischargeable Claim, in immediately available funds, as follows:

(a) $1,000,000 on the Effective Date; and

(b) $250,000 for each Financial Event, provided, however, that if Turner receives less than $750,000 as a result of a Bout (other than the first Bout), Turner shall pay to the Creditors' Trustee on behalf of the Creditors' Trust one-third of the Distribution or other amount Turner actually receives as a result of such Bout.

4.2.6    Other Provisions of the Turner Settlement:

(a) Any amounts received by Turner from the Plan Trust, from Tyson through the Turner Fight Payments or otherwise from Tyson on account of the Turner Non-Dischargeable Claim, shall simultaneously reduce, dollar for dollar, the amount of each of the Turner Remaining Claim and the Turner Non-Dischargeable Claim.  Any payment by Tyson on account of the Turner Non-Dischargeable Claim, whether through a Turner Fight Payment or otherwise, shall not impair in any way the Committee Carve-out.

(b) Turner and the Children shall not be entitled to share in any Distributions to Holders of Allowed General Unsecured Claims and shall not share in any other Distributions from the Plan Trust of any kind or on account of any Claim except as specifically set forth herein.

(c) Subject to the: (1) occurrence of the Effective Date under Article IX of this Plan; (2) enforcement of all of Turner's rights under the Turner Settlement, including, inter alia, Turner's receipt of full and indefeasible payment in Cash of the Turner Claims under the terms of the Plan; (3) the effectiveness of the release of Turner and the Children by the Estate Representatives (as defined below) provided in section 4.2.6(d) hereof; and (4) surrender of the letter of credit (if any) by the Committee pursuant to section 4.2.1 hereof, Turner, her heirs, successors and assigns, and Turner on behalf of the Children, and their respective heirs, successors and assigns, knowingly and voluntarily, forever release, acquit and discharge the Debtors (exclusive of those claims against Tyson which the Children may not release as a matter of law), the Estates, the Committee, the members of the Committee, and their respective representatives and counsel solely in such respective capacities, from and of any and all claims, actions, causes of action, damages, losses, actions, suits, obligations, liabilities, and demands of any kind or nature whatsoever, in law or in equity, whether presently known or unknown, that Turner or any of the Children may have had, now have or which they may have, for, upon or by reason of

any matter, cause or thing whatsoever from the beginning of time through the Effective Date, including, <u>inter alia</u>, the claims and causes of action set forth in the adversary proceeding commenced by Turner against Tyson on December 5, 2003, pursuant to Bankruptcy Code sections 523(a)(5) and (15), as the same may be amended.

(d)     Subject to their respective rights under the Turner Settlement set forth in this Plan and the effectiveness of the release by Turner and the Children provided in section 4.2.6(c) hereof, the Debtors, the Estates, the Committee, the members of the Committee (solely in their respective capacities as members), and their respective successors, assigns (and as to the Committee, this includes the Creditors' Representative or Plan Administrator to the extent that the Creditors' Representative or Plan Administrator become the representative of the Estates after dissolution of the Committee), or any chapter 11 or chapter 7 trustee of the Estates, or any other entity that for any reason is designated to act as a fiduciary or representative of either or both of the Estates whether pursuant to this Plan or otherwise, and their respective representatives solely in such capacities (collectively, the "Estate Representatives"), knowingly and voluntarily, forever release, acquit and discharge Turner, her successors and assigns, the Children, their successors and assigns, and the representatives and counsel of Turner and the Children solely in such capacities, from and of any and all claims, causes of action (including, without limitation, claims or causes of action to recover cash or property or to otherwise challenge the Turner Claims under applicable non-bankruptcy law, any avoidance actions arising under the Bankruptcy Code (such as those set forth in sections 542 through 550 thereof)), damages, losses, actions, suits, obligations, liabilities, and demands of any kind or nature whatsoever, in law or in equity, whether presently known or unknown, that any of the Estate Representatives may have had, now have or which they may have, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of time through the Effective Date.

(e)     Until the Committee Carve-Out is paid in full, Turner shall not alter, modify or amend the Turner Settlement or compromise or transfer the Turner Remaining Claim or (to the extent such compromise or transfer affects the Committee Carve-out) the Turner Non-Dischargeable Claim without the prior written consent of the Creditors' Trustee and the Debtors.

(f)     The Turner Settlement shall survive and remain binding notwithstanding any dismissal or conversion of either or both of the Bankruptcy Cases.  The Turner Settlement shall be binding on

any chapter 11 trustee or chapter 7 trustee appointed in the Bankruptcy Cases, or any other entity that for any reason (including, without limitation, in connection with the Plan) is designated to act as a fiduciary or representative for either or both of the Estates. Any default or breach by Turner under the Turner Settlement in respect of payment of the Committee Carve-out shall require Turner to pay to the Creditors' Trust all Collection Costs.

(g)     The Turner Settlement is subject to occurrence of the Effective Date.

**4.3     (Intentionally Omitted)**

**4.4     Class 4 – Other Secured Claims**

4.4.1    Class 4 is not impaired by the Plan. Each Holder of an Allowed Secured Claim in Class 4 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. At the election of the Plan Administrator, the Holder of each Allowed Class 4 Secured Claim shall, on account of such Claim, on the later of (A) the Effective Date and (B) the date such Secured Claim becomes an Allowed Claim, either: (a) be paid in Cash in full; (b) have surrendered, without representation or warranty, the collateral securing its Claim; (c) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) have reinstated the maturity of such Claim as such maturity existed before such default, (iii) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (iv) otherwise not have altered the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim; or (d) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. In the case of option (b) or (c), in the event that any such Claim is not completely satisfied by such Distribution, the deficiency amount will constitute a General Unsecured Claim and will be classified in Class 5, and will receive the same treatment as other Claims in such Class. Any Holder of a Secured Claim may agree to accept less favorable treatment.

**4.5     Class 5 – General Unsecured Claims**

4.5.1    Class 5 is impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against any of the Debtors and the Estates shall be entitled to vote to accept or reject the Plan.

4.5.2    Each Holder of an Allowed General Unsecured Claim against any of Tyson, MTE, the Tyson Estate and the MTE Estate shall receive its Pro Rata Share of the available Cash from the Plan Assets and other property and assets held by the Plan Trust after full payment of or reserve for:

(a) First, the Claims Resolution Reserve and other reasonably necessary reserves established by the Plan Administrator in accordance with the terms hereof;

(b) Second, reasonable market-based fees and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses and post-Effective Date taxes) of the Plan Administrator and, until the Full Creditor Payment Date, the fees (which shall equal $5,000 per month) and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses[2]) of the Creditors' Representative;

(c) Third, Allowed Higher Priority Claims;

(d) Fourth, the Turner Remaining Claim (to be paid by the Plan Trust solely from proceeds of the King Settlement); and

(e) Fifth, Allowed Priority Tax Claims.

Notwithstanding the foregoing, the Holders of Allowed General Unsecured Claims shall not be entitled to receive any Distributions from the Plan Trust from and after the Full Creditor Payment Date; provided, however, that, notwithstanding the occurrence of the Full Creditor Payment Date (as a result of the occurrence of the fourth anniversary (subject to tolling) as described in section 1.54 hereof in the definition of the term "Full Creditor Payment Date"), such Holders shall be entitled to receive Distributions on account of Plan Assets that have not been fully administered by the Full Creditor Payment Date until the date that such Holders have received 25% of the aggregate amount of Allowed General Unsecured Claims (including Committee Carve-out funds received by the Creditors' Trust), and provided further, however, that, notwithstanding the occurrence of the Full Creditor Payment Date, such Holders shall be entitled to receive Distributions on account of Non-Scheduled Assets identified by the Full Creditor Payment Date, even if such Distributions shall cause such Holders to receive more than 25% of the aggregate amount of Allowed General Unsecured Claims (including the Committee Carve-out funds received by the Creditors' Trust), and provided further, however, that, notwithstanding the occurrence of the Full Creditor Payment Date (as a result of the occurrence of the fourth anniversary (subject to tolling) as described in section 1.54 hereof in the definition of the term "Full Creditor Payment Date"), such Holders shall be entitled to receive Creditors' Additional Payments, if any, in accordance with the last proviso contained in section 1.54 until the date that such Holders have received 25% of the aggregate amount of Allowed General Unsecured Claims (including Committee Carve-out funds received by the Creditors' Trust).

4.6    Class 6 – MTE and Tyson Interests

4.6.1    Class 6 is impaired by the Plan. Because no Distributions will be made to Holders of Class 6 Interests nor shall such Holders retain any property on account of such

---

[2] Subject to the restrictions set forth in section 5.2.5(b) hereof.

Interests, the Holders of Class 6 Interests are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

4.6.2    As a result of the substantive consolidation of the Estates, on the Effective Date, all existing MTE Common Stock Interests shall, without any further action, be cancelled, annulled, and extinguished and any certificates representing such Interests shall become null, void, and of no force or effect. The Holders of such Interests shall retain no rights and receive no consideration on account thereof. Tyson shall not receive any Distributions on account of his Class 6 Interest.

## ARTICLE V

## MEANS OF IMPLEMENTATION

5.1    Substantative Consolidation.

5.1.1    Substantive Consolidation. The Plan contemplates the substantive consolidation of the Bankruptcy Cases into a single proceeding. On the Effective Date: (a) all Interdebtor Claims shall be cancelled, eliminated and extinguished; (b) all assets and liabilities of the Debtors' Estates shall be consolidated into a single estate, i.e., the Tyson Estate; (c) all guarantees made by one Debtor of the obligations of the other Debtor before the Effective Date shall be eliminated; (d) any obligation of either Debtor and all guarantees thereof shall be deemed to be a single obligation of the Reorganized Debtor and Plan Trust; (e) any Claims filed or to be filed in connection with any such obligation and such guarantees referenced in subsection (d) hereof shall be deemed to be a single Claim against the Reorganized Debtor and the Plan Trust; (f) each and every Claim filed in the individual Bankruptcy Case of any Debtor shall be deemed to be a single obligation of the Reorganized Debtor or Plan Trust under the Plan; (g) all duplicative claims (identical in both amount and subject matter) filed against both Debtors shall be automatically expunged so that only one Claim survives against the Reorganized Debtor and the Plan Trust (but in no way shall such surviving Claim be deemed Allowed by reason of this section); and (h) MTE shall be dissolved. All Claims based upon guarantees of collection, payment or performance made by one Debtor as to the obligations of the other Debtor or of any other Person shall be discharged, released and of no further force and effect; provided, however, that nothing herein shall affect the obligations arising under this Plan.

5.1.2    Procedure Related to Consolidation. Unless the Bankruptcy Court has ordered substantive consolidation of the Bankruptcy Cases before the Confirmation Hearing, the Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Bankruptcy Cases. If no objection to substantive consolidation is timely filed and served by any Holder of a Claim in a Class impaired by the Plan on or before the date by which objections to Confirmation of the Plan shall be filed or such other date as may be established by the Bankruptcy Court, an order approving substantive consolidation (which may be the Confirmation Order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Bankruptcy Cases solely for

purposes of Confirmation, consummation and implementation and the objections thereto will be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

5.2     Plan Trust

      5.2.1     Establishment of Plan Trust.  On the Effective Date, the Plan Trust shall be established. The Plan Trust shall be governed by and operate in conformity with the Plan Trust Agreement to be filed as part of the Plan Supplement with the Bankruptcy Court by the Plan Proponents not later than fifteen (15) days prior to the Confirmation Hearing.  On the Effective Date, R. Todd Neilson, or an alternate administrator appointed by the Debtors and reasonably acceptable to the Committee, will be appointed as and shall assume the responsibilities of the Plan Administrator as provided for herein.  The Plan Administrator shall act as the fiduciary and trustee for the Plan Trust from and after the Effective Date.  On the Effective Date, the Creditors' Representative shall be appointed and shall assume the responsibilities of Creditors' Representative as provided for herein.  The Creditors' Representative shall not be a fiduciary or trustee of the Plan Trust, but shall be a fiduciary representative of Creditors of the Estates and shall have standing to pursue their rights and remedies in the Bankruptcy Court or other forum on their behalf to protect their interests or to enforce performance of the Plan.  The Plan Administrator shall collect, administer, investigate, dispose of, and distribute Plan Assets described below from and after the Effective Date on behalf of the Plan Trust, and shall provide quarterly written reports on such activities to the Creditors' Representative and Turner.

      5.2.2     Transfer of Plan Assets to Plan Trust.  On the Effective Date, the Plan Trust shall receive all of the Estates' present and future right, title and interest in the following assets, cash, and property, tangible or intangible, and all proceeds, interest, and other earnings generated therefrom (all of which constitute "Plan Assets"), but no other property of any kind, tangible or intangible, all to be transferred free and clear of all liens, encumbrances, interests, exemptions, claims, and rights of setoff or recoupment:

          (a)    the remaining portion of the Connecticut Escrow funds after payment to Turner of $2,000,000 in accordance with the Turner Settlement;

          (b)    any remaining Net Vegas Sale Proceeds in excess of the first $1,500,000 paid to Turner from the Net Vegas Sale Proceeds (or, alternatively, if the Vegas Properties have not been sold by the Effective Date, the Estates' interest in the Vegas Properties, subject to prior valid, perfected and enforceable liens on the Vegas Properties and the terms of the Turner Settlement);

          (c)    the proceeds of the King Settlement (including, without limitation, the Subsequent King Settlement Payments, all Base Interest accrued thereon, and any Default Interest and Collection Costs to which the Plan Trust is entitled for having borne any delay or costs

resulting from a breach or default by King under the King Settlement);

(d) all Litigation Actions (none of which shall be deemed released or otherwise impaired by assumption of any contract, Allowance of any Claim or Confirmation of the Plan), all books, records and documentation related thereto, and all proceeds of any of the foregoing;

(e) all accounts receivable and loans held by the Debtors and the Estates as of the Petition Date and all books, records, and documentation related thereto;

(f) all Cash held by the Debtors constituting property of the Estates, in addition to the amounts set forth in subparagraphs (a), (b), and (c) immediately above, but excluding Post-Petition Earnings;

(g) the Creditors' Additional Payments, which, after the Full Tax Payment Date, shall be solely for the benefit of Holders of Allowed General Unsecured Claims; and

(h) the Non-Scheduled Assets.

5.2.3    Distribution of Plan Assets by Plan Trust; Order of Payments. The Plan Administrator shall distribute the proceeds of the Plan Assets in satisfaction of Claims (and establish appropriate reserves as described below) in the following order of priority:

(a) first, in compensation for discharging their respective duties as described herein, (i) reasonable market-based fees and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses and post-Effective Date taxes) of the Plan Administrator, and (ii) until the Full Creditor Payment Date, the fees (which shall equal $5,000 per month) and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses[3]) of the Creditors' Representative;

(b) second, Allowed Higher Priority Claims;

(c) third, the Turner Remaining Claim (solely from proceeds of the King Settlement);

(d) fourth, Allowed Priority Tax Claims; and

(e) fifth, subject to section 4.5 hereof, Allowed General Unsecured Claims.

To the extent that Plan Assets remain in the Plan Trust after payment of all amounts and Distributions due under the Plan and satisfaction of all obligations under the Plan, (i) any residual assets remaining in the Plan Trust (other than the Disputed Claims Reserve and the Claims Resolution Reserve) will be paid or transferred to Tyson on account of the Contribution Agreement, as set forth in section 5.3.2(d) hereof, and (ii)

---

[3] Subject to the restrictions set forth in section 5.2.5(b) hereof.

further, upon the resolution of all Disputed Claims, the Plan Trust shall be dissolved and any residual assets remaining in the Disputed Claims Reserve and the Claims Resolution Reserve will be paid or transferred to Tyson on account of the Contribution Agreement, as set forth in section 5.3.2(d) hereof.

5.2.4   <u>Claims Resolution Reserve.</u>  Before making any Distributions or payments from Plan Assets, on the Effective Date the Plan Administrator shall establish the Claims Resolution Reserve, which shall be used to fund the investigation, litigation, and disposition of Claims (including, without limitation, Priority Tax Claims, Priority Non-Tax Claims, Administrative Tax Claims, General Unsecured Claims and Administrative Expense Claims) against any of the Debtors and the Estates (but not in respect of the dischargeability of any debts or Claims).  The Plan Administrator shall be responsible for resolving any Claims against the Estates that are not resolved by the Effective Date and for establishing as may be reasonably necessary reserves (in addition to the Claims Resolution Reserve) in respect of Disputed Claims.

5.2.5   <u>Miscellaneous Plan Trust Provisions:</u>  On and after the Effective Date:

(a)     The Plan Administrator shall also have the right to object to Claims after the Effective Date and have the Bankruptcy Court estimate or determine the amount of any Allowed Claim.

(b)     The Plan Administrator shall have the right to retain and employ legal counsel and accountants to assist the Plan Administrator in the settlement or prosecution of the Litigation Actions and the administration of the Plan Trust.  The Plan Administrator will consult with Tyson regarding the selection of these professionals. In the event that the Creditors' Representative retains and employs legal counsel and accountants to pursue the rights and remedies of Creditors in the Bankruptcy Court or another forum on their behalf to enforce performance of the Plan, upon presentation to the Plan Administrator of invoice(s) for the services rendered and related expenses incurred by such professional(s) from and after such default, the Plan Administrator shall deposit into an escrow account of the Creditors' Representative's legal counsel an amount equal to such invoice(s), and upon the determination of a court of competent jurisdiction that the Plan Administrator has breached his obligations hereunder, said amount shall be released from such escrow account to the Creditors' Representative.  If a court of competent jurisdiction determines that no such breach has occurred, the amount deposited into the escrow account shall be returned to the Plan Administrator.  If no determination is made by a court of competent jurisdiction within one (1) year of the date of the deposit of such funds, they shall be returned to the Plan Administrator.  Subject to the foregoing, to the extent the Creditors' Representative employs counsel to assist the Creditors' Representative in carrying out its day-to-day duties as Creditors'

Representative, fees and expenses incurred in connection therewith by such counsel shall not be paid by or from assets of the Plan Trust.

(c)     The Plan Administrator shall pay the reasonable fees and expenses of the Creditors' Representative, the Plan Trust and their respective professionals in accordance with the terms of the Plan, and no such professional shall be required to apply for Bankruptcy Court approval of its retention. The Bankruptcy Court shall have jurisdiction only over disputes, if any, regarding the payment of such fees and expenses.

5.2.6   <u>Additional Rights, Duties, and Obligations</u>: This section 5.2.6 sets forth certain additional terms, rights, duties, and obligations of the Plan Trust and its trustee, the Plan Administrator. In the event of any conflict between the terms of this section 5.2.6 and the Plan Trust Agreement, the terms of the Plan shall govern.

(a)     *Purpose of the Plan Trust.* The Plan Trust shall be established for the sole purpose of liquidating its assets, in accordance with U.S. Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business;

(b)     *Plan Assets.* The Plan Trust shall consist of the cash, assets, and property transferred to the Plan Trust pursuant to section 5.2.2 hereof (and all proceeds thereof and income thereon), which in the aggregate shall constitute the "Plan Assets;"

(c)     *Transferability of Plan Trust Interests.* The beneficial interests in the Plan Trust are not transferable;

(d)     *Cash.* The Plan Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, *provided, however,* that such investments are investments permitted to be made by a liquidating trust within the meaning of U.S. Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities;

(e)     *Distributions.* The Plan Administrator shall distribute at least annually and in accordance with the Plan Trust Agreement, beginning on the Effective Date or as soon thereafter as is practicable, all Cash on hand (including any cash received from the Debtors on the Effective Date and treating as Cash for this purpose any investments made in accordance with section 5.2.6(d) above), except such amounts (i) as would be distributable to a Holder of a Disputed Claim if such Disputed Claim had been Allowed on the Effective Date (but only until such Claim is resolved), (ii) as are

reasonably necessary to meet contingent liabilities and to maintain the value of the Plan Assets during liquidation, (iii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Plan Trust or in respect of the Plan Assets), and (iv) to satisfy other liabilities incurred by the Plan Trust in accordance with this Plan or the Plan Trust Agreement; and

(f) *Dissolution.* The Plan Administrator and the Plan Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Disputed Claims have been resolved, (ii) all Plan Assets have been liquidated and (iii) all Distributions required to be made by the Plan Administrator under the Plan have been made, but in no event shall the Plan Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Plan Assets.

5.2.7 <u>Federal Income Tax Treatment of the Plan Trust</u>: This section 5.2.7 sets forth the federal income tax treatment that the Plan Trust, the parties to this Plan, the Plan Administrator, and the beneficiaries of the Plan Trust will have in connection with the formation of the Plan Trust and the transactions by or with respect to the Plan Trust.

(a) *Plan Assets Treated as Owned by Holders of Allowed Claims.* For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Plan Administrator, and the Holders of Allowed Claims) shall treat the transfer of the Plan Assets to the Plan Trust as (i) a transfer of the Plan Assets directly to the Holders of Allowed Claims, followed by (ii) the transfer by such Holders to the Plan Trust of the Plan Assets in exchange for beneficial interests in the Plan Trust. Accordingly, the Holders of such Allowed Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Plan Assets;

(b) *Tax Reporting*.

(i) The Plan Administrator shall file returns for the Plan Trust as a grantor trust pursuant to U.S. Treasury Regulation section 1.671-4(a) and in accordance with this section 5.2.7(b). The Plan Administrator shall also annually send to each holder of a beneficial interest a separate statement

28

setting forth the holder's share of items of income, gain, loss, deduction, or credit, and will instruct all such holders to report such items on their federal income tax returns. The Plan Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to section 5.2.7(b)(iii) hereof, relating to Disputed Claims) to the Holders of Allowed Claims in accordance with their relative beneficial interests in the Plan Trust.

(ii)    As soon as possible after the Effective Date, but in no event later than ninety (90) days thereafter, the Plan Administrator shall make a good faith valuation of the Plan Assets, and such valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Plan Administrator, and the Holders of Allowed Claims) for all federal income tax purposes. The Plan Administrator shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any governmental unit.

(iii)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator shall (a) treat any assets allocable to, or retained on account of, Disputed Claims as held by one or more discrete trusts for federal income tax purposes (the "Plan Trust Disputed Claims Reserve"), consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Internal Revenue Code (sections 641 et. seq.), (b) treat as taxable income or loss of the Plan Trust Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the Holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (c) treat as a Distribution from the trust for Disputed Claims any increased amounts distributed by the Plan Trust as a result of any Disputed Claims resolved earlier in the taxable year, to the extent such Distributions relate to taxable income or loss of the trust for Disputed Claims determined in accordance with the provisions hereof, and (d) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All

Holders of Claims shall report, for tax purposes, consistent with the foregoing.

(iv) The Plan Administrator shall be responsible for payments, out of the Plan Assets, of any taxes imposed on the trust or its assets, including the Plan Trust Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Plan Trust Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Plan Administrator as a result of the resolutions of such Disputed Claims.

(v) The Plan Administrator may request an expedited determination of taxes of the Plan Trust, including the Plan Trust Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust.

5.3 Contribution Agreement As of the Effective Date, Tyson individually and the Plan Administrator, on behalf of the Plan Trust, shall enter into the Contribution Agreement and other ancillary and implementing documentation necessary or appropriate to effectuate its terms (including, without limitation, execution and delivery to the Plan Administrator of letters of direction (with the third party addressee(s) thereof left blank) signed by Tyson and a power(s) of attorney signed by Tyson in favor of the Plan Administrator (pursuant to which, among other things, Tyson will appoint the Plan Administrator attorney-in-fact with the right, upon Tyson's default under the Contribution Agreement or the default of third parties in payment of amounts payable to the Plan Administrator on behalf of the Plan Trust pursuant to a letter of direction delivered to such party, to collect such payments and amounts and otherwise enforce, settle, compromise and resolve Tyson's rights against third parties, either in the Plan Administrator's name or in the name of Tyson, which Contribution Agreement and ancillary and implementing documents shall be incorporated by reference into this Plan. The Contribution Agreement and the forms of such ancillary and implementing documentation shall be subject to the prior approval of the Committee and shall have the following additional terms and conditions, as well as such other customary terms and conditions as are necessary or appropriate:

5.3.1 Tyson shall retain at his expense a financial advisor (who shall not be the Plan Administrator), whose responsibilities shall include (A) receiving and administering Future Tyson Fight Income, (B) paying Creditors' Additional Payments to the Plan Trust and the Turner Fight Payments to Turner in accordance with the terms hereof, (C) monitoring Tyson's compliance with the Contribution Agreement, and (D) delivering written reports to the Plan

Administrator (who shall, in turn, furnish such reports to the Creditors' Representative and Turner) on a quarterly basis, and granting to the Plan Administrator reasonable access to Tyson's books and records regarding Future Tyson Fight Income, Bout Expenses, the payment of post-Effective Date taxes, Net Future Tyson Fight Income, the Tyson Fight Payments, the Turner Fight Payments and the Creditors' Additional Payments and all evidence of and calculations related thereto.

5.3.2    In consideration of Tyson's receipt of a discharge and the transfer to Tyson of the assets described in section 5.3.2(d) below on account of the Contribution Agreement,

> (a)    subject to section 5.3.2(c) hereof, until the Full Tax Payment Date, for each Bout that is not a Lower Revenue Bout, Tyson shall pay or cause to be paid from Net Future Tyson Fight Income (after payment of the Tyson Fight Payment), (1) first, the Turner Fight Payment to Turner, and (2) second, the Creditors' Additional Payment to the Plan Trust, and

> (b)    from and after the Full Tax Payment Date and (subject to the last proviso contained in section 1.54 hereof in the definition of the term "Full Creditor Payment Date") until the Full Creditor Payment Date, for each Bout Tyson shall pay to the Plan Trust from Future Tyson Fight Income the Creditors' Additional Payment.

> (c)    In further consideration of Tyson's receipt of a discharge and the transfer to Tyson of the assets described in section 5.3.2(d) below on account of the Contribution Agreement, until the Full Tax Payment Date, for each Bout that constitutes a Lower Revenue Bout, Tyson shall pay in full (i) Bout Expenses (excluding Restructuring Expenses) relating to such Lower Revenue Bout, (ii) reasonably estimated income taxes and other taxes arising from or incurred in connection with such Lower Revenue Bout, and (iii) the Tyson Fight Payment relating to such Lower Revenue Bout. Then, Tyson shall pay the remaining amount of the Future Tyson Fight Income generated by such Lower Revenue Bout (net of the above payments described in subsections (i), (ii), and (iii) immediately above), on a pro rata basis, (x) to Turner on account of the Turner Fight Payment, (y) to the entities owed payment of Restructuring Expenses (up to, in the aggregate, the Restructuring Expenses Cap), and (z) to the Plan Trust on account of the Creditors' Additional Payment in an amount equal to the Tyson Fight Payment less the Turner Fight Payment (that would be paid if the Bout were not a Lower Revenue Bout), if any).

> (d)    On the Effective Date, on account of the Contribution Agreement, Tyson shall receive the following assets:

> > (i)    all assets that are exempt pursuant to section 522 of the Bankruptcy Code;

<ol type="i" start="2">
<li>all Post-Petition Earnings and other assets that have been acquired by Tyson since the Petition Date whether by purchase, gift or otherwise; and</li>
<li>all personal property, intellectual property and other assets of the Estates other than Plan Assets.</li>
</ol>

To the extent that Plan Assets remain in the Plan Trust after payment of all amounts and Distributions due under the Plan and satisfaction of all obligations under the Plan, (A) any residual assets remaining in the Plan Trust (other than the Disputed Claims Reserve and Claims Resolution Reserve) will be paid or transferred to Tyson, and (B) further, upon the resolution of all Disputed Claims, the Plan Trust shall be dissolved and any residual assets remaining in the Disputed Claims Reserve and the Claims Resolution Reserve will be paid or transferred to Tyson.

(e) Any default or breach by Tyson of his obligations under the Contribution Agreement shall require Tyson to pay to the Plan Trust all Collection Costs associated therewith.

(f) Prior to the occurrence of the Effective Date, Tyson shall deposit with counsel to the Debtors, or other escrow agent reasonably acceptable to Tyson and the Committee, who shall then hold in escrow, all Future Tyson Fight Income (net of Bout Expenses (excluding Restructuring Expenses) relating to the Bout(s) that generated such Future Tyson Fight Income, reasonably estimated income and other taxes arising from or incurred in connection with such Bout(s), and Tyson Fight Payments due on account of such Bout(s)), and, upon the occurrence of the Effective Date, counsel to the Debtors shall distribute such escrowed amounts to Turner, the Plan Trust and the entities owed payment of Restructuring Expenses in accordance with the terms hereof.

5.4    **The King Settlement.**  This Plan incorporates the terms of the King Settlement. The Committee consents to the King Settlement in connection with this Plan and expressly reserves its right to contest the King Settlement other than in connection with Confirmation of this Plan.  The following description is a summary of the King Settlement, which summary is qualified in its entirety by reference to the documents evidencing the King Settlement:

5.4.1   King shall pay to the Plan Trust $14,000,000, payable as follows:

(a) on the Effective Date, $8,000,000;

(b) on the first Business Day of January, 2005, $3,000,000, plus Base Interest on such amount measured from the date of entry of a Final Order approving the King Settlement; and

(c) on the first Business Day of January, 2006, $3,000,000, plus Base Interest on such amount measured from the date of entry of a Final Order approving the King Settlement.

5.4.2    Any default or breach by King under the King Settlement shall require King to pay, in addition to Base Interest, Default Interest on all outstanding amounts due and payable pursuant to the King Settlement and all Collection Costs.

5.4.3    [RESERVED].

5.4.4    The King Settlement (as embodied in the Plan) is subject to entry of the Confirmation Order and the occurrence of the Effective Date.  Following the entry of an order approving the King Settlement, the Debtors and King shall file on or after the Effective Date with the District Court a stipulation of dismissal dismissing any and all claims against King asserted by Tyson in the King Litigation and any and all counterclaims asserted by King against Tyson in the King Litigation, with prejudice (which dismissal shall not be effective until after the Effective Date).

5.4.5    On the Effective Date: (i) mutual general releases shall be exchanged between King, on the one hand, and the Debtors and Tyson, the Estates, and the Committee (and its members solely in such capacities) on the other hand (and their respective representatives solely in such capacities); and (ii) King shall withdraw with prejudice (or cause to be withdrawn with prejudice) the proofs of claim filed on behalf of Don King Productions, Inc. and KingVision Pay Per View Ltd. against the Debtors.

5.4.6    The King Settlement shall survive the Effective Date and remain binding notwithstanding any dismissal or conversion of either or both of the Bankruptcy Cases.  The King Settlement shall be binding on any chapter 11 trustee or chapter 7 trustee appointed in the Bankruptcy Cases, or any other entity that for any reason (including, without limitation, in connection with the Plan) is designated to act as a fiduciary or representative for either or both of the Estates.

5.4.7    In addition to a definitive settlement agreement, and other related documentation, the foregoing payment obligations arising under the King Settlement shall be evidenced by a promissory note from Don King Productions, Inc., and personally guaranteed by Don King (but only in the event the Committee affirmatively and continuously supports the King Settlement until such time as a Final Order is entered approving the King Settlement), made payable to the order of the Plan Trust (and not subject to setoff rights or defenses of any kind), and negotiable and transferable only after a default under the promissory note.

# ARTICLE VI

## PROVISIONS REGARDING VOTING
## AND DISTRIBUTIONS UNDER THE PLAN, AND
## TREATMENT OF DISPUTED, CONTINGENT, AND UNLIQUIDATED
## ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS, AND INTERESTS

6.1     Voting of Claims and Interests.

      6.1.1     In General.  Each Holder of Allowed Claims in an impaired Class shall be entitled to vote separately to accept or reject the Plan as provided in the order entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (a copy of which is annexed to the Disclosure Statement as Exhibit B).

      6.1.2     Controversy Concerning Impairment.  In the event of a controversy as to whether any Claim or Class of Claims or Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

6.2     Distributions to Holders of Claims

      6.2.1     In General.  All Distributions under the Plan from the Plan Trust shall be made by the Plan Administrator.

      6.2.2     Distributions on Account of Allowed Claims Only.  Notwithstanding anything herein to the contrary, no Distribution shall be made on a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

      6.2.3     No Recourse.  No Creditor or Interest Holder shall have recourse to the Reorganized Debtor or the Plan Trust (or any property thereof), other than with regard to the enforcement of rights or Distributions under the Plan.

      6.2.4     Method of Cash Distributions.  Any Cash payment to be made pursuant to the Plan will be in U.S. dollars and may be made by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law and payment shall be deemed made when the draft, check, or wire transfer, as the case may be, is transmitted.

      6.2.5     Minimum Distributions.  Payment of Cash in an amount of less than twenty-five dollars ($25.00) need not be made by the Plan Administrator to any Holder of a Claim.

      6.2.6     Distributions on Non-Business Days.  Any payment or Distribution due on a day other than a Business Day may be made, without interest, on the next Business Day.

      6.2.7     No Distribution in Excess of Allowed Amount of Claim.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of

such Claim any Distribution (of a value set forth herein or in the Disclosure Statement) in excess of the Allowed amount of such Claim.

6.3    Objections to Claims.

6.3.1   Objections to Claims. Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed and served on the applicable Holder of such Claim not later than sixty (60) days after the later to occur of: (a) the Effective Date and (b) the filing of the relevant Claim. After the Effective Date, only the Plan Administrator or Tyson (at his own sole expense and only if the Plan Administrator has failed to file such objection) shall have the authority to file, settle, compromise, withdraw, or litigate to judgment their respective objections to Claims. The Plan Administrator may settle or compromise any Disputed Claim without Bankruptcy Court approval.

6.3.2   Amendments to Claims. After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the Holder of such Claim solely to decrease, but not to increase, the amount or priority. Unless otherwise provided herein, any new or amended Claim filed after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Debtors or the Plan Administrator unless the Claim Holder has obtained prior Bankruptcy Court authorization for the filing.

6.4    Unclaimed Property. The Plan Administrator shall hold all Unclaimed Property (and all interest, dividends, and other distributions thereon), for the benefit of the Holders of Claims entitled thereto under the terms of this Plan for two (2) years, and shall not invest any Unclaimed Property so that no income shall be earned thereon. Thereafter, all Unclaimed Property held pursuant to this section shall be deemed to have been forfeited to the Plan Trust and any Holder of an Allowed Claim who would have been entitled to Unclaimed Property shall cease to be entitled thereto, and all Unclaimed Property shall be retained by the Plan Trust. Any Cash or other Distributions pursuant to the Plan that are unclaimed for a period of two (2) years after Distribution thereof shall be forfeited and revested in the Plan Trust.

6.5    Disputed Claims. If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any Distribution, the Plan Administrator may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court order or by written agreement among the interested parties to such dispute, provided, that the Plan Administrator shall not invest any Distribution while it is in escrow so that no income will be earned thereon.

6.6    Withholding Taxes. Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

6.7    Exemption from Certain Transfer Taxes. Pursuant to section 1146(c) of the Bankruptcy Code: (i) the issuance, transfer, or exchange of any securities, instruments, or documents; (ii) the creation of any other lien, mortgage, deed of trust, or other security interest;

or (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan or the sale of any assets of the Debtors, any deeds, bills of sale, or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge, or expense to the fullest extent provided for under section 1146(c) of the Bankruptcy Code.

6.8     Setoffs.  Except as provided in the Plan, the Confirmation Order, or in agreements approved by Final Order of the Bankruptcy Court, the Plan Administrator may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Expense Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights, and causes of action of any nature that the Debtors or the Estates may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, nor any other action or omission of the Plan Trust or Plan Administrator, nor any provision of this Plan shall constitute a waiver or release by the Plan Trust or the Estates of any such claims, rights, and causes of action that the Debtors, the Estates, or the Plan Trust may possess against such Holder. To the extent the Plan Administrator fails to set off against a Creditor and seeks to collect a claim from such Creditor after a Distribution to such Creditor pursuant to the Plan, the Plan Administrator, if successful in asserting such claim, shall be entitled to full recovery on the claim of such party or parties against such Creditor.

6.9     Not Severable.  The provisions of the Plan, including, without limitation, its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.

6.10    Insurance Preservation and Proceeds.  Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that may cover claims against the Debtors or any other Person.  Holders of Claims that are eligible to be satisfied, in whole or in part, through any such policy shall be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery or assist the Plan Administrator in seeking recovery under such policies with regard to such Claims.

## ARTICLE VII

## EFFECT OF CONFIRMATION OF PLAN

7.1     Discharge

7.1.1     Scope.  Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1141(d)(1) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge, effective as of the Effective Date, of all debts of, Claims against, liens on, and Interests in the Debtors, their assets, or properties, which debts, Claims, liens, and Interests arose at any time before the entry of the Confirmation Order. The discharge of the Debtors shall be effective as to each Claim, regardless of whether a proof of claim therefor was filed, whether the Claim is an Allowed Claim or whether the Holder thereof votes to accept the Plan. On the Effective Date, as to every discharged

Claim and Interest, any Holder of such Claim or Interest shall be precluded from asserting against the Debtors, the Reorganized Debtor, the Creditors' Trust, the Plan Trust or Tyson or the assets or properties of any of them, any other or further Claim or Interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

      7.1.2   Injunction. In accordance with section 524 of the Bankruptcy Code, the discharge provided by this section and section 1141 of the Bankruptcy Code, among other things, acts as an injunction against the commencement or continuation of any action, employment of process, or act to collect, offset, or recover the Claims, liens, and Interests treated and provided for under this Plan. Inasmuch as Tyson's contributions pursuant to the Contribution Agreement are necessary to the performance the Plan, and any action, employment of process, or act to collect, offset, or recover the Claims, liens, and Interests treated and provided for under this Plan would otherwise frustrate Tyson's rehabilitation, as long as either the Plan Administrator or Tyson, as the case may be, is making payments on account of any non-dischargeable Allowed Claim that is to be paid in full under the Plan, including the Allowed Turner Non-Dischargeable Claim and Allowed Priority Tax Claims, in accordance with the provisions of this Plan and Tyson is not in violation of the Contribution Agreement, then the Holder of such non-dischargeable Claim shall be enjoined from collecting such Claim from Tyson or his non-estate property and Post-Petition Earnings or in any manner other than from the Plan Assets in accordance with the terms of the Plan.

    7.2   Release of Claims.

      7.2.1   Satisfaction of Claims and Interests. The treatment to be provided for respective Claims or Interests (other than non-dischargeable debts or Claims) pursuant to this Plan shall be in full satisfaction, settlement, release, and discharge of such respective Claims or Interests.

      7.2.2   Exculpation. Except as provided herein or in the Confirmation Order, the Debtors, the Reorganized Debtor, the Committee (and its members in such capacity) and any Professionals retained by the foregoing Persons (in their respective capacities as such), or successor in interest to any of the foregoing Persons, shall have no liability to any Person for any act or omission following the Petition Date through the Effective Date in connection with the Debtors or the Bankruptcy Cases or arising out of its administration of the Plan or the property to be distributed under the Plan, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, or consummating the Plan and Disclosure Statement or any contract, instrument, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, or (ii) any Distributions made pursuant to the Plan, except for willful misconduct or gross negligence and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

    7.3   Preservation of Litigation Actions and Objections to Claims. All Litigation Actions, including, without limitation, causes of action arising under chapter 5 of the Bankruptcy

Code, other Avoidance Actions, rights to object to Claims, and any Advisor Actions shall be preserved and shall be conveyed to and administered by the Plan Trust, and shall not be waived, released or discharged by Confirmation of the Plan, entry of the Confirmation Order, Allowance of any Claim or the occurrence of the Effective Date. Annexed to the Disclosure Statement as Exhibit E is a non-exclusive List of Certain Preserved Litigation Actions, which are expressly identified and preserved for prosecution on and after the Effective Date. To the extent necessary, the Plan Administrator shall be deemed the representative of the Estates in accordance with section 1123(b) of the Bankruptcy Code.

## ARTICLE VIII

## EXECUTORY CONTRACTS

8.1    Executory Contracts and Unexpired Leases

8.1.1    Except as otherwise provided herein or by the Confirmation Order, as of the Effective Date, all pre-petition executory contracts and unexpired leases of the Debtors or the Estates shall be rejected by the Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except:  (i) any executory contracts and unexpired leases that are the subject of separate motions to reject filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order, (ii) contracts and leases listed in the Schedule 8.1 - Schedule of Executory Contracts to be filed by the Debtors with the Bankruptcy Court at least fifteen (15) days prior to the Confirmation Hearing (which shall provide for the assumption, as of the Effective Date, of such contracts and leases), or (iii) all executory contracts or unexpired leases rejected under this Plan or by order of the Bankruptcy Court entered before the Confirmation Date. Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered prior to the Confirmation Date.

8.1.2    Listing a contract or lease in Schedule 8.1 - Schedule of Executory Contracts shall not constitute an admission by the Debtors that such contract or lease, including related agreements, is an executory contract or unexpired lease or that the Debtors have any liability thereunder.

8.1.3    Subject to section 8.1.1 above and section 8.3 below, the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of executory contracts and unexpired leases the assumption or rejection of which is provided for in section 8.1.1 hereof pursuant to section 365 and 1123 of the Bankruptcy Code and such assumption or rejection shall be deemed effective as of the Effective Date.

8.2    Bar Date for Rejection Damages.  If the rejection of any executory contract or unexpired lease under the Plan (including executory contracts and unexpired leases included in the Schedule 8.1 - Schedule of Executory Contracts) gives rise to a Claim by the non-Debtor

party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified as a General Unsecured Claim in Class 5; provided, however, that the General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Plan Trust, their successors or properties, unless a proof of such Claim is filed with the Bankruptcy Court and served on the Plan Administrator within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executory contract or unexpired lease, which may include, if applicable, the Confirmation Order.

8.3     Cure.  At the election of the Debtors or the Plan Administrator, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code (a) by payment of the default amount in Cash by Tyson (and not from any assets of the Estates or the Plan Trust) on or as soon as reasonably practicable after the later to occur of (i) thirty (30) days after the determination of the cure amount and (ii) the Effective Date or such other date as may be set by the Bankruptcy Court, or (b) on such other terms as agreed to by the Debtors, the Plan Administrator and the non-Debtor party to such executory contract or unexpired lease, provided that such terms do not require payment by the Plan Trust.  In the event of a dispute regarding: (i) the amount of any cure payments, (ii) the ability of the Reorganized Debtor to provide adequate assurance of future performance under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made only following the entry of a Final Order resolving the dispute and approving assumption. The Debtors shall have the right at any time to move to reject any executory contract or unexpired lease based on the existence of such a dispute.

## ARTICLE IX

## EFFECTIVENESS OF THE PLAN

9.1     Conditions Precedent.  The effectiveness of the Plan (and the occurrence of the Effective Date) is subject to the following conditions:

9.1.1    The Bankruptcy Court shall have entered the Confirmation Order.

9.1.2    The Confirmation Order shall have become a Final Order; provided, that if the Confirmation Order has been entered and has not been stayed, this condition may be waived by the Plan Proponents jointly in their collective sole and absolute discretion, in which case the Plan Proponents shall consummate the Plan notwithstanding the pendency of any appeal.

9.1.3    The Turner Settlement and the King Settlement shall have been approved by the Bankruptcy Court simultaneously with Confirmation of this Plan, and all documents evidencing such settlements shall have been executed and delivered.

9.1.4    A Bout shall have occurred.

9.1.5    The Claim or Claims of Showtime against the Estates shall have been resolved in a manner acceptable to the Plan Proponents.

9.2    Effective Date Transactions.  On the Effective Date, the following transactions shall occur simultaneously.  The Effective Date shall not be deemed to have occurred and the Plan shall not be effective until each of the following transactions or events has occurred.

        9.2.1    Tyson shall execute and deliver the Contribution Agreement.

        9.2.2    King shall pay to the Plan Trust $8,000,000 pursuant to the King Settlement.

        9.2.3    Turner shall receive $2,312,000 on account of the Turner Remaining Claim.

        9.2.4    Turner shall pay $1,000,000 to the Creditors' Trustee on behalf of the Creditors' Trust on account of the Committee Carve-out.

        9.2.5    The Plan Trust shall be established by execution and delivery of the Plan Trust Agreement, and the Plan Assets shall be transferred to the Plan Trust.

        9.2.6    The Plan Administrator shall be appointed and shall assume its responsibilities as provided for hereunder.

        9.2.7    The Creditors' Trust shall be established by execution and delivery of the Creditors' Trust Agreement that shall evidence the Creditors' Trust.

        9.2.8    The Creditors' Trustee shall be appointed and shall assume its responsibilities as provided for hereunder.

        9.2.9    The Creditors' Representative shall be appointed and shall assume its responsibilities as provided for hereunder.

        9.2.10  The Connecticut Escrow shall be broken and the proceeds thereof distributed as set forth in section 4.2.1 hereof.

9.3    Failure of Conditions/Non-Occurrence of Effective Date.  In the event that any of the conditions specified in section 9.1 of the Plan or any event or transaction described in section 9.2 of the Plan either has not occurred or has not been satisfied or waived (in the manner provided in section 9.4 below) within sixty (60) days after entry of the Confirmation Order, then the Plan Proponents may, upon notification to the Bankruptcy Court, terminate the Plan.  In addition, if the Effective Date does not occur by November 30, 2004, unless extended by agreement of the Plan Proponents, the Plan shall automatically be terminated.  Upon termination of the Plan (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) all the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

9.4     Waiver of Conditions.  The conditions to effectiveness of the Plan set forth in sections 9.1 and 9.2 of the Plan may be waived only upon the express written consent of the Debtors and the Committee.

9.5     Revocation of the Plan.  Either of the Plan Proponents may revoke or withdraw the Plan at any time prior to the Confirmation Date.  If either of the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, then it will be deemed null and void.

## ARTICLE X

## ADMINISTRATIVE PROVISIONS

10.1     Retention of Jurisdiction.  Notwithstanding Confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, without limitation, for the following purposes:

10.1.1     To determine the allowability, classification, or priority of Claims upon objection by the Plan Administrator or any other party in interest entitled hereunder to file an objection (including the resolution of disputes regarding any Disputed Claims and claims for disputed Distributions), and the validity, extent, priority, and nonavoidability of consensual and nonconsensual liens and other encumbrances;

10.1.2     To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Bankruptcy Cases on or before the Effective Date with respect to any Person;

10.1.3     To protect the property of the Estates, the Plan Trust and the Creditors' Trust from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning liens, security interests, or encumbrances on any property of the Estates, the Plan Trust and the Creditors' Trust;

10.1.4     To resolve any dispute arising under or related to the implementation, execution, consummation, or interpretation of the Plan and related agreements and other documents, and the making of Distributions hereunder;

10.1.5     To determine any and all motions related to the rejection, assumption, or assignment of executory contracts or unexpired leases, to determine any motion to reject an executory contract or unexpired lease pursuant to the Plan or to resolve any disputes relating to the appropriate cure amount or other issues related to the assumption of executory contracts or unexpired leases in the Bankruptcy Cases;

10.1.6     To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Bankruptcy Cases, including any remands;

10.1.7     To enter a Final Order closing the Bankruptcy Cases;

10.1.8     To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

10.1.9     To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person, to the full extent authorized by the Bankruptcy Code;

10.1.10    To enable the Plan Administrator to prosecute any and all proceedings to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state, or local laws except as may be waived pursuant to the Plan;

10.1.11    To determine any tax liability pursuant to section 505 of the Bankruptcy Code;

10.1.12    To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Bankruptcy Cases;

10.1.13    To hear and resolve any causes of action involving the Debtors, the Reorganized Debtor, or the Estates that arose prior to the Effective Date or in connection with the implementation of the Plan, including actions to avoid or recover preferential transfers or fraudulent conveyances and Litigation Actions;

10.1.14    To resolve any disputes concerning any release of a non-Debtor hereunder or the injunction against acts, employment of process, or actions against such non-Debtor arising hereunder;

10.1.15    To approve any Distributions, or objections thereto, under the Plan; and

10.1.16    To approve any Claims settlement entered into or setoff exercised by the Plan Administrator.

10.2    Failure of the Bankruptcy Court to Exercise Jurisdiction.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Bankruptcy Cases, then section 10.1 hereof shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

10.3    Amendment.  This Plan and the Plan Supplement may not be altered, amended, or modified except with the prior written consent of each of the Plan Proponents.

10.4　Governing Law.  Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under this Plan shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.

10.5　Effectuating Documents and Further Transactions.

10.5.1　Documents.  The Debtors, Tyson, the Committee, the Plan Administrator, the Creditors' Representative, the Creditors' Trustee and the Reorganized Debtor shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan.

10.5.2　Plan Supplement.  At least fifteen (15) days prior to the Confirmation Hearing, the Plan Proponents shall file with the Bankruptcy Court the Plan Supplement containing the following (all of which shall be subject to the prior approval of the Plan Proponents): Contribution Agreement; Plan Trust Agreement; Creditors' Trust Agreement; documents evidencing the King Settlement; Schedule 8.1 - Schedule of Executory Contracts; Exhibit E to the Disclosure Statement – List of Certain Preserved Litigation Actions; and disclosure of identities of Creditors' Trustee, Plan Administrator and Creditors' Representative.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims may obtain a copy of the Plan Supplement upon written request in accordance with applicable provisions of the Disclosure Statement.

10.6　Notices.  All notices or requests in connection with the Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

(a)　if to the Debtors or the Reorganized Debtor:

**PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.**

Counsel for the Debtors and Debtors in Possession
780 Third Avenue, 36th Floor
New York, New York 10017
Attn:  Robert J. Feinstein, Esq.

(b)　if to the Committee:

**BROWN RUDNICK BERLACK ISRAELS LLP**
One Financial Center
Boston, Massachusetts 02111
Attn:  Anthony L. Gray, Esq.

(c)　if to Turner:

**MILES & STOCKBRIDGE**
10 Light Street
Baltimore, MD 21202
Attn: Joseph J. Bellinger, Esq.

(d)    if to King:

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Attn: Steven J. Reisman, Esq.

10.7    No Admissions.  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Plan Proponents with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of the classification of a Claim.

10.8    Termination of Committee.  On the date by which both (a) the Effective Date has occurred, and (b) the Confirmation Order has become a Final Order, the Committee shall cease to exist, and its members, employees and agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) shall be deemed released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from, or in connection with their service on the Committee.  Following the date that the Committee ceases to exist as provided in this section 10.8, the Committee will continue to exist (and the Committee will continue to employ its counsel) after such date solely with respect to (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any Professional and (ii) return of the letter of credit (if issued) to Turner.  Following the date that the Committee ceases to exist as provided in this section 10.8, the Creditors' Representative shall be deemed the successor of the Committee as Plan Proponent in respect of any proposed amendment, modification or withdrawal of the Plan or any dispute relating to the implementation, execution, consummation or interpretation of the Plan and making Distributions hereunder.

Dated:  June 24, 2004

Respectfully submitted,



By:  /s/ Michael G. Tyson
Name:  Michael G. Tyson

MIKE TYSON ENTERPRISES, INC.

By:  /s/ Michael G. Tyson
Name:  Michael G. Tyson

Title: President, Secretary and Chief Financial Officer

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:  Darius Decorative and Antique Rugs, Chairperson

By:  /s/ Kerry Gotlib
Name:  Kerry Gotlib, duly authorized

# SCHEDULE 1.16

## BOUT EXPENSES CAP

| **If Future Tyson Fight Income for a Bout** | **The Bout Expenses Cap for such Bout shall be** |
|---|---|
| Is less than or equal to $10,000,000 | $1,400,000 |
| Is more than $10,000,000, but less than or equal to $15,000,000 | $1,700,000 |
| Is more than $15,000,000 | $2,000,000 |

# SCHEDULE 8.1

## SCHEDULE OF EXECUTORY CONTRACTS

### [To Be Provided]