**THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| MICHAEL G. TYSON, *et al.*, | : Case No. 03-41900 (ALG) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE JOINT PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
780 Third Avenue, 36th Floor
New York, New York 10017-2024
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

Attorneys for the Debtors and Debtors In Possession

BROWN RUDNICK BERLACK ISRAELS LLP

One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (212) 856-8201

Attorneys for Official Committee of Unsecured Creditors

Dated: New York, New York
June 24, 2004

**Table of Contents**

**Page No.**

I. INTRODUCTION ....................................................................................................1

II. GENERAL INFORMATION ...............................................................................2

    A.     General Information.............................................................................2
    B.     Right to Vote on the Plan....................................................................3
    C.     Voting Instructions .............................................................................4
    D.     Confirmation Hearing .........................................................................5

III. OVERVIEW OF THE PLAN ..............................................................................6

    A.     Classification and Treatment of All Claims and Interests Under the Plan..............6

IV. SUMMARY OF INFORMATION WITH RESPECT TO THE DEBTORS ...........8

    A.     Description of the Debtors ...................................................................8
        1.     Tyson ......................................................................................8
        2.     MTE and Other Related Entities..............................................8
    B.     Legal Proceedings................................................................................9
        1.     King Litigation........................................................................9
        2.     Lewis Litigation......................................................................9
        3.     Other Litigation ....................................................................10
    C.     Tyson/Turner Separation Agreement .................................................10
    D.     Vegas Properties ................................................................................11
    E.     Events Leading to the Commencement of the Bankruptcy Cases........11

V. SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES ....................11

    A.     Continuation of Business; Stay of Litigation......................................11
    B.     Appointment of the Committee ..........................................................12
    C.     Debtors' and Committee's Professionals............................................12
    D.     Stipulations Among the Debtors, the Committee and Turner ..............13
    E.     Adversary Proceedings ......................................................................14
    F.     Investigation of Claims By and Litigation Actions Against Other Parties............15
    G.     Exclusivity.........................................................................................16
    H.     Claims Process and Bar Date.............................................................16
        1.     Schedules and Statements ......................................................16
        2.     Bar Dates ..............................................................................16
    I.     Unexpired Leases of Nonresidential Real Property and Executory Contracts ......17
    J.     Sale of Tyson's Residential Real Property..........................................17

VI. THE PLAN OF REORGANIZATION .................................................................17

    A.      Classification and Treatment of Claims and Interests ...........................18
            1.      Administrative Expense and Priority Tax Claims ......................18
            2.      Class 1 – Priority Non-Tax Claims.............................................21
            3.      Classes 2 and 3 - Turner Claims and Turner Settlement .........21
            4.      Class 4 – Other Secured Claims ..............................................26
            5.      Class 5 – General Unsecured Claims........................................27
            6.      Class 6 – MTE and Tyson Interests ..........................................28
            7.      Substantive Consolidation.........................................................28
    B.      Other Aspects of the Plan .....................................................................29
            1.      Plan Trust .................................................................................29
            2.      Contribution Agreement ............................................................35
             3.      The King Settlement .................................................................38
            4.      Timing and Method of Distributions Under the Plan...............39
            5.      Disputed Claims and Objections to Claims ..............................39
            6.      Conditions Precedent to the Plan..............................................40
            7.      Effective Date Transactions.......................................................40
            8.      Failure of Conditions/Non-Occurrence of Effective Date.........41
            9.      Executory Contracts and Unexpired Leases .............................41
            10.     Discharge of the Debtors .........................................................42
            11.     Injunction..................................................................................43
            12.     Exculpation and Releases .........................................................43
            13.     Preservation of Litigation Actions and Objections to Claims ..................44
            14.     Termination of Committee .......................................................44
            15.     Amendment of the Plan.............................................................44
            16.     Revocation of the Plan..............................................................44
            17.     Payment of Statutory Fees and Related
                     Post-Confirmation Requirements .............................................45
            18.     Plan Supplement ......................................................................45

VII. CONFIRMATION AND CONSUMMATION PROCEDURE...........................45

    A.      Solicitation of Votes ..............................................................................45
    B.      The Confirmation Hearing......................................................................45
    C.      Confirmation...........................................................................................46
            1.      Acceptance................................................................................47
            2.      Unfair Discrimination and Fair and Equitable Tests ...............47
            3.      Feasibility.................................................................................47
            4.      Best Interests Test ....................................................................48
    D.      Consummation.......................................................................................49

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ...................................49

    A.      Projected Financial Information ..............................................................50
    B.      Certain Risks of Non-Confirmation........................................................50
    C.      Forward-Looking Information May Prove Inaccurate ...........................51

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................51

    A.      Consequences to the Debtors ...................................................................52
    B.      Consequences to Holders of Class 5 Claims .........................................52
          1.      Recognition of Gain or Loss Generally ....................................52
          2.      Distributions in Discharge of Accrued But Unpaid Interest.....................54
          3.      Tax Treatment of the Plan Trust and Holders of
                  Beneficial Interests in the Plan Trust.........................................54
          4.      Cash and Property Held in Trust for Disputed Claims .............................56
          5.      Withholding ...............................................................................57
          6.      The Creditors' Trust ..................................................................57

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........58

    A.      Liquidation Under Chapter 7 .................................................................58
    B.      Alternative Plan of Reorganization ........................................................58

XI. CONCLUSION AND RECOMMENDATION ...................................................................58

EXHIBITS

    Exhibit A      Joint Plan of Reorganization Proposed By the Debtors and the Official
                     Committee of Unsecured Creditors
    Exhibit B      Disclosure Statement Approval Order
    Exhibit C      Projected Financial Information
    Exhibit D      Liquidation Analysis
    Exhibit E      List of Certain Preserved Litigation Actions

# I.    INTRODUCTION

The following is a brief introduction summarizing the provisions of the Joint Plan of Reorganization Proposed By the Debtors and the Official Committee of Unsecured Creditors dated as of June 24, 2004 (the "Plan"), a copy of which is attached hereto as Exhibit "A." This introduction is qualified in its entirety by reference to the Plan and the Exhibits and Schedules attached thereto, as well as the detailed financial and other information contained elsewhere in this document and the Exhibits hereto. Capitalized terms defined in the Plan and not otherwise defined herein shall have the meanings ascribed to them in the Plan. In case of any conflict between any provision of the Disclosure Statement and any provision of the Plan, the provision of the Plan shall govern.

The Plan represents a global settlement of the most significant disputes in these cases. Specifically, the Plan includes settlements and compromises of (1) substantial causes of action held by the Debtors and their Estates against King; (2) substantial Claims held by King against the Estates; (3) substantial Claims held by Turner against the Estates and vice versa; and (4) disputes as to the nature and extent of the Estates' interests, if any, in Tyson's Post-Petition Earnings. Resolution of these disputes through such settlements and compromises avoids the delay, cost and risk of protracted litigation, provides Tyson with a fresh start, allows Tyson to continue his fruitful boxing career for the benefit of all parties in interest, and provides Creditors with the best opportunity for a meaningful recovery.

Under the Plan, Creditors receive payment from two sources. The first is the liquidation of the Debtors' principal assets – including real property and Litigation Actions. The second source of funds is a significant contribution from Tyson's Post-Petition Earnings. The Plan establishes the Plan Trust for the benefit of the Holders of Allowed Claims. The Plan Trust will collect, receive and liquidate substantially all of the assets in the Estates. The Plan Trust will also collect the earnings contribution from Tyson. Except under certain limited circumstances in connection with the Turner Claims, the Plan Administrator will distribute the proceeds of the Plan Trust to Holders of Allowed Claims in the order of priority set forth in the Bankruptcy Code. Turner asserts one of the highest priority unsecured claims against the Estates, as well as secured claims against Tyson's real property. The settlement with Turner that is embodied in the Plan provides for the waiver of a portion of her secured claim and the partial subordination of her priority claim so that other Creditors will receive payment prior to payment of her Allowed Claim in full.

Tyson's contribution to the Plan Trust is effectively[1] 50% of the net earnings from his professional boxing matches for up to four (4) years. Subject to the terms and conditions of the Plan, if Holders of Priority Tax Claims are paid in full and Holders of Class 5 General Unsecured Claims receive Distributions on account of their Allowed Claims totaling 25% (inclusive of their recovery from the Committee Carve-out) of their Allowed Claims sooner than four years after the Effective Date, Tyson will no longer be required to make the contributions to the Plan Trust.

Turner has agreed to make payments (from her Distributions under the Plan and from

---

[1] In certain circumstances the actual contribution could be more or less than 50%. The Plan provides for Tyson to receive a priority distribution of $2,000,000 from each Bout.

Turner Fight Payments) of up to $2,000,000 in the aggregate -- the Committee Carve-out -- to Holders of Allowed Class 5 General Unsecured Claims through the separate Creditors' Trust for their benefit.

The Plan Proponents believe that the Plan represents the best means for resolving the material issues in these Bankruptcy Cases and providing meaningful recoveries for Creditors, and therefore urge Creditors to vote to accept the Plan.

## II. GENERAL INFORMATION

**A.      General Information**

The Debtors and the Committee are hereby soliciting acceptances of their Plan.  This Disclosure Statement is being distributed in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider Confirmation of the Plan (the "Confirmation Hearing") scheduled for _____, 2004 at ___ __.m. Prevailing Eastern Time.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- • The Plan (Exhibit A);
- • Order of the Bankruptcy Court dated _____, 2004, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);
- • Projected Financial Information (Exhibit C);
- • Liquidation Analysis (Exhibit D); and
- • List of Certain Preserved Litigation Actions (Exhibit E).

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the Holders of Claims that are entitled to vote to accept or reject the Plan.

**ON _____, 2004, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK APPROVED THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT"), WHICH APPROVAL DOES NOT CONSTITUTE A DETERMINATION ON THE FAIRNESS OR MERITS OF THE PLAN OF REORGANIZATION ANNEXED HERETO AS EXHIBIT A AND DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE APPROVAL OF THIS DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS OF THE DEBTORS TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED IN THIS**

DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS, INTEREST HOLDERS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN OR TAKE A POSITION WITH RESPECT TO THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT.  SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN ARE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION. ALL CREDITORS, INTEREST HOLDERS AND OTHER INTERESTED PARTIES SHOULD READ CAREFULLY AND CONSIDER FULLY THE SECTION HEREOF ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED" BEFORE VOTING FOR OR AGAINST THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW.

AS TO CLAIMS OBJECTIONS, CONTESTED MATTERS, ADVERSARY PROCEEDINGS, LITIGATION ACTIONS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS, THE COMMITTEE OR ANY OTHER PARTY, AND IT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE DEBTORS' REORGANIZATION ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

B.      <u>Right to Vote on the Plan</u>

Pursuant to the provisions of the Bankruptcy Code, only Holders of Allowed Claims or

Interests in Classes of Claims or Interests that are impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan. Holders of Allowed Claims or Interests in Classes of Claims or Interests that are unimpaired under the terms and provisions of the Plan are conclusively presumed to have accepted the plan and therefore are not entitled to vote on such a plan. The Debtors believe that Class 4 is unimpaired, is conclusively presumed to have accepted the Plan, and therefore does not have the right to vote on the Plan.

Classes 1, 2, 3, 5, and 6 are impaired. Class 6 Interests shall be cancelled, the Holders thereof shall receive no Distributions or retain any property on account thereof and accordingly the Holders of those Interests are deemed to have rejected the Plan. Therefore, the Debtors are soliciting acceptances only from the Holders of Claims in Classes 1, 2, 3 and 5.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the Claims that cast ballots for acceptance or rejection of the plan. For a complete description of the requirements for Confirmation of the Plan, see section VI hereof.

If a Class of Claims or Interests rejects the Plan or is deemed to reject the Plan, the Plan Proponents have the right, and reserve the right, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding the nonacceptance of such plan by one or more impaired classes of claims or interests if the proponent thereof complies with the provisions of that section. Under that section, the Plan may be confirmed by the Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting Class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see section VI hereof.

The Debtors and Committee believe that (i) through the Plan, Holders of Claims against the Debtors will obtain a substantially greater recovery from the Debtors' Estates than the recovery that would be available if the assets of the Debtors were liquidated under chapter 7 of the Bankruptcy Code, and (ii) the Plan will afford the Reorganized Debtor the opportunity and ability to continue in business upon emergence from the Bankruptcy Cases.

After carefully reviewing this Disclosure Statement, including the Exhibits, each Holder of a Claim that is entitled to vote on the Plan should vote on the Plan.

**THE DEBTORS AND THE COMMITTEE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS AND URGE THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

## C.     Voting Instructions

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims. Please vote and return your Ballot(s). Your Ballot must be delivered either by mail or personal delivery, to:

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C
Counsel for Debtors and Debtors in Possession
780 Third Avenue, 36th Floor
New York, New York 10017
Attn: Robert J. Feinstein, Esq.

**BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED. BALLOTS THAT ARE NOT CORRECTLY COMPLETED WILL NOT BE COUNTED.**

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE **RECEIVED** BY NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME ON _____, 2004.

If you are a Creditor entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact Noelia Jaramillo at (212) 561-7700 or njaramillo@pszyjw.com.

**D.     Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2004 at _____ __.m. Prevailing Eastern Time before the Honorable Allan L. Gropper, United States Bankruptcy Judge, at the United States Bankruptcy Court, One Bowling Green, 6th Floor, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be served and filed so that they are received on or before _____, 2004, at 5:00 p.m. Prevailing Eastern Time, in the manner described below in section VII. B., "Confirmation and Consummation Procedure, The Confirmation Hearing." Objections to Confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure. Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number and class of shares of stock held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court (with a copy to Chambers) and the following parties on or before _____, 2004 at 5:00 p.m., Prevailing Eastern Time:

**PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.**
Counsel for the Debtors and Debtors in Possession
780 Third Avenue, 36th Floor
New York, New York 10017
Attn: Robert J. Feinstein, Esq.

**BROWN RUDNICK BERLACK ISRAELS LLP**
Counsel for the Committee
One Financial Center
Boston, Massachusetts 02111

Attn: Anthony L. Gray, Esq.

**MILES & STOCKBRIDGE**
Counsel for Turner
10 Light Street
Baltimore, MD 21202
Attn: Joseph J. Bellinger, Esq.

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Counsel for King
101 Park Avenue
New York, New York 10178-0061
Attn: Steven J. Reisman, Esq.

**OFFICE OF THE UNITED STATES TRUSTEE**
33 Whitehall Street
New York, New York 10004
Attn: Pamela Jean Lustrin, Esq.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## III. OVERVIEW OF THE PLAN

The following is a brief summary of the material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, a copy of which is annexed hereto as Exhibit A, and the more detailed financial and other information contained elsewhere in this Disclosure Statement and in the Exhibits hereto. In addition, for a more detailed description of the terms and provisions of the Plan, see section V hereof.

The Plan Proponents believe that the Plan represents the best means for providing meaningful recoveries for Creditors and therefore urge Creditors to vote to accept the Plan.

## A. Classification and Treatment of All Claims and Interests Under the Plan

The Plan designates 5 Classes of Claims and 1 Class of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The following table sets forth the classification and treatment of all Claims and Interests under the Plan and the consideration distributable to such Claims and Interests under the Plan. The information set forth in the following table is for convenient reference only, and each Holder of a Claim or Interest should refer to the Plan for a full and complete understanding of the classification and treatment of Claims and Interests provided for under the Plan. The Claims reconciliation procedure and liquidation of Plan Assets is continuing and, accordingly, the actual amount of Allowed Claims may vary from the estimates.

## SUMMARY OF CLASSIFICATION AND TREATMENT
## OF ALL CLAIMS AND INTERESTS UNDER THE PLAN

| Class | Estimate of Total Allowed Amount of Claims in Class | Treatment |
|---|---|---|
| Class 1<br>Allowed Priority Non-Tax Claims | Approximately $96,000 | Impaired; 100% of the unpaid amount of such Allowed Claim in Cash or as otherwise agreed. Estimated recovery: 100% |
| Classes 2 and 3<br>Turner Claims | Approximately $9,000,000 (subject to adjustments) | Impaired; see section V.A.3. below. Estimated recovery: 100 % |
| Class 4<br>Allowed Other Secured Claims | Approximately $1,900,000 | Unimpaired; see section V.A.4. below. Estimated recovery: 100% |
| Class 5<br>Allowed General Unsecured Claims | Approximately $10,000,000 | Impaired; see section V.A.5. below. [2] Estimated recovery: 25% [3] |
| Class 6<br>MTE and Tyson Interests | N/A | Impaired; MTE Common Stock Interests shall be cancelled and Holders thereof shall retain no rights or receive any Distribution on account thereof; Tyson shall retain no rights or receive any Distribution on account of his Class 6 Interest. Estimated recovery: 0% |
| Administrative Expense Claims | Approximately $3,750,000 | Unimpaired; see section V.A.1. below. Estimated recovery: 100% |
| Allowed Priority Tax Claims | Approximately $19,400,000 | Impaired; see section V.A.1. below. Estimated recovery: 100% |

For a more detailed explanation of the timing and manner of Distributions under the Plan, see section VI. below.

---

[2] In addition to net Cash from the Plan Trust that may be distributed to the Holders of Allowed General Unsecured Claims pursuant to section 4.5 of the Plan and as described in section VI.A.3.e. below, Holders of Allowed General Unsecured Claims may also receive distributions on account of such Claims from the Creditors' Trust.

[3] This estimated percentage assumes, among other things, an aggregate recovery of $2,000,000 from the Creditors' Trust.

## IV.     SUMMARY OF INFORMATION WITH RESPECT TO THE DEBTORS

**A.**     **Description of the Debtors**

**1.**     **Tyson**

Tyson is a professional boxer and a former heavyweight champion of the world. He was born on June 30, 1966, in Brooklyn, New York, and began boxing at the age of 13. He was a successful amateur boxer and turned professional on March 6, 1985. By August 1, 1987, Tyson captured the World Boxing Council (WBC), World Boxing Association (WBA) and International Boxing Federation (IBF) heavyweight titles, becoming the undisputed world heavyweight champion.

In 1988, Tyson hired boxing promoter Don King, and gave him control of his professional and business affairs.

Thereafter, Tyson defended his titles successfully until February 1990, when James "Buster" Douglas defeated him. Tyson then won four straight bouts and earned the right to challenge for the title of world champion. At that time, Tyson's representatives were engaged in discussions for him to fight then title-holder Evander Holyfield on November 8, 1991. However, Tyson was forced to postpone the bout due to an injury and, thereafter, a prison sentence. On March 25, 1995, he was released for good behavior after serving only three years of his ten-year sentence.

On March 19, 1996, Tyson regained the WBC heavyweight crown and six months later, on September 7, 1996, he recaptured the WBA Heavyweight Championship. On November 9, 1996, he lost to Evander Holyfield. Tyson's rematch with Holyfield on June 28, 1997, ended with his disqualification and resulted in the revocation of his license to box, the imposition of a $3 million fine by the Nevada Athletic Commission and the filing of class action lawsuits in New York and Nevada by disgruntled fight viewers.

In late 1998, Tyson entered into a multi-fight agreement with Showtime, which provided for the exclusive staging, television production and distribution of no less than five (5) fights, together with undercard events.

Tyson returned to boxing on January 16, 1999, and won a succession of matches, but was defeated by Lennox Lewis ("Lewis") on June 8, 2002. He defeated Clifford Etienne in a first round knockout on February 22, 2003. He has not boxed since, but intends to resume his career as a heavyweight boxer on the terms set forth in the Plan.

**2.**     **MTE and Other Related Entities**

Tyson is the President, Secretary and sole shareholder of MTE, which was incorporated in the State of California on February 20, 1998. As of January 31, 2004, MTE had no employees.

Tyson and MTE are parties to a pre-petition employment agreement pursuant to which, among other things, MTE provides Tyson's boxing-related services to third parties. Tyson also formed Tyson Records, a California corporation, and Mike Tyson Productions, Inc., a Delaware corporation. None of the entities other than MTE is a debtor in these Bankruptcy Cases nor is active or presently engaged in business operations nor holds any assets.

## B. Legal Proceedings

### 1. King Litigation

In 1998, Tyson commenced the King Litigation in the District Court. In that lawsuit, Tyson sought certain monetary damages from King for, among other allegations (each of which King denies), breach of contract and breach of fiduciary duty.

Since the Petition Date, Tyson, the Committee and King actively engaged in negotiations with respect to settling the King Litigation. The negotiations culminated in the King Settlement, pursuant to which King, without admitting any liability for the allegations asserted by Tyson in connection with the King Litigation or otherwise, has agreed to pay $14 million to the Estates ($8 million on the Effective Date, and, assuming the Order approving the Plan is entered by the Bankruptcy Court on or before January 1, 2005, $3 million plus interest on or before the first Business Day of January 2005, and $3 million plus interest on or before the first Business Day of January 2006) and release any and all Claims of King against the Debtors and the Estates (whether or not asserted or known), and pursuant to which the Debtors and the Estates (together with Turner and certain other entities related to Tyson) agreed to release any and all Claims of the Debtors and the Estates (as well as any and all Claims of Turner or certain other entities related to Tyson) against King. A summary of the King Settlement can be found in section VI.B.3. hereof and section 5.4 of the Plan.

### 2. Lewis Litigation

On or about May 8, 2003, Lewis and his boxing promoter, Lion Promotions, L.L.C. ("Lion"), sued Tyson, MTE, Don King Productions, Inc. and Don King in the Supreme Court of the State of New York (the "Lewis Litigation") alleging that (a) Tyson breached a contract (to which neither Lewis nor Tyson are parties) for a rematch with Lewis (the "Putative Rematch Contract"), (b) Tyson was about to agree to a settlement of the alleged breach of the Putative Rematch Contract and (c) Don King and Don King Productions, Inc. tortiously induced Tyson not to enter into the settlement of the alleged breach of the Putative Rematch Contract. Lewis seeks $20 million in damages against Tyson and MTE, $35 million in compensatory damages against King and DKP and $350 million in punitive damages against Don King and Don King Productions, Inc. The Lewis Litigation is stayed as to Tyson pursuant to section 362 of the Bankruptcy Code, but has been proceeding against the other defendants.

The Debtors believe that the Lewis Litigation is wholly without merit. Lewis is not in contractual privity with either Tyson or MTE. Lewis is a party to a contract with HBO to provide Lewis' individual fight services to third parties. Similarly, MTE and Tyson are parties to a pre-petition contract with Showtime to provide Tyson's fight services to third parties. Lewis and Tyson have no contract with each other.

Rather, HBO entered into a one-time agreement with Showtime (the "HBO-Showtime Contract") that provided for the joint production of up to two Lewis/Tyson bouts. The HBO-Showtime Contract required, among other things, that if a rematch was requested, a second Lewis/Tyson bout would take place within 180 days of the first Lewis/Tyson bout. A second Lewis/Tyson bout did not take place within 180 days of the first Lewis/Tyson bout as provided in the HBO-Showtime Contract. No written modification of that deadline was executed.

The HBO-Showtime Contract contains a "no third-party beneficiary" clause and a clause requiring that all modifications be in writing. Nonetheless, Lewis argues that the deadline in the HBO-Showtime Contract was extended orally and that Mr. Tyson and MTE are bound by the oral modification of a contract to which they are not a party. The Debtors vigorously dispute these allegations and believe that Lewis and Lion have no enforceable Claims against the Estates.

### 3. Other Litigation

In 2003 and prior to the Petition Date, Roosevelt McKinley ("McKinley") commenced a suit against Mr. Tyson and MTE in the Chancery Court of Shelby County, Tennessee seeking payment for services he allegedly rendered to the Debtors. The litigation is pending and is stayed pursuant to section 362 of the Bankruptcy Code. McKinley has not filed a proof of claim in the Bankruptcy Cases.

Two actions were commenced against Mr. Tyson in 2002. First, Mitchell and Dolores Rose filed suit in the Supreme Court of the State of New York, Kings County (Index No. 15966/02). This action was dismissed and is closed. Second, Jose Sulaimon Chagnon ("Sulaimon") initiated proceedings in the Supreme Court of the State of New York, New York County (Index No. 117030/02). This matter is pending and stayed pursuant to section 362 of the Bankruptcy Code. On April 1, 2004, Sulaimon filed a Motion for Leave From the Automatic Stay (the "Sulaimon Stay Motion") in the Bankruptcy Cases requesting permission to continue prosecution of the state court proceeding. The Sulaimon Stay Motion was withdrawn without prejudice on May 12, 2004. Sulaimon filed a proof of claim in the Bankruptcy Cases. The Debtors dispute Sulaimon's Claim and intend to object to it.

An additional action was commenced on July 11, 2003 by Isadore Philip Bolton against Mr. Tyson in the Circuit Court of Palm Beach County, Florida (Index No. 502003CA007271XXONAG). This action is also pending and stayed pursuant to section 362 of the Bankruptcy Code. In addition, as set forth in section IV.E. hereof, Bolton commenced an adversary proceeding in the Bankruptcy Cases seeking a determination that the alleged debt is non-dischargeable under section 523(a)(6) of the Bankruptcy Code.

## C. Tyson/Turner Separation Agreement

Tyson and Turner were married on April 19, 1997. They have two Children together. The parties separated in or about August, 2001, and later divorced. On November 23, 2002, after a contested divorce proceeding, Tyson and Turner entered into a Voluntary Separation and Property Settlement Agreement (as amended on March 26, 2003, the "Tyson/Turner Separation

Agreement") and subsequently dissolved their marriage.  The Tyson/Turner Separation Agreement provided, inter alia, that Tyson is obligated to make certain payments (the "Support Obligations") to Turner in the aggregate amount of $6.5 million.  As part of the Tyson/Turner Separation Agreement, Tyson conveyed the Connecticut Property to Turner.  The Tyson/Turner Separation Agreement provides further that if Tyson defaulted under its terms he would be obligated to pay Turner the aggregate amount of $9 million.  To secure Tyson's obligations under the Tyson/Turner Separation Agreement, Tyson granted to Turner a lien and security interest in the Vegas Properties, subordinate only to the first mortgages held thereon.  As of the Petition Date, Tyson was in default under the Tyson/Turner Separation Agreement.

**D.      Vegas Properties**

Tyson owns the Vegas Properties.  Each of the Vegas Properties is encumbered by liens or interests held by various parties, including Turner.  Turner's interest in the Vegas Properties has been resolved as part of the Turner Settlement pursuant to section 4.2 of the Plan.

**E.      Events Leading to the Commencement of the Bankruptcy Cases**

Tyson was in financial distress since 1998, when he was burdened with substantial debt to Showtime, taxing authorities and parties to litigation.  Since that time, although his fight income, various asset sales and litigation recoveries enabled him to pay a portion of his debt, his liabilities greatly exceeded his assets.  As of the Petition Date, Tyson had not fought for several months, and was receiving no other income.  As of the Petition Date, Tyson had non-tax debt of over $10 million in addition to the approximately $18 million in unpaid taxes.  He has also incurred high legal costs in connection with the King Litigation and other matters and other personal and business obligations.

Tyson's tangible assets include the Vegas Properties, cars and other personal property. Tyson and MTE have substantial intangible assets, including causes of action against King and Showtime.

**V.      SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES**

The following is a brief description of some of the major events that have occurred during the Bankruptcy Cases through May 31, 2004, or a later date if specifically noted.

**A.      Continuation of Business; Stay of Litigation**

Following the commencement of the Bankruptcy Cases, the Debtors have continued to operate their businesses and manage their properties as Debtors in Possession under the protection of the Bankruptcy Court.  The Bankruptcy Court has certain supervisory powers over the Debtors' operations during the Bankruptcy Cases, which are generally limited to reviewing and ruling on any objections to the Debtors' operations or proposed outside of the ordinary course transactions.  The Debtors must notify parties in interest and obtain Bankruptcy Court approval of any transactions that are outside the ordinary course of business, such as any sale of an asset of the Debtors outside the ordinary course of business.  In addition, the Debtors must

obtain Bankruptcy Court approval of certain other transactions, such as the borrowing of money on a secured basis or the employment of attorneys, accountants and other professionals.

An immediate effect of the filing of the Bankruptcy Cases was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all pre-petition litigation against, and efforts to collect funds from, the Debtors. This injunction remains in effect unless modified or lifted by order of the Bankruptcy Court.

**B.**     **Appointment of the Committee**

On August 22, 2003, the United States Trustee appointed the Committee, pursuant to section 1102 of the Bankruptcy Code, to represent unsecured creditors of the Debtors.

The Committee initially consisted of the following members as set forth below:

> Shelly Finkel Management, Inc.
> 60 East 42nd Street, Suite 462
> New York, NY 10165

> CLS Transportation Inc. (CLS Limo Services)
> 15303 Ventura Blvd., Suite 1100
> Sherman Oaks, CA 91403

> Jeff S. Wald
> 1467 Chastain Parkway West
> Pacific Palisades, CA 90272

> Darius Decorative and Antique Rugs
> 981 Third Avenue
> New York, NY 10022

> Diamond Resort Management, Inc.
> 555 Kaukahi Street
> Wailea, HI 96753

As of May 4, 2004, Shelly Finkel Management, Inc. resigned from membership on the Committee.

**C.**     **Debtors' and Committee's Professionals**

The Debtors applied for and were granted authorization from the Bankruptcy Court to retain the law firm of Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. ("Pachulski Stang") as bankruptcy counsel. The Debtors also applied for and were granted authorization from the Bankruptcy Court to retain Neilson Elggren LLP ("Neilson Elggren") to provide turnaround/crisis management services for the Debtors. In addition, the Bankruptcy Court authorized the retention of Greenberg Glusker Fields Claman Machtinger & Kinsella to continue

in its prepetition capacity as litigation counsel for Tyson in the King Litigation.

The order approving the retention by the Debtors of Pachulski Stang and the order approving the retention by the Debtors of Neilson Elgggren contemplate the payment of a fee enhancement to each of Pachulski Stang and Neilson Elgggren, solely out of non-estate property, equal to the aggregate hourly billings incurred by each firm throughout these Bankruptcy Cases. The Bankruptcy Court will review and determine all requests for compensation and reimbursement of expenses, including without limitation the fee enhancements.

Tyson has requested that Pachulski Stang and Neilson Elgggren voluntarily reduce their fee enhancements to $500,000 in the aggregate. Pachulski Stang and Neilson Elgggren have agreed, subject to certain conditions, to the requested fee enhancement cap.

The Committee applied for and was granted authorization from the Bankruptcy Court to retain the law firm of Brown Rudnick Berlack Israels LLP as its counsel.

Finally, Tyson applied for and was granted authorization to retain Century 21 Money World Realty ("Century 21") to market and sell the Vegas Properties.

**D.**     **Stipulations Among the Debtors, the Committee and Turner**

Prior to the Petition Date, Turner marketed the Connecticut Property and entered into an agreement to sell it for the purchase price of $4,100,000. To avoid any appearance of a conflict of interest with respect to Tyson investigating claims affecting his former spouse and children, the Committee requested, and the Debtors agreed, to appoint the Committee as estate representative in connection therewith. Accordingly, on September 23, 2003, the Bankruptcy Court so ordered a stipulation dated September 8, 2003 between the Debtors and the Committee, which appointed the Committee as legal representative of the Debtors' Estates with respect to investigating and prosecuting claims, if any, against Turner with respect to the Connecticut Property (the "Initial Connecticut Property Stipulation").

Pursuant to the Initial Connecticut Property Stipulation, and as the proposed sale by Turner of the Connecticut Property was scheduled to close on or about September 10, 2003, the Committee commenced a state court action against Turner in Connecticut alleging, inter alia, that the transfer of the Connecticut Property by Tyson to Turner was subject to claims under state and federal law (the "State Court Action"). In order to resolve the State Court Action and provide more efficient means to deal with the Connecticut Property, the Debtors, the Committee and Turner entered into a stipulation (the "Connecticut Proceeds Stipulation"), which was so ordered by the Bankruptcy Court on September 23, 2003. Pursuant to the Connecticut Proceeds Stipulation, among other things: (i) the sale of the Connecticut Property was approved; (ii) the State Court Action was withdrawn; (ii) approximately $2,500,000 (the "Escrowed Proceeds") of $2,809,546 of net proceeds generated from the sale of the Connecticut Property was placed into an escrow account; and (iii) the Committee and the Debtors were given the right to file within 60 calendar days an adversary proceeding against Turner to recover any or all of the Escrowed Proceeds (the "Objection Period"). In order to facilitate settlement discussions, the parties have continued to agree to extend the Objection Period during the course of the Bankruptcy Cases. Pursuant to such agreements, the Objection Period has not yet expired. To date no adversary

proceeding against Turner has been filed.

Since September 2003, the Committee undertook an extensive investigation of potential avoidance causes of action on behalf of the Estates against Turner and the Children, as well as the Turner Claims against the Debtors and the Estates. In connection with such investigation, the Committee conducted, with the approval of the Bankruptcy Court, an examination of Turner pursuant to Bankruptcy Rule 2004. In connection with such examination, Turner produced voluminous documents to the Committee. The settlement with Turner embodied in the Plan is the result of the Committee's investigation and negotiations with Turner and Tyson.

On April 28, 2004, the Debtors, the Committee and Turner entered into an amended stipulation (the "First Amended Connecticut Proceeds Stipulation") pursuant to which Turner may elect to (a) cause the release of $2,000,000 of the Escrowed Proceeds to herself or her designee, (b) cause the release of the entire remainder, after deducting certain fees and expenses, of the Escrowed Proceeds (in the approximate amount of $500,000) (the "Remainder") to the Committee to be held by the Committee for the benefit of the Estates pending an order of the Bankruptcy Court regarding its disposition and (c) deliver to the Committee a letter of credit in the amount of $2,000,000 (the "Letter of Credit") (collectively, the "Escrow Substitution Actions"). Upon the occurrence of the Escrow Substitution Actions, (a) Turner shall have no rights or interests in the Remainder, (b) upon entry of a final and nonappealable order that directs Turner to pay any sum or provide other item of value to the Committee and/or either estate ("Direction Order"), Turner shall fully comply with such Direction Order and, if she fails to do so within ten (10) days of the Committee's written demand to do so, the Committee may (in its discretion) effectuate one or more draws on the Letter of Credit in the aggregate amounts not greater than the amount or value directed to be paid by her by the Direction Order, (c) the Letter of Credit shall be treated as a substitute for the $2,000,000 portion of the Escrowed Proceeds released to Turner, and (d) upon receipt of an expiry notice (as defined in the Letter of Credit), the Committee may (in its discretion) effectuate one or more draws on the Letter of Credit in an aggregate amount not to exceed $2,000,000 and, upon receipt of the proceeds of such draws, shall deliver such proceeds to the escrow agent as Escrowed Proceeds. Pursuant to the Plan, the Committee will surrender the Letter of Credit (if issued) within five (5) days of the Effective Date. The First Amended Connecticut Proceeds Stipulation was entered by the Bankruptcy Court on May 13, 2004.

## E.     Adversary Proceedings

Two parties commenced adversary proceedings against Tyson seeking orders and/or judgments of the Bankruptcy Court declaring that the obligations giving rise to their purported debts or Claims against Tyson are non-dischargeable. First, Isadore Philip Bolton ("Bolton") filed a complaint against Tyson on December 5, 2003, seeking only a determination that the alleged debt resulting from an alleged assault constitutes a debt for "willful and malicious injury" by Tyson to Bolton and should therefore be excepted from discharge pursuant to section 523(a)(6) of the Bankruptcy Code. Bolton has filed no proof of claim in the Bankruptcy Cases. Tyson and Bolton have been engaged in discussions with respect to settling this action. With Bolton's consent, Tyson has not filed a response in this action as of the date hereof.

Second, Turner filed a complaint against Tyson on December 5, 2003, seeking: (a) a

determination that (i) certain of Tyson's obligations arising from the Tyson/Turner Separation Agreement are in the nature of alimony to, maintenance for, or support of Turner and their Children and therefore should be excepted from discharge pursuant to section 523(a)(5) or 523(a)(15) of the Bankruptcy Code and (ii) attorneys' fees and costs in connection with the adversary proceeding are nondischargeable pursuant to section 523(a)(15); and (b) a judgment against Tyson in the amount of $9,000,000, plus attorneys' fees and costs. In addition, Turner filed proofs of claim against the Estates in the amount of $9,000,000, plus attorneys' fees and costs. In the proof of claim filed against the Tyson Estate, Turner asserted that her $9,000,000 claim against the Tyson Estate was secured by liens on the Vegas Properties and entitled to priority treatment in accordance with section 507(a)(7) of the Bankruptcy Code as alimony, maintenance and support. Tyson's time to answer the complaint has been extended continuously throughout the course of these Bankruptcy Cases. The Debtors, the Committee and Turner have negotiated a settlement of the adversary proceeding and any and all Claims of Turner and the Children against the Estates, which is embodied in the Turner Settlement as set forth in section 4.2 of the Plan and described below in section VI.A.3.

## F.       Investigation of Claims By, And Litigation Actions Against, Other Parties

On August 14, 2003, and August 22, 2003, the Debtors filed separate applications to authorize and direct the oral examinations and production of documents by Showtime (the "Showtime Application") and Sheldon Finkel (the "Finkel Application"), respectively. The Showtime Application requested, inter alia, extensive production of documents and examination of witnesses relating to the multi-fight agreement with Showtime. Finkel was Tyson's boxing advisor from about June 1998 through June 2003. The Finkel Application requested production of documents and the oral examination of Finkel concerning the documents, files contracts and correspondences in the possession or control of Finkel. The Bankruptcy Court granted both the Showtime and Finkel Applications on September 9, 2003. The Finkel deposition was conducted on October 21, 2003, and Finkel has produced responsive documents. The Debtors have served multiple subpoenas requesting the production of documents and requiring the appearance of witnesses for examination in connection with the Showtime Application.

On October 16, 2003, the Debtors filed their application (the "Simms Application") for an order to authorize and direct the oral examination and production of documents by Shawnee Simms ("Simms"). Simms served as the chief operating officer and vice president of MTE until Tyson terminated her employment in or around July 2003. The Bankruptcy Court granted the Simms Application on October 21, 2003. Simms has produced some responsive documents and was deposed on May 5 and 6, 2004.

On December 10, 2003, the Committee filed its application (the "Rowe Application") for an order pursuant to Bankruptcy Rule 2004 authorizing and directing the oral examination of and production of documents by Jackie Rowe ("Rowe"). The Bankruptcy Court granted the Rowe Application on December 11, 2003. In accordance with the order granting the Rowe Application, the Committee issued a subpoena to examine Rowe and compel Rowe to produce documents. Rowe has not complied with the Bankruptcy Court's order and subpoena. On May 20, 2004, the Committee filed a motion with the Bankruptcy Court seeking sanctions against Rowe and other relief.

The Debtors and the Committee have also begun to investigate other Claims, potential objections thereto and other potential Litigation Actions. The Litigation Actions include, without limitation, Advisor Actions, potential Avoidance Actions, claims against Rowe and Showtime and other Litigation Actions that have not yet been identified. Such investigation has not been completed. Pursuant to section 7.3 of the Plan and Exhibit E to the Disclosure Statement, all objections to Claims and all Litigation Actions shall be preserved and not released, notwithstanding Confirmation of the Plan, entry of the Confirmation Order and the occurrence of the Effective Date, for the benefit of Holders of Allowed Claims. All Litigation Actions, as well as other Plan Assets, shall be conveyed to the Plan Trust on the Effective Date. The Plan Administrator shall have the right, pursuant to section 5.2.1 of the Plan, to investigate, litigate, settle, compromise and otherwise dispose of the Litigation Actions. The Plan Administrator and Tyson (at his own sole expense and only if the Plan Administrator fails to assert such objection) shall have the right, pursuant to section 6.3.1 of the Plan, to assert, settle or compromise their respective objections to Claims.

## G.    Exclusivity

On November 13, 2003, the Debtors filed a motion pursuant to section 1121(d) of the Bankruptcy Code to extend the exclusive periods during which the Debtors may file a plan of reorganization and solicit acceptances thereto under sections 1121(b) and (c) (the "Exclusivity Periods"). On December 2, 2003, the Bankruptcy Court granted an extension of the Exclusivity Periods through and including March 30, 2004 and May 28, 2004. On March 29, 2004, the Bankruptcy Court granted a further extension of the Exclusivity Periods through and including May 28, 2004 and July 28, 2004. On May 28, 2004, the Bankruptcy Court entered an order granting a further extension of the Exclusivity Periods through and including July 2, 2004 and August 31, 2004, and providing further that if the Committee does not serve and file on or before June 25, 2004, an objection to a further extension of the Exclusivity Periods, then the Exclusivity Periods shall be deemed extended further, through and including July 27, 2004 and September 27, 2004, without the need for the entry of an order by the Bankruptcy Court. If the Committee files such objection, a hearing will be held on July 2, 2004 at 10:00 A.M.

## H.    Claims Process and Bar Date

### 1.    Schedules and Statements

On October 1, 2003, the Debtors each filed with the Bankruptcy Court a statement of financial affairs, schedules of assets and liabilities and schedules of executory contracts and unexpired leases (collectively, the "Schedules"). On December 18, 2003, the Debtors each filed amendments to the Schedules.

### 2.    Bar Dates

By Order dated November 5, 2003, the Bankruptcy Court fixed December 29, 2003 at 5:00 P.M. as the last date and time by which proofs of claim were required to be filed in the Bankruptcy Cases, with the exception of proofs of claim by or on behalf of governmental units, which were required to be filed by January 28, 2004. The Debtors subsequently entered into a series of stipulations with the IRS, so ordered by the Bankruptcy Court, which extended the time

for the IRS to file proofs of claim against the Debtors.  Pursuant to the most recent stipulation executed on May 27, 2004, the Debtors and the IRS agreed on a further extension of time for the IRS to file proof(s) of claim against the Debtors until June 28, 2004.  That stipulation will be presented to the Bankruptcy Court for signature on June 7, 2004.

## I.  Unexpired Leases of Nonresidential Real Property and Executory Contracts

As Debtors in Possession, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject any executory contract or unexpired lease, including, but not limited to, any employment or severance contract or agreement, as contemplated by section 365 of the Code, in effect on the Petition Date between the Debtors and any other person (an "Executory Contract").  In this context, assumption means that the Reorganized Debtor agrees to perform his obligations and cure existing defaults under an Executory Contract.  Rejection of an Executory Contract relieves the Debtors from their obligation to perform further under such Executory Contract.  Damages resulting to the other party from the rejection of an Executory Contract are treated as a General Unsecured Claim (as defined in the Plan) arising prior to the Petition Date and are included in the appropriate Class to the extent such Claim is allowed by the Bankruptcy Court.  Claims arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court no later than 30 days after notice of entry of an order confirming the Plan or approving the rejection of such contract or lease.

Neither of the Debtors is a party to an unexpired lease of nonresidential real property.

On September 10, 2003, the Debtors filed a joint motion to reject that certain employment agreement between Tyson and MTE (the "Employment Agreement Motion").  The Committee filed an objection to the relief requested and a hearing was held.  By order entered on December 18, 2003, the Bankruptcy Court denied the Employment Agreement Motion without prejudice.

## J.  Sale of Tyson's Residential Real Property

The Plan contemplates the sale of both Vegas Properties.  Tyson has received an offer to purchase the Vegas Property located at 6760 Tomiyasu Lane free and clear of all encumbrances, with such encumbrances to attach to the sale proceeds, and will be applying to the Bankruptcy Court for approval of such sale.  The Vegas Property located at 6740 Tomiyasu Lane continues to be marketed by Century 21 and is expected to be sold as well.  If the Vegas Properties are not sold prior to the Effective Date of the Plan, they will be conveyed to the Plan Trust and sold thereafter.

## VI.    THE PLAN OF REORGANIZATION

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions set forth in the Plan.

## A.    Classification and Treatment of Claims and Interests

### 1.    Administrative Expense and Priority Tax Claims

#### a.    Administrative Expense Claims

Administrative Expense Claims are Claims constituting a cost or expense of administration of the Bankruptcy Cases allowed under section 503(b) of the Bankruptcy Code. Such Claims include any actual and necessary costs and expenses of operating the business of the Debtors in Possession, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their businesses or the acquisition or lease of property or the rendition of services, any allowance of compensation and reimbursement of expenses to the extent allowed by a Final Order under section 330 of the Bankruptcy Code, the actual, necessary expenses of members of the Committee and fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

Except to the extent that the Holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Plan Administrator shall provide to each Holder of an Allowed Administrative Expense Claim (a) Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of (i) the Effective Date, (ii) the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the date such Allowed Administrative Expense Claim is due in accordance with the terms and conditions of the particular transactions or governing documents or (b) such other treatment as the Plan Administrator and such Holder shall have agreed upon in writing; provided, however, that Allowed Administrative Expense Claims (other than Administrative Expense Claims under section 330 of the Bankruptcy Code) representing obligations incurred in the ordinary course of business of or assumed by the Reorganized Debtor shall be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

#### b.    Priority Tax Claims

Priority Tax Claims are those Claims for taxes entitled to priority in payment under section 507(a)(7) of the Bankruptcy Code. The aggregate amount of Priority Tax Claims as reflected in the Debtors' Schedules, including disputed amounts, is approximately $21,400,000. The Debtors estimate that the aggregate amount of Allowed Priority Tax Claims is approximately $19,400,000.

Except to the extent that the Holder of an Allowed Priority Tax Claim agrees to a different treatment, the Plan Administrator shall pay to each Holder of an Allowed Priority Tax Claim from the Plan Trust, at the sole option of the Plan Administrator:

      (i)    on the Effective Date, its Pro Rata share of the available Cash in the Plan Trust after full payment of or reserve for:

            (a)    Cash needed to fund the Claims Resolution Reserve and other reasonably necessary reserves to be established by the

Plan Administrator in accordance with the terms hereof, and

(b)     (A) reasonable market-based fees and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses and post-Effective Date taxes) of the Plan Administrator and (B) until the Full Creditor Payment Date, the fees (which shall equal $5,000 per month) and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses[4]) of the Creditors' Representative, and

(c)     Allowed Higher Priority Claims, and

(d)     the Turner Remaining Claim (solely from proceeds of the King Settlement), and

following the Effective Date, equal annual cash payments, in arrears, in an aggregate amount equal to the outstanding balance of such Allowed Priority Tax Claim, together with interest to accrue as of the Effective Date at a fixed annual rate equal to five percent (5%), over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim; provided, however, that the Plan Administrator may prepay without penalty the outstanding balance of such Allowed Priority Tax Claim at any time; or either of

(ii)    upon such other terms determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; or

(iii)   such other, less favorable treatment as the Plan Administrator and such Holder shall have agreed upon in writing.

Any claim or demand for penalty relating to any Priority Tax Claims shall be disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Plan Trust, the Creditors' Trust or the Reorganized Debtor.

### c.     Bar Date for Administrative Tax Claims

All requests for payment of Administrative Tax Claims and for which no earlier bar date has been or is established outside of this Plan, such as may be established by requesting an expedited audit under Bankruptcy Code section 505, must be filed with the Bankruptcy Court and served on (i) the Plan Administrator, Neilson Elggren LLP, 10100 Santa Monica Blvd., Ste. 410, Los Angeles, CA 90067, Attn: R. Todd Neilson, (ii) counsel for the pre-Effective Date

---

[4] Subject to the restrictions set forth in section 5.3.2(b) of the Plan.

Debtors, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Attn: Robert J. Feinstein, Esq., 780 Third Avenue, New York, New York 10017, (iii) counsel for the Committee, Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, MA 02111, Attn: Anthony L. Gray, Esq., and (iv) the United States Trustee, Attn: Pamela Jean Lustrin, Esq., 33 Whitehall Street, 21st Floor, New York, New York, 10004 on or before the later of (a) sixty (60) days following the Effective Date and (b) sixty (60) days following the filing of any required tax return for such taxes for such year or period with the applicable governmental unit. Any Holder of any Administrative Tax Claim that is required to file a request for payment of such taxes and does not file such a request by the applicable bar date will be forever barred from asserting any such Administrative Tax Claim against the Debtors, the Plan Trust, the Creditors' Trust, the Plan Administrator, the Creditors' Trustee, the Creditors' Representative, the Estates, or any of their property, successors, or assigns. Any party in interest shall have thirty days from the date an Administrative Tax Claim is filed to bring an objection to such Claim.

### d. Bar Date for All Other Administrative Expense Claims

Except as otherwise provided in this Plan, requests for payment of Administrative Expense Claims (other than Administrative Tax Claims and statutory fees) must be filed and served on (i) the Plan Administrator, Neilson Elggren LLP, 10100 Santa Monica Blvd., Ste. 410, Los Angeles, CA 90067, Attn: R. Todd Neilson (ii) counsel for the pre-Effective Date Debtors, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Attn: Robert J. Feinstein, Esq., 780 Third Avenue, New York, New York 10017, (iii) counsel for the Committee, Brown Rudnick Berlack Israels LLP, One Financial Center, Boston, MA 02111, Attn: Anthony L. Gray, Esq., and (iv) the United States Trustee, Attn: Pamela Jean Lustrin, Esq., 33 Whitehall Street, 21st Floor, New York, New York, 10004 no later than sixty (60) days after the Effective Date. Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) or 1103 for services rendered prior to the Effective Date will file and serve on all parties entitled to notice thereof, an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such requests for payment of Administrative Expense Claims and applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. Holders of Administrative Expense Claims (including, without limitation, Professionals) requesting compensation or reimbursement of expenses that do not file such requests by the applicable bar date will be forever barred from asserting such Claims against the Debtors, the Plan Trust, the Creditors' Trust, the Plan Administrator, the Creditors' Trustee, the Creditors' Representative, the Estates, or any of their property, successors or assigns. Any party in interest shall have thirty (30) days from the date an Administrative Expense Claim is filed to bring an objection to such Claim.

All payments to professionals for compensation and reimbursement of expenses and all payments to reimburse expenses of members of the Committee will be made in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court relating to the payment of interim and final compensation and expenses. The Debtors estimate that compensation and reimbursement of expenses of professionals retained in the Bankruptcy Cases will be approximately $3,750,000, not including the payment of a fee enhancement to each of Pachulski Stang and Neilson Elggren, solely out of Tyson's non-estate property, equal to the aggregate hourly billings incurred by each firm throughout these

Bankruptcy Cases as contemplated in the orders authorizing the retention and employment of Pachulski Stang and Neilson Elggren, respectively. Tyson has requested that Pachulski Stang and Neilson Elggren voluntarily reduce their fee enhancements to $500,000 in the aggregate. Pachulski Stang and Neilson Elggren have agreed, subject to certain conditions, to the requested fee enhancement cap. The Committee has reserved all of its rights in respect of such proposed fee enhancements.

Requests for compensation and reimbursement of expenses, including without limitation fee enhancements, must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors, the Committee and other parties in interest may participate and, if appropriate, object to the allowance of any compensation and reimbursement of expenses.

## 2. Class 1 – Priority Non-Tax Claims

Class 1 consists of Priority Non-Tax Claims (other than the Turner Claims). This Class includes, but is not limited to, Claims asserted against any of Tyson, MTE, the Tyson Estate and the MTE Estate, which are entitled to priority in accordance with section 507(a) of the Bankruptcy Code (other than Administrative Expense Claims, Priority Tax Claims, Administrative Tax Claims and Turner Claims). The Debtors estimate that the amount of Allowed Priority Non-Tax Claims is approximately $96,000.

Pursuant to the Plan, Holders of Allowed Class 1 Priority Non-Tax Claims against any of Tyson, MTE, the Tyson Estate and the MTE Estate shall receive 100% of the unpaid Allowed amount of such Claim in Cash on the later of (i) the Effective Date and (ii) the date such Priority Non-Tax Claim becomes an Allowed Claim. Notwithstanding the foregoing, the Holder of an Allowed Priority Non-Tax Claim (except the Turner Claims) may receive such other, less favorable treatment as may be agreed upon by the claimant and the Plan Administrator. Class 1 is impaired under the Plan. Holders of Allowed Claims in Class 1 are entitled to vote to accept or reject the Plan.

## 3. Classes 2 and 3 - Turner Claims and Turner Settlement

The Debtors, the Committee, Turner and Tyson have agreed to the Turner Settlement set forth in section 4.2 of the Plan, which provides for the following settlement and treatment of the Class 2 and Class 3 Claims and the settlement of the Turner Non-Dischargeable Claim as described below. Thus, in full satisfaction of the Turner Gross Claim, the Turner Remaining Claim and the Turner Non-Dischargeable Claim:

### a. The Connecticut Escrow

Unless otherwise agreed by the Plan Proponents and Turner and approved by the Bankruptcy Court, on the Effective Date, the Connecticut Escrow shall be broken and such proceeds shall be distributed as follows:

(i)     $2,000,000 shall be paid to Turner; and

(ii)    the balance of the Connecticut Escrow funds (in the amount of approximately $500,000), together with any earnings generated by all funds in the Connecticut Escrow before the Effective Date (but after deducting any fees and expenses actually incurred by the escrow agent up to a maximum of $2,500), shall be paid to the Plan Trust.

Turner shall have no right of distribution on account of or claim to any Connecticut Escrow funds in excess of the $2,000,000 paid to her as provided above.

In the event that the Connecticut Escrow was broken and the proceeds distributed pursuant to an agreement entered into by the Plan Proponents and Turner and approved by the Bankruptcy Court prior to the Effective Date, the Committee shall promptly surrender any letter of credit delivered by Turner to the Committee in conjunction with such agreement within five (5) calendar days of the Effective Date.

    **b.**    **The Vegas Sale Proceeds**

Upon the sale or disposition of the Vegas Properties (or either of them), Turner shall receive $1,500,000 of the Net Vegas Sale Proceeds on account of her liens against the Vegas Properties. The amount of Net Vegas Sale Proceeds, if any, in excess of such $1,500,000 of the Net Vegas Sale Proceeds paid to Turner shall be paid to the Plan Trust. Turner shall have no right of distribution on account of or claim to any remaining Net Vegas Sale Proceeds in excess of the $1,500,000 paid to her from the Net Vegas Sale Proceeds.

    **c.**    **The Turner Remaining Claim**

    (i)    <u>Calculation.</u>

The Turner Remaining Claim against the Plan Trust shall be calculated as follows:

- the Turner Gross Claim, less

- $879,000, representing the payments received by Turner from November 23, 2002, to the Petition Date, less

- $309,000, representing the payment received by Turner in September 2003 from the proceeds of the sale of the Connecticut Property, less

- all funds received by Turner from the Connecticut Escrow and the Net Vegas Sale Proceeds, as set forth above.

    (ii)    <u>Allowance and Payment</u>

Subject to the terms set forth below, the Turner Remaining Claim shall be deemed Allowed as a Class 2 Claim pursuant to Bankruptcy Code section 507(a)(7). Notwithstanding the foregoing, Turner agrees to forego immediate full payment of the Turner Remaining Claim

and will accept payment on the Turner Remaining Claim from the Plan Trust or from Tyson through a Turner Fight Payment (or from both sources) in the aggregate amount of $2,312,000 on the Effective Date and, thereafter, $750,000 for each Financial Event, until the Turner Remaining Claim is fully satisfied. If, however, no Bout, other than the first Bout, occurs by the date the Plan Trust receives the final Subsequent King Settlement Payment, Turner shall be paid the then outstanding balance of the Turner Remaining Claim, less $500,000, from such final Subsequent King Settlement Payment and will not be entitled to receive any other payments on account of the Turner Remaining Claim, unless a Bout occurs after the final Subsequent King Settlement Payment but before the Full Creditor Payment Date (in which case the balance of the Turner Remaining Claim shall increase by $750,000, i.e., $500,000 plus $250,000 as required under the definition of the term "Turner Gross Claim" upon the occurrence of a Financial Event). Thus, Turner shall not be entitled to share (except as otherwise specified in the Plan) in any proceeds received by the Plan Trust from the Connecticut Escrow or from the Vegas Properties or from any other Plan Assets.

### d. The Turner Non-Dischargeable Claim

The Turner Remaining Claim shall also be deemed a non-dischargeable alimony and support claim (i.e., the Turner Non-Dischargeable Claim) against Tyson individually (and not against the Estates or the Plan Trust), provided, however, that if no Bout, other than the first Bout, occurs by the Full Creditor Payment Date, then the Turner Non-Dischargeable Claim shall be reduced by $500,000. The Turner Non-Dischargeable Claim shall only be paid as expressly provided for in the Plan or in another manner that does not impair in any way the Committee Carve-out.

### e. The Committee Carve-out and the Creditors' Trust

In consideration of obtaining the support of Holders of General Unsecured Claims to the terms and conditions reflected in the Plan and the releases to be provided to her and the Children in connection with the transactions set forth therein, Turner shall pay to the Creditors' Trustee on behalf of the Creditors' Trust the Committee Carve-out only from any Distributions or other amounts she receives for or on account of the Turner Remaining Claim or the Turner Non-Dischargeable Claim in accordance with the terms set forth below, up to a maximum of $2,000,000; provided, however, that such maximum amount shall be reduced to $1,500,000 if no Bout, other than the first Bout, occurs by the Full Creditor Payment Date. The Creditors' Trust shall hold the Committee Carve-out funds in trust for the benefit of holders of Allowed General Unsecured Claims. Any reasonable out-of-pocket expenses of the Creditors' Trustee incurred on behalf of the Creditors' Trust shall be paid solely from Committee Carve-out funds before their Distribution to the Holders of Allowed General Unsecured Claims. The Creditors' Trust shall administer, hold, liquidate and distribute net Cash proceeds of assets held by the Creditors' Trust to Holders of Allowed General Unsecured Claims in accordance with the terms of the Creditors' Trust Agreement. Pursuant to the terms of the Creditors' Trust Agreement, the Creditors' Trustee shall have the right to enforce Turner's obligations under the Turner Settlement. As provided in the Creditors' Trust Agreement, the sole purpose of the Creditors' Trust will be to liquidate its assets (which shall consist of the rights to the Committee Carve-out to be paid by Turner and all proceeds thereof, income thereon and payments on account thereof) for the benefit of Holders of General Unsecured Claims, in accordance with U.S. Treasury Regulation section

301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

Turner shall pay the Committee Carve-out to the Creditors' Trustee on behalf of the Creditors' Trust only from any Distributions or other amounts she receives for or on account of the Turner Remaining Claim or the Turner Non-Dischargeable Claim, in immediately available funds, as follows:

    (i)    $1,000,000 on the Effective Date; and

    (ii)    $250,000 for each Financial Event, provided, however, that if Turner receives less than $750,000 as a result of a Bout (other than the first Bout), Turner shall pay to the Creditors' Trustee on behalf of the Creditors' Trust one-third of the Distribution or other amount Turner actually receives as a result of such Bout.

**f.**    **Other Provisions of the Turner Settlement**

    (i)    Any amounts received by Turner from the Plan Trust, from Tyson through the Turner Fight Payments or otherwise from Tyson on account of the Turner Non-Dischargeable Claim, shall simultaneously reduce, dollar for dollar, the amount of each of the Turner Remaining Claim and the Turner Non-Dischargeable Claim. Any payment by Tyson on account of the Turner Non-Dischargeable Claim, whether through a Turner Fight Payment or otherwise, shall not impair in any way the Committee Carve-out.

    (ii)    Turner and the Children shall not be entitled to share in any Distributions to Holders of Allowed General Unsecured Claims and shall not share in any other Distributions from the Plan Trust of any kind or on account of any claim except as specifically set forth in the Plan.

    (iii)    Subject to the: (1) occurrence of the Effective Date under Article IX of the Plan; (2) enforcement of all of Turner's rights under the Turner Settlement, including, inter alia, Turner's receipt of full and indefeasible payment in Cash of the Turner Claims under the terms of the Plan; (3) the effectiveness of the release of Turner and the Children by the Estate Representatives (as defined below) provided in section 4.2.6(d) of the Plan; and (4) surrender of the letter of credit (if any) by the Committee pursuant to section 4.2.1 of the Plan, Turner, her heirs, successors and assigns, and Turner on behalf of the Children, and their respective heirs, successors and assigns, knowingly and voluntarily, forever release, acquit and discharge the Debtors (exclusive of those claims against Tyson which the Children may not release as a matter of law), the Estates, the Committee, the members of the Committee, and their respective representatives and counsel solely in such respective capacities, from and of any and all claims, actions, causes of

action, damages, losses, actions, suits, obligations, liabilities, and demands of any kind or nature whatsoever, in law or in equity, whether presently known or unknown, that Turner or any of the Children may have had, now have or which they may have, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of time through the Effective Date, including, inter alia, the claims and causes of action set forth in the adversary proceeding commenced by Turner against Tyson on December 5, 2003, pursuant to Bankruptcy Code sections 523(a)(5) and (15), as the same may be amended.

(iv)     Subject to their respective rights under the Turner Settlement set forth in this Plan and the effectiveness of the release by Turner and the Children provided in section 4.2.6(c) of the Plan, the Debtors, the Estates, the Committee, the members of the Committee (solely in their respective capacities as members), and their respective successors, assigns (and as to the Committee, this includes the Creditors' Representative or Plan Administrator to the extent that the Creditors' Representative or Plan Administrator become the representative of the Estates after dissolution of the Committee), or any chapter 11 or chapter 7 trustee of the Estates, or any other entity that for any reason is designated to act as a fiduciary or representative of either or both of the Estates whether pursuant to this Plan or otherwise, and their respective representatives solely in such capacities (collectively, the "Estate Representatives"), knowingly and voluntarily, forever release, acquit and discharge Turner, her successors and assigns, the Children, their successors and assigns, and the representatives and counsel of Turner and the Children solely in such capacities, from and of any and all claims, causes of action (including, without limitation, claims or causes of action to recover cash or property or to otherwise challenge the Turner Claims under applicable non-bankruptcy law, any avoidance actions arising under the Bankruptcy Code (such as those set forth in sections 542 through 550 thereof)), damages, losses, actions, suits, obligations, liabilities, and demands of any kind or nature whatsoever, in law or in equity, whether presently known or unknown, that any of the Estate Representatives may have had, now have or which they may have, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of time through the Effective Date.

(v)      Until the Committee Carve-Out is paid in full, Turner shall not alter, modify or amend the Turner Settlement or compromise or transfer the Turner Remaining Claim or (to the extent such compromise or transfer affects the Committee Carve-out) the Turner Non-Dischargeable Claim without the prior written consent of the Creditors' Trustee and the Debtors.

(vi)     The Turner Settlement shall survive and remain binding notwithstanding any dismissal or conversion of either or both of the Bankruptcy Cases.  The Turner Settlement shall be binding on any chapter 11 trustee or chapter 7 trustee appointed in the Bankruptcy Cases, or any other entity that for any reason (including, without limitation, in connection with the Plan) is designated to act as a fiduciary or representative for either or both of the Estates.  Any default or breach by Turner under the Turner Settlement in respect of payment of the Committee Carve-out shall require Turner to pay to the Creditors' Trust all Collection Costs.

(vii)    The Turner Settlement is subject to occurrence of the Effective Date.

Classes 2 and 3 are impaired under the Plan.  Holders of Allowed Class 2 and 3 Claims are entitled to vote to accept or reject the Plan.

### 4.    Class 4 – Other Secured Claims

Class 4 consists of Secured Claims (except Class 3 Claims).  The aggregate amount of Other Secured Claims in the Debtors' Schedules is approximately $3,400,000.  The Debtors estimate that the aggregate amount of Allowed Other Secured Claims is approximately $1,900,000.

Pursuant to the Plan, at the election of the Plan Administrator, the Holder of each Allowed Class 4 Secured Claim shall, on account of such Claim, on the later of (A) the Effective Date and (B) the date such Secured Claim becomes an Allowed Claim, either:  (a) be paid in Cash in full; (b) have surrendered, without representation or warranty, the collateral securing its Claim; (c) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) have reinstated the maturity of such Claim as such maturity existed before such default, (iii) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (iv) otherwise not have altered the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim; or (d) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim.  In the case of option (b) or (c), in the event that any such Claim is not completely satisfied by such Distribution, the deficiency amount will constitute a General Unsecured Claim and will be classified as a General Unsecured Claim in Class 5, and will receive the same treatment as other Claims in such Class.  Any Holder of a Secured Claim may agree to accept less favorable treatment.  Class 4 is not impaired under the Plan.  Holders of Allowed Class 4 Claims are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

## 5. <u>**Class 5 – General Unsecured Claims**</u>

Class 5 consists of General Unsecured Claims. This Class of Claims includes, but is not limited to, all Claims against any of Tyson, MTE, the Tyson Estate and the MTE Estate for pre-petition goods or services and damages arising from the rejection of executory contracts and/or pre-petition litigation. The aggregate amount of General Unsecured Claims as reflected in the Debtors' Schedules, including disputed amounts but excluding Interdebtor Claims, is approximately $11,000,000. The Debtors estimate that the aggregate amount of Allowed Claims in Class 5 will be approximately $10,000,000.

Pursuant to the Plan, each Holder of a General Unsecured Claim shall receive its Pro Rata Share of the available Cash in the Plan Trust after full payment of or reserve for:

**a.** First, the Claims Resolution Reserve and other reasonably necessary reserves established by the Plan Administrator in accordance with the terms of the Plan;

**b.** Second, reasonable market-based fees and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses and post-Effective Date taxes) of the Plan Administrator and, until the Full Creditor Payment Date, the fees (which shall equal $5,000 per month) and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses[5]) of the Creditors' Representative;

**c.** Third, Allowed Higher Priority Claims;

**d.** Fourth, the Turner Remaining Claim (to be paid by the Plan Trust solely from proceeds of the King Settlement); and

**e.** Fifth, Allowed Priority Tax Claims.

Notwithstanding the foregoing, the Holders of Allowed General Unsecured Claims shall not be entitled to receive any distributions from the Plan Trust from and after the Full Creditor Payment Date; provided, however, that, notwithstanding the occurrence of the Full Creditor Payment Date (as a result of the occurrence of the fourth anniversary (subject to tolling) as described in section 1.54 of the Plan in the definition of the term "Full Creditor Payment Date"), such Holders shall be entitled to receive Distributions on account of Plan Assets that have not been fully administered by the Full Creditor Payment Date until the date that such Holders have received 25% of the aggregate amount of Allowed General Unsecured Claims (including Committee Carve-out funds received by the Creditors' Trust), and provided further, however, that, notwithstanding the occurrence of the Full Creditor Payment Date, such Holders shall be entitled to receive Distributions on account of Non-Scheduled Assets identified by the Full Creditor Payment Date, even if such Distributions shall cause such Holders to receive more than 25% of the aggregate amount of Allowed General Unsecured Claims (including the Committee Carve-out funds received by the Creditors' Trust), and provided further, however, that, notwithstanding the occurrence of the Full Creditor Payment Date (as a result of the occurrence

---

[5] Subject to the restrictions set forth in section 5.2.5(b) of the Plan.

of the fourth anniversary (subject to tolling) as described in section 1.54 of the Plan in the definition of the term "Full Creditor Payment Date"), such Holders shall be entitled to receive Creditors' Additional Payments, if any, in accordance with the last proviso contained in section 1.54 of the Plan until the date that such Holders have received 25% of the aggregate amount of Allowed General Unsecured Claims (including Committee Carve-out funds received by the Creditors' Trust).

Class 5 is impaired by the Plan. Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

## 6. Class 6 – MTE and Tyson Interests

Class 6 consists of all Interests directly or indirectly arising from or under, or relating in any way to, MTE Common Stock. As of the Petition Date, there were 1,000 shares of MTE Common Stock outstanding. All shares of MTE Common Stock and all issuable shares of MTE Common Stock are included in Class 6 under the Plan.

As a result of the substantive consolidation of the Estates as of the Effective Date pursuant to the Plan, all existing MTE Common Stock Interests shall, without any further action, be cancelled, annulled, and extinguished and any certificates representing such Interests shall become null, void, and of no force or effect. The Holders of such Interests shall retain no rights and receive no Distributions on account thereof. Tyson shall not receive any Distributions on account of his Class 6 Interest. Class 6 is impaired under the Plan. Because Holders of Class 6 Interests shall retain no rights or receive any Distributions on account of their Class 6 Interests, such Holders are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

## 7. Substantive Consolidation

The Plan contemplates the substantive consolidation of the Debtors' Bankruptcy Cases into a single proceeding. On the Effective Date: (a) all Interdebtor Claims shall be cancelled, eliminated and extinguished; (b) all assets and liabilities of the Debtors' Estates shall be consolidated into a single estate, i.e., the Tyson Estate; (c) all guarantees made by one Debtor of the obligations of the other Debtor before the Effective Date shall be eliminated; (d) any obligation of either Debtor and all guarantees thereof shall be deemed to be a single obligation of the Reorganized Debtor and Plan Trust; (e) any Claims filed or to be filed in connection with any such obligation and such guarantees referenced in subsection (d) hereof shall be deemed to be a single Claim against the Reorganized Debtor and the Plan Trust; (f) each and every Claim filed in the individual Bankruptcy Case of any Debtor shall be deemed to be a single obligation of the Reorganized Debtor or Plan Trust under the Plan; (g) all duplicative Claims (identical in both amount and subject matter) filed against both Debtors shall be automatically expunged so that only one Claim survives against the Reorganized Debtor and the Plan Trust (but in no way shall such surviving Claim be deemed Allowed by reason of this section); and (h) MTE shall be dissolved. All Claims based upon guarantees of collection, payment or performance made by one Debtor as to the obligations of the other Debtor or of any other Person shall be discharged, released and of no further force and effect; provided, however, that nothing in the Plan shall affect the obligations arising under the Plan.

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. The effect of substantive consolidation is the pooling of the assets of, and the claims against, the multiple debtors for the purposes of voting on the plan and satisfying liabilities from a common fund. In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988).

Courts evaluate the propriety of substantive consolidation on a case-by-case basis. FDIC v. Colonial Realty Co., 966 F.2d 57 (2d Cir. 1992). The extensive list of factors relied upon by courts may be distilled into two main factors: (i) whether creditors dealt with the entities as a single economic unit; and (ii) whether the affairs of the debtors are so entangled that consolidation is necessary and will benefit all creditors. In re Augie/Restivo Baking Co., 860 F.2d at 518. The Plan Proponents believe that substantive consolidation of the Debtors in the Bankruptcy Cases is warranted under the criteria considered by courts in ruling on the propriety of substantive consolidation in other cases. In connection with the Confirmation Hearing, the Plan Proponents will present evidence appropriate for the Court to approve substantive consolidation of the Debtors' Bankruptcy Cases.

**B.** **Other Aspects of the Plan**

The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.

**1.** **Plan Trust**

**a.** **Establishment of Plan Trust**

On the Effective Date, the Plan Trust shall be established. The Plan Trust shall be governed by and operate in conformity with the Plan Trust Agreement to be filed as part of the Plan Supplement with the Bankruptcy Court by the Plan Proponents not later than fifteen (15) days prior to the Confirmation Hearing. On the Effective Date, R. Todd Neilson, or an alternate administrator appointed by the Debtors and reasonably acceptable to the Committee, will be appointed as and shall assume the responsibilities of the Plan Administrator as provided for in the Plan. The Plan Administrator shall act as the fiduciary and trustee for the Plan Trust from and after the Effective Date. On the Effective Date, the Creditors' Representative shall be appointed and shall assume the responsibilities of Creditors' Representative as provided for in the Plan. The Creditors' Representative shall not be a fiduciary or trustee of the Plan Trust, but shall be a fiduciary representative of creditors of the Estates and shall have standing to pursue their rights and remedies in the Bankruptcy Court or other forum on their behalf to protect their interests or to enforce performance of the Plan. The Plan Administrator shall collect, administer, investigate, dispose of, and distribute Plan Assets described below from and after the Effective Date on behalf of the Plan Trust, and shall provide quarterly written reports on such activities to the Creditors' Representative and Turner.

**b.**     **Transfer of Plan Assets to Plan Trust**

On the Effective Date, the Plan Trust shall receive all of the Estates' present and future right, title, and interest in the following assets, cash, and property, tangible or intangible, and all proceeds, interest, and other earnings generated therefrom (all of which constitute "Plan Assets"), but no other property of any kind, tangible or intangible, all to be transferred free and clear of all liens, encumbrances, interests, exemptions, claims, and rights of setoff or recoupment:

(i)      the remaining portion of the Connecticut Escrow funds after payment to Turner of $2,000,000 in accordance with the Turner Settlement;

(ii)      any remaining Net Vegas Sale Proceeds in excess of the $1,500,000 paid to Turner from the Net Vegas Sale Proceeds (or, alternatively, if the Vegas Properties have not been sold by the Effective Date, the Estates' interest in the Vegas Properties, subject to prior liens on the Vegas Properties and the terms of the Turner Settlement);

(iii)      the proceeds of the King Settlement (including, without limitation, the Subsequent King Settlement Payments, all Base Interest accrued thereon, and any Default Interest and Collection Costs to which the Plan Trust is entitled for having borne any delay or costs resulting from a breach or default by King under the King Settlement);

(iv)      all Litigation Actions (none of which shall be deemed released or otherwise impaired by assumption of any contract, Allowance of any Claim or Confirmation of the Plan), all books, records and documentation related thereto, and all proceeds of any of the foregoing;

(v)      all accounts receivable and loans held by the Debtors and the Estates as of the Petition Date and all books, records, and documentation related thereto;

(vi)      all Cash held by the Debtors constituting property of the Estates, in addition to the amounts set forth in subparagraphs (i), (ii), and (iii) immediately above, but excluding Postpetition Earnings;

(vii)      the Creditors' Additional Payments, which, after the Full Tax Payment Date, shall be solely for the benefit of Holders of Allowed General Unsecured Claims; and

(viii)      the Non-Scheduled Assets.

### c.      Distribution of Plan Assets by Plan Trust

The Plan Administrator shall distribute the proceeds of the Plan Assets in satisfaction of Claims (and establish appropriate reserves as described below) in the following order of priority:

> (i)      first, in compensation for discharging their respective duties as described herein, (i) reasonable market-based fees and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses and post-Effective Date taxes) of the Plan Administrator, and (ii) until the Full Creditor Payment Date, the fees (which shall equal $5,000 per month) and reasonable out-of-pocket expenses (including reasonable legal and accounting expenses[6]) of the Creditors' Representative;

> (ii)      second, Allowed Higher Priority Claims;

> (iii)      third, the Turner Remaining Claim (solely from proceeds of the King Settlement);

> (iv)      fourth, Allowed Priority Tax Claims; and

> (v)      fifth, subject to section 4.5 of the Plan, Allowed General Unsecured Claims.

To the extent that Plan Assets remain in the Plan Trust after payment of all amounts and Distributions due under the Plan and satisfaction of all obligations under the Plan, (A) any residual assets remaining in the Plan Trust (other than the Disputed Claims Reserve and the Claims Resolution Reserve) will be paid or transferred to Tyson on account of the Contribution Agreement, as set forth in section 5.3.2(d) of the Plan, and (B) further, upon the resolution of all Disputed Claims, the Plan Trust shall be dissolved and any residual assets remaining in the Disputed Claims Reserve and the Claims Resolution Reserve will be paid or transferred to Tyson on account of the Contribution Agreement, as set forth in section 5.3.2(d) of the Plan.

### d.      Claims Resolution Reserve

Before making any Distributions or payments from Plan Assets, on the Effective Date the Plan Administrator shall establish the Claims Resolution Reserve, which shall be used to fund the investigation, litigation, and disposition of Claims (including, without limitation, Priority Tax Claims, Priority Non-Tax Claims, Administrative Tax Claims, General Unsecured Claims and Administrative Expense Claims) against any of the Debtors and their Estates (but not in respect of the dischargeability of any debts or Claims). The Plan Administrator shall be responsible for resolving any Claims against the Estates that are not resolved by the Effective Date and for establishing as may be reasonably necessary reserves (in addition to the Claims Resolution Reserve) in respect of Disputed Claims.

---

[6] Subject to the restrictions set forth in section 5.2.5(b) of the Plan.

### e.      **Miscellaneous Plan Trust Provisions**

The Plan Administrator shall also have the right to object to Claims after the Effective Date and have the Bankruptcy Court estimate or determine the amount of any Allowed Claim.

The Plan Administrator shall have the right to retain and employ legal counsel and accountants to assist the Plan Administrator in the settlement or prosecution of the Litigation Actions and the administration of the Plan Trust. The Plan Administrator will consult with Tyson regarding the selection of these professionals. In the event that the Creditors' Representative retains and employs legal counsel and accountants to pursue the rights and remedies of Creditors in the Bankruptcy Court or another forum on their behalf to enforce performance of the Plan, upon presentation to the Plan Administrator of invoice(s) for the services rendered and related expenses incurred by such professional(s) from and after such default, the Plan Administrator shall deposit into an escrow account of the Creditors' Representative's legal counsel an amount equal to such invoice(s), and upon the determination of a court of competent jurisdiction that the Plan Administrator has breached his obligations under the Plan, said amount shall be released from such escrow account to the Creditors' Representative. If a court of competent jurisdiction determines that no such breach has occurred, the amount deposited into the escrow account shall be returned to the Plan Administrator. If no determination is made by a court of competent jurisdiction within one (1) year of the date of the deposit of such funds, they shall be returned to the Plan Administrator. Subject to the foregoing, to the extent the Creditors' Representative employs counsel to assist the Creditors' Representative in carrying out its day-to-day duties as Creditors' Representative, fees and expenses incurred in connection therewith by such counsel shall not be paid by or from assets of the Plan Trust.

The Plan Administrator shall pay the reasonable fees and expenses of the Creditors' Representative, the Plan Trust and their respective professionals in accordance with the terms of the Plan, and no such professional shall be required to apply for Bankruptcy Court approval of its retention. The Bankruptcy Court shall have jurisdiction only over disputes, if any, regarding the payment of such fees and expenses.

### f.      **Additional Rights, Duties and Obligations**

    (i)      *Purpose of the Plan Trust.* The Plan Trust shall be established for the sole purpose of liquidating its assets, in accordance with U.S. Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business;

    (ii)      *Plan Assets.* The Plan Trust shall consist of the cash, assets, and property transferred to the Plan Trust pursuant to section 5.2.2 of the Plan (and all proceeds thereof and income thereon), which in the aggregate shall constitute the "Plan Assets;"

    (iii)      *Transferability of Plan Trust Interests.* The beneficial interests in the Plan Trust are not transferable;

(iv) *Cash.* The Plan Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, *provided, however,* that such investments are investments permitted to be made by a liquidating trust within the meaning of U.S. Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities;

(v) *Distributions.* The Plan Administrator shall distribute at least annually and in accordance with the Plan Trust Agreement, beginning on the Effective Date or as soon thereafter as is practicable, all Cash on hand (including any cash received from the Debtors on the Effective Date and treating as Cash for this purpose any investments made in accordance with section 5.2.6(d) of the Plan), except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed on the Effective Date (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Plan Assets during liquidation, (iii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Plan Trust or in respect of the Plan Assets), and (iv) to satisfy other liabilities incurred by the Plan Trust in accordance with this Plan or the Plan Trust Agreement; and

(vi) *Dissolution.* The Plan Administrator and the Plan Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Disputed Claims have been resolved, (ii) all Plan Assets have been liquidated and (iii) all Distributions required to be made by the Plan Administrator under the Plan have been made, but in no event shall the Plan Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Plan Assets.

**g.      Federal Income Tax Treatment of Plan Trust**

(i) *Plan Assets Treated as Owned by Holders of Allowed Claims.* For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Plan Administrator, and the Holders of Allowed Claims) shall treat the transfer of the Plan Assets to the Plan Trust as (i) a transfer of the Plan Assets directly to the

Holders of Allowed Claims, followed by (ii) the transfer by such Holders to the Plan Trust of the Plan Assets in exchange for beneficial interests in the Plan Trust. Accordingly, the Holders of such Allowed Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Plan Assets;

(ii)     *Tax Reporting*.

(a)     The Plan Administrator shall file returns for the Plan Trust as a grantor trust pursuant to U.S. Treasury Regulation section 1.671-4(a) and in accordance with section 5.2.7(b) of the Plan. The Plan Administrator shall also annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit, and will instruct all such holders to report such items on their federal income tax returns. The Plan Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to section 5.2.7(b)(iii) of the Plan, relating to Disputed Claims) to the Holders of Allowed Claims in accordance with their relative beneficial interests in the Plan Trust.

(b)     As soon as possible after the Effective Date, but in no event later than ninety (90) days thereafter, the Plan Administrator shall make a good faith valuation of the Plan Assets, and such valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Plan Administrator, and the Holders of Allowed Claims) for all federal income tax purposes. The Plan Administrator shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any governmental unit.

(c)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator shall (i) treat any assets allocable to, or retained on account of, Disputed Claims as held by one or more discrete trusts for federal income tax purposes (the "Plan Trust Disputed Claims Reserve"), consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Internal Revenue Code (sections 641 <u>et</u>.

seq.), (ii) treat as taxable income or loss of the Plan Trust Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the Holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (iii) treat as a Distribution from the trust for Disputed Claims any increased amounts distributed by the Plan Trust as a result of any Disputed Claims resolved earlier in the taxable year, to the extent such Distributions relate to taxable income or loss of the trust for Disputed Claims determined in accordance with the provisions of the Plan, and (iv) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All Holders of Claims shall report, for tax purposes, consistent with the foregoing.

(d)     The Plan Administrator shall be responsible for payments, out of the Plan Assets, of any taxes imposed on the trust or its assets, including the Plan Trust Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Plan Trust Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Plan Administrator as a result of the resolutions of such Disputed Claims.

(e)     The Plan Administrator may request an expedited determination of taxes of the Plan Trust, including the Plan Trust Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust.

## 2.      Contribution Agreement

As of the Effective Date, Tyson individually and the Plan Administrator, on behalf of the Plan Trust, shall enter into the Contribution Agreement and other ancillary and implementing documentation necessary or appropriate to effectuate its terms (including, without limitation, execution and delivery to the Plan Administrator of letters of direction (with the third party addressee(s) thereof left blank) signed by Tyson and a power(s) of attorney signed by Tyson in

favor of the Plan Administrator (pursuant to which, among other things, Tyson will appoint the Plan Administrator attorney-in-fact with the right, upon Tyson's default under the Contribution Agreement or the default of third parties in payment of amounts payable to the Plan Administrator on behalf of the Plan Trust pursuant to a letter of direction delivered to such party, to collect such payments and amounts and otherwise enforce, settle, compromise and resolve Tyson's rights against third parties, either in the Plan Administrator's name or in the name of the Tyson), which Contribution Agreement and ancillary and implementing documentation shall be incorporated by reference into the Plan. The Contribution Agreement and the forms of such ancillary and implementing documents shall be subject to the prior approval of the Committee and shall have the following additional terms and conditions, as well as such other customary terms and conditions as are necessary or appropriate:

Tyson shall retain at his expense a financial advisor (who shall not be the Plan Administrator), whose responsibilities shall include (A) receiving and administering Future Tyson Fight Income, (B) paying Creditors' Additional Payments to the Plan Trust and the Turner Fight Payments to Turner in accordance with the terms hereof, (C) monitoring Tyson's compliance with the Contribution Agreement, and (D) delivering written reports to the Plan Administrator (who shall, in turn, furnish such reports to the Creditors' Representative and Turner) on a quarterly basis, and granting to the Plan Administrator reasonable access to Tyson's books and records regarding Future Tyson Fight Income, Bout Expenses, the payment of post-Effective Date taxes, Net Future Tyson Fight Income, the Tyson Fight Payments, the Turner Fight Payments and the Creditors' Additional Payments and all evidence of and calculations related thereto.

In consideration of Tyson's receipt of a discharge and the transfer to Tyson of the assets described in section 5.3.2(d) of the Plan on account of the Contribution Agreement:

    **a.**    Subject to section 5.3.2(c) of the Plan, until the Full Tax Payment Date, for each Bout that is not a Lower Revenue Bout, Tyson shall pay or cause to be paid from Net Future Tyson Fight Income (after payment of the Tyson Fight Payment), (1) first, the Turner Fight Payment to Turner, and (2) second, the Creditors' Additional Payment to the Plan Trust, and

    **b.**    From and after the Full Tax Payment Date and (subject to the second proviso contained in section 1.54 of the Plan in the definition of the term "Full Creditor Payment Date") until the Full Creditor Payment Date, for each Bout Tyson shall pay to the Plan Trust from Future Tyson Fight Income the Creditors' Additional Payment.

    **c.**    In further consideration of Tyson's receipt of a discharge and the transfer to Tyson of the assets described in section 5.3.2(d) of the Plan on account of the Contribution Agreement, until the Full Tax Payment Date, for each Bout that constitutes a Lower Revenue Bout, Tyson shall pay in full (i) Bout Expenses (excluding Restructuring Expenses) relating to such Lower Revenue Bout, (ii) reasonably estimated income taxes and other taxes arising from or incurred in connection with such Lower Revenue Bout, and (iii) the Tyson Fight Payment relating to such Lower Revenue Bout.

Then, Tyson shall pay the remaining amount of the Future Tyson Fight Income generated by such Lower Revenue Bout (net of the above payments described in subsections (i), (ii), and (iii) immediately above), on a pro rata basis, (x) to Turner on account of the Turner Fight Payment, (y) to the entities owed payment of Restructuring Expenses (up to, in the aggregate, the Restructuring Expenses Cap), and (z) to the Plan Trust on account of the Creditors' Additional Payment in an amount equal to the Tyson Fight Payment less the Turner Fight Payment (that would be paid if the Bout were not a Lower Revenue Bout), if any).

**d.** On the Effective Date, on account of the Contribution Agreement, Tyson shall receive the following assets:

    (i) All assets that are exempt pursuant to section 522 of the Bankruptcy Code;

    (ii) all Post-petition Earnings and other assets that have been acquired by Tyson since the Petition Date whether by purchase, gift or otherwise; and

    (iii) all personal property, intellectual property and other assets of the Estates other than Plan Assets.

To the extent that Plan Assets remain in the Plan Trust after payment of all amounts and Distributions due under the Plan and satisfaction of all obligations under the Plan, (A) any residual assets remaining in the Plan Trust (other than the Disputed Claims Reserve and the Claims Resolution Reserve) will be paid or transferred to Tyson, and (B) further, upon the resolution of all Disputed Claims, the Plan Trust shall be dissolved and any residual assets remaining in the Disputed Claims Reserve and the Claims Resolution Reserve will be paid or transferred to Tyson.

**e.** Any default or breach by Tyson of his obligations under the Contribution Agreement shall require Tyson to pay to the Plan Trust all Collection Costs associated therewith.

**f.** Prior to the occurrence of the Plan Effective Date, Tyson shall deposit with counsel to the Debtors, or other escrow agent reasonably acceptable to Tyson and the Committee, who shall then hold in escrow, all Future Tyson Fight Income (net of Bout Expenses (excluding Restructuring Expenses) relating to the Bout(s) that generated such Future Tyson Fight Income, reasonably estimated income and other taxes arising from or incurred in connection with such Bout(s), and Tyson Fight Payments due on account of such Bout(s)), and, upon the occurrence of the Effective Date, counsel to the Debtors shall distribute such escrowed amounts to Turner, the Plan Trust and the entities owed payment of Restructuring Expenses in accordance with the terms of the Plan.

3. **The King Settlement**

The Plan incorporates the terms of the King Settlement, which by its terms is conditioned upon approval by the Bankruptcy Court as embodied in either (a) an order confirming a plan of reorganization, or (b) an order pursuant to Bankruptcy Rule 9019 approving the settlement. The Committee consents to the King Settlement in connection with the Plan and expressly reserves its right to contest the King Settlement other than in connection with Confirmation of the Plan, i.e., if presented separately under Bankruptcy Rule 9019. The Plan Proponents are seeking to approve the King Settlement under the Plan. If the Plan is withdrawn or Confirmation thereof is denied, the Debtors intend immediately to seek approval of the King Settlement under Bankruptcy Rule 9019, and the Committee's right to object thereto is expressly reserved.

The following description is a summary of the King Settlement, which summary is qualified in its entirety by reference to the documents evidencing the King Settlement:

King has agreed to pay to the Plan Trust $14,000,000, payable as follows:

      **a.**      on the Effective Date, $8,000,000;

      **b.**      on the first Business Day of January, 2005, $3,000,000, plus Base Interest on such amount measured from the date of entry of a Final Order approving the King Settlement;

      **c.**      on the first Business Day of January, 2006, $3,000,000, plus Base Interest on such amount measured from the date of entry of a Final Order approving the King Settlement;

      **d.**      any default or breach by King under the King Settlement shall require King to pay, in addition to Base Interest, Default Interest on all outstanding amounts due and payable pursuant to the King Settlement and all Collection Costs;

      **e.**      the King Settlement (as embodied in the Plan) is subject to entry of the Confirmation Order and the occurrence of the Effective Date. Following the entry of an order approving the King Settlement, the Debtors and King shall file on or after the Effective Date with the District Court a stipulation of dismissal dismissing any and all claims against King asserted by Tyson in the King Litigation and any and all counterclaims asserted by King against Tyson in the King Litigation, with prejudice (which dismissal shall not be effective until after the Effective Date);

      **f.**      on the Effective Date: (i) mutual general releases shall be exchanged between King, on the one hand, and the Debtors and Tyson, the Estates, and the Committee (and its members) on the other hand (and their respective representatives solely in such capacities); and (ii) King shall withdraw with prejudice (or cause to be withdrawn with prejudice) the

proofs of claim filed on behalf of Don King Productions, Inc. and KingVision Pay Per View Ltd. against the Debtors;

**g.**     the King Settlement shall survive the Effective Date and remain binding notwithstanding any dismissal or conversion of either or both of the Bankruptcy Cases. The King Settlement shall be binding on any chapter 11 trustee or chapter 7 trustee appointed in the Bankruptcy Cases, or any other entity that for any reason (including, without limitation, in connection with the Plan) is designated to act as a fiduciary or representative for either or both of the Estates; and

**h.**     in addition to a definitive settlement agreement, and other related documentation, the foregoing payment obligations arising under the King Settlement shall be evidenced by a promissory note from Don King Productions, Inc., and personally guaranteed by Don King (but only in the event the Committee affirmatively and continuously supports the King Settlement until such time as a Final Order is entered approving the King Settlement), made payable to the order of the Plan Trust (and not subject to setoff rights or defenses of any kind), and negotiable and transferable only after a default under the promissory note.

**4.      Timing and Method of Distributions Under the Plan**

All Distributions under the Plan from the Plan Trust shall be made by the Plan Administrator. With respect to all Claims, the Plan Administrator shall be entitled to rely on the most current claims register prior to twenty (20) days before the Confirmation Date.

Any Cash payment to be made pursuant to the Plan will be in U.S. dollars and may be made by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law and payment shall be deemed made when the draft, check, or wire transfer, as the case may be, is transmitted. Payment of Cash in an amount of less than twenty-five dollars ($25.00) need not be made by the Plan Administrator to any Holder of a Claim. Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made, without interest, on the next succeeding Business Day.

**5.      Disputed Claims and Objections to Claims**

Notwithstanding anything in the Plan to the contrary, no Distribution shall be made on a Disputed Claim until such Disputed Claim becomes an Allowed Claim. In addition, in accordance with the Plan, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution (of a value set forth herein or in the Plan) in excess of the Allowed amount of such Claim. No Creditor or Interest Holder shall have recourse to the Reorganized Debtor or the Plan Trust (or any property thereof), other than with regard to the enforcement of rights or Distributions under the Plan.

Except as provided in the Plan, the Confirmation Order, or in agreements approved by

Final Order of the Bankruptcy Court, the Plan Administrator may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Expense Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights, and causes of action of any nature that the Debtors or the Estates may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, nor any other action or omission of the Plan Trust or Plan Administrator, nor any provision of the Plan shall constitute a waiver or release by the Plan Trust or the Estates of any such claims, rights, and causes of action that the Debtors, the Estates, or the Plan Trust may possess against such Holder. To the extent the Plan Administrator fails to set off against a Creditor and seeks to collect a claim from such Creditor after a Distribution to such Creditor pursuant to the Plan, the Plan Administrator, if successful in asserting such claim, shall be entitled to full recovery on the claim of such party or parties against such Creditor.

Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed and served on the applicable Holder of such Claim not later than sixty (60) days after the later to occur of: (a) the Effective Date and (b) the filing of the relevant Claim. After the Effective Date, only the Plan Administrator or Tyson (at his own sole expense and only if the Plan Administrator fails to file such objection) shall have the authority to file, settle, compromise, withdraw, or litigate to judgment their respective objections to Claims. The Plan Administrator may settle or compromise any Disputed Claim without Bankruptcy Court approval.

After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the Holder of such Claim solely to decrease, but not to increase, the amount or priority. Unless otherwise provided in the Plan, any new or amended Claim filed after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Debtors or the Plan Administrator unless the Claim Holder has obtained prior Bankruptcy Court authorization for the filing.

### 6. Conditions Precedent to the Plan

The Plan will not become effective unless and until (i) the Bankruptcy Court shall have entered a Confirmation Order; (ii) the Confirmation Order shall have become a Final Order; provided, that if the Confirmation Order has been entered and has not been stayed, this condition may be waived by the Plan Proponents jointly in their collective sole and absolute discretion, in which case the Plan Proponents shall consummate the Plan notwithstanding the pendency of any appeal; (iii) the Turner Settlement and the King Settlement shall have been approved by the Bankruptcy Court simultaneously with Confirmation of the Plan, and all documents evidencing such settlements shall have been executed and delivered; (iv) a Bout shall have occurred; and (v) the Claim or Claims of Showtime against the Estates shall have been resolved in a manner acceptable to the Plan Proponents.

### 7. Effective Date Transactions

On the Effective Date, the following transactions shall occur simultaneously. The Effective Date shall not be deemed to have occurred and the Plan shall not be effective until each

of the following transactions or events has occurred: (i) Tyson shall execute and deliver the Contribution Agreement; (ii) King shall pay to the Plan Trust $8,000,000 pursuant to the King Settlement; (iii) Turner shall receive $2,312,000 on account of the Turner Remaining Claim; (iv) Turner shall pay $1,000,000 to the Creditors' Trustee on behalf of the Creditors' Trust on account of the Committee Carve-out; (v) the Plan Trust shall be established by the execution and delivery of the Plan Trust Agreement and the Plan Assets shall be transferred to the Plan Trust; (vi) the Plan Administrator shall be appointed and shall assume its responsibilities as provided for in the Plan; (vii) the Creditors' Trust shall be established by execution and delivery of the Creditors' Trust Agreement that shall evidence the Creditors' Trust; (viii) the Creditors' Trustee shall be appointed and shall assume its responsibilities as provided for under the Plan; (ix) the Creditors' Representative shall be appointed and shall assume its responsibilities as provided for under the Plan; and (x) the Connecticut Escrow shall be broken and the proceeds thereof distributed as set forth in section 4.2.1 of the Plan.

## 8.    Failure of Conditions/Non-Occurrence of Effective Date

In the event that any of the conditions precedent specified in section 9.1 of the Plan or any event or transaction described in section 9.2 of the Plan either has not occurred or has not been satisfied or waived (in the manner provided in section 9.4 of the Plan) on or before sixty (60) days after the Confirmation Date, the Plan Proponents may, upon notification submitted by them to the Bankruptcy Court, terminate the Plan.  In addition, if the Effective Date does not occur by November 30, 2004, unless extended by agreement of the Plan Proponents, the Plan shall automatically be terminated.  Upon termination of the Plan, (i) the Confirmation Order will be vacated, (ii) no Distributions will be made under the Plan, (iii) the Debtors and all Holders of Claims and Interests will be returned to the status quo ante and (iv) all of the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.  The conditions to effectiveness of the Plan contained in sections 9.1 and 9.2 of the Plan may be waived only upon express written consent by the Debtors and the Committee.

## 9.    Executory Contracts and Unexpired Leases

The Bankruptcy Code gives the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or other unexpired lease is rejected, the other party to the agreement may file a claim for damages incurred by reason of the rejection.  In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.

The Plan provides that, except as otherwise set forth therein or in the Confirmation Order, all pre-petition executory contracts and unexpired leases existing between any of the Debtors or their Estates and any party will be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date except: (i) any executory contracts and unexpired leases that are the subject of separate motions to reject filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order, (ii) contracts and leases listed in Schedule 8.1 - Schedule of Executory Contracts to be filed by the Debtors with the Bankruptcy

Court as part of the Plan Supplement at least fifteen (15) days prior to the Confirmation Hearing (which shall provide for the assumption, as of the Effective Date, of such contracts and leases), or (iii) all executory contracts or unexpired leases rejected under the Plan or by order of the Bankruptcy Court entered before the Confirmation Date. Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered prior to the Confirmation Date.

Listing a contract or lease in Schedule 8.1 - Schedule of Executory Contracts shall not constitute an admission by the Debtors that such contract or lease, including related agreements, is an executory contract or unexpired lease or that the Debtors have any liability thereunder.

Subject to sections 8.1.1 and 8.3 of the Plan, the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of executory contracts and unexpired leases the assumption or rejection of which is provided for in section 8.1.1(a) of the Plan pursuant to section 365 and 1123 of the Bankruptcy Code and such assumption or rejection shall be deemed effective as of the Effective Date.

Any Creditor whose Claim arises from rejection of an executory contract or unexpired lease shall have thirty (30) days from service upon such Creditor of notice of entry of an order of the Bankruptcy Court rejecting the executory contract or unexpired lease, which may include, if applicable, the Confirmation Order, to file with the Bankruptcy Court and serve upon the Plan Administrator a proof of claim. To the extent such Claim is Allowed, said Creditor shall have the rights of a Holder of a Class 5 Allowed Claim with respect thereto.

At the election of the Debtors or the Plan Administrator, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code (a) by payment of the default amount in Cash by Tyson (and not from any assets of the Estates or the Plan Trust) on or as soon as reasonably practicable after the later to occur of (i) thirty (30) days after the determination of the cure amount and (ii) the Effective Date or such other date as may be set by the Bankruptcy Court, or (b) on such other terms as agreed to by the Debtors, the Plan Administrator and the non-Debtor party to such executory contract or unexpired lease (provided that such terms do not require payment by the Plan Trust). In the event of a dispute regarding: (i) the amount of any cure payments, (ii) the ability of the Reorganized Debtor to provide adequate assurance of future performance under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made only following the entry of a Final Order resolving the dispute and approving assumption. The Debtors shall have the right at any time to move to reject any executory contract or unexpired lease based on the existence of such a dispute.

## 10. Discharge of the Debtors

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1141(d)(1) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge, effective as of the Effective Date, of all debts of, Claims against, liens on, and Interests in the

Debtors, their assets, or properties, which debts, Claims, liens, and Interests arose at any time before the entry of the Confirmation Order. The discharge of the Debtors shall be effective as to each Claim, regardless of whether a proof of claim therefor was filed, whether the Claim is an Allowed Claim or whether the Holder thereof votes to accept the Plan. On the Effective Date, as to every discharged Claim and Interest, any Holder of such Claim or Interest shall be precluded from asserting against the Debtors, Reorganized Debtor, the Creditors' Trust, the Plan Trust or Tyson or the assets or properties of any of them, any other or further Claim or Interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

## 11.    <u>Injunction</u>

In accordance with section 524 of the Bankruptcy Code, the discharge provided by this section and section 1141 of the Bankruptcy Code, among other things, acts as an injunction against the commencement or continuation of any action, employment of process, or act to collect, offset, or recover the Claims, liens, and Interests treated and provided for under the Plan. Inasmuch as Tyson's contributions pursuant to the Contribution Agreement are necessary to the performance the Plan, and any action, employment of process, or act to collect, offset, or recover the Claims, liens, and Interests treated and provided for under the Plan would otherwise frustrate Tyson's rehabilitation, as long as either the Plan Administrator or Tyson, as the case may be, is making payments on account of any non-dischargeable Allowed Claim that is to be paid in full under the Plan, including the Turner Non-Dischargeable Allowed Claim and Allowed Priority Tax Claims, in accordance with the provisions of the Plan, and Tyson is not in violation of the Contribution Agreement, then the Holder of such non-dischargeable claim shall be enjoined from collecting such Claim from Tyson or his non-estate property and Post-Petition Earnings or in any manner other than from the Plan Assets in accordance with the terms of the Plan.

## 12.    <u>Exculpation and Releases</u>

The treatment to be provided for respective Claims or Interests (other than non-dischargeable Claims) pursuant to the Plan shall be in full satisfaction, settlement, release, and discharge of such respective Claims or Interests.

Except as provided in the Plan or in the Confirmation Order, the Debtors, the Reorganized Debtor, the Committee (and its members in such capacity) and any Professionals retained by the foregoing Persons (in their respective capacities as such), or successor in interest to any of the foregoing Persons, shall have no liability to any Person for any act or omission following the Petition Date through the Effective Date in connection with the Debtors or the Bankruptcy Cases or arising out of its administration of the Plan or the property to be distributed under the Plan, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, or consummating the Plan and Disclosure Statement or any contract, instrument, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, or (ii) any Distributions made pursuant to the Plan, except for willful misconduct or gross negligence and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

13.    **Preservation of Litigation Actions and Objections to Claims**

Under chapter 5 of the Bankruptcy Code, a debtor in possession has certain powers to recover money or other assets for the debtor's estate, eliminate security interests in estate property or eliminate debt incurred by the estate.  In addition to these rights, the Debtors hold certain Litigation Actions, including Advisor Actions.  Under the Plan, all Litigation Actions, including, without limitation, causes of action arising under chapter 5 of the Bankruptcy Code, other Avoidance Actions, rights to object to Claims, and any Advisor Actions shall be preserved and shall be conveyed to and administered by the Plan Trust, and shall not be waived, released or discharged by Confirmation of the Plan, entry of the Confirmation Order, Allowance of any Claim or the occurrence of the Effective Date.  Annexed hereto as Exhibit E is a non-exclusive List of Certain Preserved Litigation Actions, which are expressly identified and preserved for prosecution on and after the Effective Date.  To the extent necessary, the Plan Administrator shall be deemed the representative of the Estates in accordance with section 1123(b) of the Bankruptcy Code.

14.    **Termination of Committee**

Except as otherwise provided in section 10.8 of the Plan, on the date by which both (a) the Effective Date has occurred, and (b) the Confirmation Order has become a Final Order, the Committee shall cease to exist, and its members, employees and agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) shall be deemed released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from, or in connection with their service on the Committee.  Following the date that the Committee ceases to exist as provided in section 10.8 of the Plan, the Committee will continue to exist (and the Committee will continue to employ its counsel) after such date solely with respect to (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any Professional and (ii) return of the letter of credit (if issued) to Turner.  Following the date that the Committee ceases to exist as provided in section 10.8 of the Plan, the Creditors' Representative shall be deemed the successor of the Committee as Plan Proponent in respect of any proposed amendment, modification or withdrawal of the Plan or any dispute relating to the implementation, execution, consummation or interpretation of the Plan and making Distributions thereunder.

15.    **Amendment of the Plan**

The Plan and the Plan Supplement may not be altered, amended, or modified except with the prior written consent of each of the Plan Proponents.

16.    **Revocation of the Plan**

Either of the Plan Proponents may revoke or withdraw the Plan at any time prior to the Confirmation Date.  If either of the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, then it will be deemed null and void.

**17.**     **Payment of Statutory Fees and Related Post-Confirmation Requirements**

On the Effective Date, and thereafter as may be required, the Debtors, and after the Effective Date, the Plan Administrator shall (i) pay all fees payable pursuant to section 1930 of Chapter 123 of Title 28 of the United States Code and (ii) file post-confirmation reports required under the Bankruptcy Code and Bankruptcy Rules, including without limitation disbursement reports.

**18.**     **Plan Supplement**

As set forth in section 10.5.2 of the Plan, at least fifteen (15) days before the Confirmation Date, the Plan Proponents shall file with the Bankruptcy Court a Plan Supplement containing the exhibits and schedules to the Plan and such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Copies of the Plan Supplement may be viewed by accessing the Bankruptcy Court's website at www.nysb.uscourts.gov (a Bankruptcy Court- issued password is necessary) or by contacting Noelia Jaramillo at (212) 561-7700 or njaramillo@pszyjw.com.

## VII.     CONFIRMATION AND CONSUMMATION PROCEDURE

**A.**     **Solicitation of Votes**

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes 1, 2, 3, and 5 of the Plan are impaired and the Holders of Claims in such Classes are entitled to vote to accept or reject the Plan. The Holders of Allowed Claims in Class 4 are unimpaired. Accordingly, such Holders are conclusively presumed to have accepted the Plan, and the solicitation of acceptances with respect to such Classes is not required under section 1126(f) of the Bankruptcy Code. Because no Distributions will be made to the Holders of Interests in Class 6, such Holders are impaired and deemed to have rejected the Plan.

As to classes of claims entitled to vote on a plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that have timely voted to accept or reject a plan, and acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of interests of that class that have timely voted to accept or reject a plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Creditor of an impaired Class whose Claim is an Allowed Claim is entitled to vote. In the event of a controversy as to whether any Claim or Class of Claims or Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

**B.**     **The Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation

hearing. The Confirmation Hearing in respect of the Plan has been scheduled for _____, 2004 at 10:00 a.m., Prevailing Eastern Time before the Honorable Allan L. Gropper, United States Bankruptcy Judge at the United States Bankruptcy Court, One Bowling Green, 6th Floor, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number of Interests held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the following parties on or before _____, 2004 at 5:00 p.m., Prevailing Eastern Time:

**PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.**
Counsel for the Debtors and Debtors in Possession
780 Third Avenue, 36th Floor
New York, New York 10017
Attn: Robert J. Feinstein, Esq.

**BROWN RUDNICK BERLACK ISRAELS LLP**
Counsel for the Committee
One Financial Center
Boston, Massachusetts 02111
Attn: Anthony L. Gray, Esq.

**MILES & STOCKBRIDGE**
Counsel for Turner
10 Light Street
Baltimore, MD 21202
Attn: Joseph J. Bellinger, Esq.

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Counsel for King
101 Park Avenue
New York, New York 10178-0061
Attn: Steven J. Reisman, Esq.

**OFFICE OF THE UNITED STATES TRUSTEE**
33 Whitehall Street
New York, New York 10004
Attn: Pamela Jean Lustrin, Esq.

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

**C.**     **Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is

"fair and equitable" as to such class, (ii) feasible, and (iii) in the "best interests" of creditors and stockholders which are impaired under the plan.

### 1. Acceptance

Classes 1, 2, 3, and 5 of the Plan are impaired under the Plan and are entitled to vote to accept or reject the Plan. The Plan Proponents reserve the right to seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan.

### 2. Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cram down" tests for unsecured creditors as follows: either (i) each impaired unsecured Creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive or retain any property under the Plan.

### 3. Feasibility

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Plan Proponents have analyzed the Reorganized Debtor's and Tyson's ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of Tyson's financial performance for the three (3) fiscal years in the period ending July 31, 2007 (the "Projection Period"). These projections, and the assumptions on which they are based, are included in Projected Financial Information annexed hereto as Exhibit C. Based upon such projections, the Plan Proponents believe that the Reorganized Debtor and Tyson will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Projected Financial Information appended to this Disclosure Statement as Exhibit C demonstrates that the Plan is feasible. Exhibit C shows that the Plan Administrator will be able to make the payments to each Class of Creditors as provided in the Plan.

The financial information and the projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date of the Plan and the initial Distributions thereunder take place as of August 20, 2004. Although the projections and information are based upon an August 20, 2004, Effective Date, the Plan Proponents believe that an actual Effective Date later in 2004 would not have any material effect on the projections.

The Debtors have prepared these financial projections based upon certain assumptions

which they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in the Projected Financial Information, annexed hereto as Exhibit C. The Projected Financial Information has not been examined or compiled by independent accountants. The Plan Proponents make no representation as to the accuracy of the projections or the ability to achieve the projected results. Many of the assumptions on which the projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the Projection Period may vary from the projected results and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projected Financial Information is based in evaluating the Plan.

## 4. <u>Best Interests Test</u>

With respect to each impaired Class of Claims and Interests, Confirmation of the Plan requires that each Holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders of Claims and Interests of each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The cash amount which would be available for satisfaction of Unsecured Claims and Interests would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation case. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those which might be payable to attorneys and other professionals that such a trustee may engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors in Possession during the pendency of the Bankruptcy Cases. The foregoing types of claims and other claims which may arise in a liquidation case or result from the pending Bankruptcy Cases, including any unpaid expenses incurred by the Debtors in Possession during the Bankruptcy Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition unsecured claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of the liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors in the Bankruptcy Cases, including (i) the

increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under Chapter 7, (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with Creditors in the Bankruptcy Cases, (iv) the adverse impact upon litigation assets and (v) the potential absence in chapter 7 of the King Settlement, the Turner Settlement, and contributions of Tyson Future Fight Income pursuant to the Contribution Agreement, the Plan Proponents have determined that Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtors under chapter 7.

The Plan Proponents also believe that the value of any Distributions to each Class of Allowed Claims in a chapter 7 case would be less than the value of Distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for several years after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Liquidation Analysis prepared by the Debtors is attached hereto as Exhibit D. The information set forth in Exhibit D provides a summary of the liquidation values of the Debtors' assets assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' Estates. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.

Underlying the Liquidation Analysis is a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected may not be realized if the Debtors were, in fact, to undergo such a liquidation. The liquidation period is assumed to be a period of approximately 24 months, allowing for the (i) discontinuation of operations, (ii) sale of assets, and (iii) resolution of litigation.

## D.    Consummation

The Plan will be consummated following the Effective Date. The Effective Date of the Plan is the first Business Day after the date on which all conditions to the effectiveness of the Plan, as set forth in section 9.1 of the Plan (and subject to section 9.2 of the Plan), are satisfied or waived. For a more detailed discussion of the conditions precedent to the Plan and the impact of the failure to meet such conditions, see sections VI.B.6 – VI.B.8 hereof.

The Plan is to be implemented pursuant to the provisions of the Bankruptcy Code.

## VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED

**THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING**

**THOSE ENUMERATED BELOW. HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

The factors specified below assume that the Plan is approved by the Bankruptcy Court and that the Effective Date occurs on or about August 20, 2004. Prior to voting on the Plan, each Holder of a Claim entitled to vote should carefully consider the risk factors specified or referred to below, the exhibits annexed hereto, as well as all of the information contained in the Plan and all exhibits and schedules thereto.

## A.    Projected Financial Information

The Projected Financial Information contained in Exhibit C to this Disclosure Statement assumes that the Plan and the transactions contemplated thereby will be implemented in accordance with their terms and are based upon numerous other assumptions and estimates. These projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, Tyson's anticipated future earnings, the boxing industry's performance, certain assumptions with respect to competitors of Tyson, general business and economic conditions and other matters, many of which are beyond the control of the Debtors. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projected Financial Information may affect the actual financial results. Accordingly, the Projected Financial Information is not necessarily indicative of the future financial condition or earnings of Tyson, which may vary significantly from those set forth in the Projected Financial Information. Although the Plan Proponents believe that the projections are reasonably attainable, some or all of the estimates will vary and variations between the actual financial results and those projected may be material. Consequently, the projected financial information contained in this Disclosure Statement should not be regarded as a representation by the Plan Proponents, their advisors, or any other person that the projections can or will be achieved.

## B.    Certain Risks of Non-Confirmation

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of the Distributions to non-accepting Claims and Interest Holders will not be less than the value of the Distributions that such Claims and Interest Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that these requirements will be satisfied, there can be no assurance that the Bankruptcy Court will concur. The Confirmation and consummation of the Plan are also subject to certain conditions, which are described in Article VI of this

Disclosure Statement.

If the Plan were not to be confirmed and consummated, it is unclear whether a reorganization comparable to the reorganization contemplated hereby could be implemented in a timely manner and, if so, what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests. Moreover, if an alternative reorganization could not be implemented in a timely manner, it is possible that the Debtors would have to liquidate their assets in a forced sale, in which case it is likely the Holders of Claims and Interests would receive less than they would have received pursuant to the Plan.

**C.** **Forward-Looking Information May Prove Inaccurate**

This Disclosure Statement contains various forward-looking statements and information that are based on beliefs as well as assumptions made by and information currently available to the Plan Proponents and their professionals. When used in this document, the words "believe," "expect," "anticipate," and similar expressions are intended to identify forward-looking statements. Such statements are subject to certain risks, uncertainties and assumptions including those identified above. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected.

## IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and Holders of Class 5 Claims. The following summary does not address the federal income tax consequences to Holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan, or to Holders of Interests who do not receive any Distributions under the Plan.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Plan Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, Holders that hold Claims as part of a hedge, straddle or conversion, Holders who acquired their Claims as compensation, and Holders who do not hold their Claims as capital assets).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Consequences to the Debtors

In general, the Internal Revenue Code provides that a debtor in a bankruptcy case is not taxable on cancellation of debt ("COD") income, but must reduce certain of its tax attributes (such as its NOL carryforwards and its tax basis in its assets) by the amount of COD income. COD income results when the amount of debt discharged exceeds the consideration given in exchange therefor, and is equal to such excess amount.  Any reduction in tax attributes does not occur, however, until the end of the taxable year or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD is incurred.  Accordingly, the Debtors' tax attributes may offset any taxable income or gain recognized in the year of discharge.  Such offset may be limited, however, in the case of alternative minimum tax.  If advantageous, a debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

As discussed below (see section IX.B. "Consequences to the Holders of Claims"), under the Plan the Debtors will be treated for U.S. federal income tax purposes as transferring the portion of their assets, if any, that comprise part of the Plan Assets directly to the Holders of Allowed Claims, who will then be treated as transferring such assets to the Plan Trust. Accordingly, the Debtors' transfer of Plan Assets may result in the Debtors' recognizing gain or income, depending in part on the value of such assets on the Effective Date.  Nevertheless, due to their reported and anticipated NOLs and NOL carryforwards and the tax basis in such assets, the Debtors do not anticipate that a significant tax liability (if any) will be incurred as a result of such transfer.

## B.    Consequences to Holders of Class 5 Claims

### 1.    Recognition of Gain or Loss Generally

Pursuant to the Plan, holders of Allowed Claims will receive, in satisfaction and discharge of their Claims, Cash and/or beneficial interests in the Plan Trust.  Holders of Allowed Claims in Class 5 may receive additional Distributions after the Effective Date to the extent any Disputed Claims are subsequently disallowed.

In general, each holder of Allowed Claims will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property (including, as discussed below, its undivided interest in the Plan Assets) that such holder receives in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date Distribution of such consideration upon the resolution of Disputed Claims),

and (ii) such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).  For a discussion of the U.S. federal income tax consequences of any Claim for accrued interest (see section IX.B.2. "Distributions in Discharge of Accrued But Unpaid Interest").

As discussed below, the Plan Trust has been structured to qualify as a "grantor trust" for U.S. federal income tax purposes.  Accordingly, each holder of an Allowed Claim receiving a beneficial interest in the Plan Trust will be treated for U.S. federal income tax purposes as directly receiving and as a direct owner of its allocable percentage of the Plan Assets (see section IX.B.3. "Tax Treatment of Plan Trust and Holders of Beneficial Interests in the Plan Trust"). Pursuant to the Plan, the Plan Administrator will make a good faith valuation of the Plan Assets, and all parties, including the holders of Allowed Claims, must consistently use such valuation for all federal income tax purposes.

Due to the possibility that a holder of an Allowed Claim may receive additional Distributions subsequent to the Effective Date in respect of any subsequently disallowed Disputed Claims or unclaimed Distributions, the imputed interest provisions of the Code may apply to treat a portion of such later Distributions to such holders as imputed interest.  In addition, it is possible (although not believed likely) that any loss realized by a holder in satisfaction of an Allowed Claim in Class 5 may be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting.  Holders are urged to consult their tax advisors regarding the possibility for deferral, and the ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

After the Effective Date, any amount a holder receives as a Distribution from the Plan Trust in respect of its beneficial interests in the Plan Trust (other than as a result of the subsequent disallowance of Disputed Claims) should not be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such holder's beneficial (ownership) interests in the Plan Trust.

Where a holder recognizes gain or loss in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been so held, whether the holder had acquired the Claim at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction.  A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

In general, a holder's tax basis in any Plan Trust interest received (and undivided interest in Plan Assets deemed owned) will equal the fair market value of its proportionate share of the Plan Assets on the Effective Date.  The holding period for such assets generally will begin the day following the Effective Date.

## 2.    Distributions in Discharge of Accrued But Unpaid Interest

Pursuant to the Plan, Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claim representing accrued but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

To the extent a holder of debt receives an amount of cash or property in satisfaction of interest accrued during its holding period, such holder generally recognizes taxable interest income in such amount (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

## 3.    Tax Treatment of the Plan Trust and Holders of Beneficial Interests in the Plan Trust

Upon the Effective Date, the Plan Trust shall be established for the benefit of holders of certain Allowed Claims on or after the Effective Date.

The Plan Trust is intended to qualify as a liquidating trust for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Plan Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Plan Administrator, and the holders of Allowed Claims) are required for federal income tax purposes to treat the Plan Trust as a grantor trust of which the holders of Allowed Claims receiving interests therein are the owners and grantors.  The following discussion assumes that the Plan Trust will be so respected for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Plan Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully such classification, the federal income tax consequences to the Plan Trust, the holders of Claims, and the Debtors could vary from those discussed herein (including the potential for an entity level tax on any income of the Plan Trust).

For all U.S. federal income tax purposes, all parties (including the Debtors, the Plan Administrator, and the holders of Allowed Claims receiving interests in the Plan Trust) must treat the transfer of the Plan Assets to the Plan Trust, in accordance with the terms of the Plan, as a transfer of such Plan Assets directly to such holders, followed by such holders' transfer of the Plan Assets to the Plan Trust.  Consistent therewith, all parties must treat the Plan Trust as a grantor trust of which such holders are the owners and grantors.  Thus, such holders (and any subsequent holders of interests in the Plan Trust) will be treated as the direct owners of their respective undivided interests in the Plan Assets for all U.S. federal income tax purposes.  Each

holder will have a tax basis in its proportionate share of the Plan Assets deemed owned equal to the fair market value thereof on the Effective Date. Pursuant to the Plan, the Plan Administrator will determine the fair market value of the Plan Assets as of the Effective Date, and all parties, including the holders of Allowed Claims receiving interests in the Plan Trust, must consistently use such valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder of an Allowed Claim receiving a beneficial interest in the Plan Trust will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Plan Trust, in accordance with its relative beneficial interest. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a holder is not dependent upon the Plan Trust distributing any cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Plan Trust regardless of the fact that holder has not received any prior or concurrent Distribution. Other than in respect of cash retained on account of Disputed Claims and subsequently distributed, the Plan Trust's Distribution of cash to Holders of Allowed Claims generally will not be taxable to the holders because they already are regarded for federal income tax purposes as owning the underlying Plan Assets.

The Plan Administrator will file with the IRS returns for the Plan Trust as a grantor trust pursuant to U.S. Treasury Regulation (the "Treasury Regulations") section 1.671-4(a). The Plan Administrator will also send to each holder of an Allowed Claim that owns a beneficial interest in the Plan Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, and credit, and will instruct the holder to report such items on its federal income tax return. The Plan Administrator also will file, or cause to be filed, all appropriate tax returns with respect to any Plan Assets allocable to Disputed Claims, as discussed below.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator shall:

(i) treat all Plan Assets allocable to, or retained on account of, Disputed Claims, as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Code (sections 641 *et seq.* of the Code);

(ii) treat as taxable income or loss of this separate trust with respect to any given taxable year the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of such Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved);

(iii) treat as a distribution from this separate trust any increased amounts distributed by the Plan Trust as a result of any Disputed Claim resolved earlier in the taxable year, to the extent such distribution relates to taxable income or loss of this separate trust determined in accordance with the provisions hereof, and

(iv) to the extent permitted by applicable law, report consistently for state and local income tax purposes.

In addition, pursuant to the Plan, all holders of Claims are required to report consistently with such treatment. Accordingly, subject to issuance of definitive guidance, the Plan Administrator will report on the basis that any amounts earned by this separate trust and any taxable income of the Plan Trust allocable to it are subject to a separate entity level tax, except to the extent such earnings are distributed during the same taxable year. Any amounts earned by or attributable to the separate trust and distributed to a holder during the same taxable year will be includible in such holder's gross income.

## 4. <u>Cash and Property Held in Trust for Disputed Claims</u>

Pursuant to the Plan, any Cash and/or other property retained by the Plan Administrator on account of Disputed Claims shall be held in trust (a "Plan Trust Disputed Claims Reserve") pending the resolution of such Disputed Claims.

Under section 468B(g) of the Code, amounts earned by an escrow account, settlement fund, or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of such accounts in a bankruptcy setting. Thus, depending on the facts of a particular situation, such an account could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of Disputed Claims, or by the Debtors, or otherwise. On February 1, 1999, the IRS issued proposed Treasury Regulations that, if finalized in their current form, would specify the tax treatment of reserves of the type here involved that are established after the date such Treasury Regulations become final. In general, such Treasury Regulations would tax such a reserve as a "qualified settlement fund" under Treasury Regulation sections 1.468B-1 *et seq.* and thus subject to a separate entity level tax. As to previously established escrows and the like, such Treasury Regulations would provide that the IRS would not challenge any reasonably, consistently applied method of taxation for income earned by the escrow or account, and any reasonably, consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Administrator of a private letter ruling if requested, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator shall (i) treat each Plan Trust Disputed Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim in the class of Claims to which such Reserve relates, in accordance with the trust provisions of the Code (sections 641 *et seq.* of the Code), and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties (including holders of Disputed Claims) shall report consistently with such treatment.

Accordingly, subject to issuance of definitive guidance, the Plan Administrator will report as subject to a separate entity level tax any amounts earned by the Plan Trust Disputed Claims Reserve, except to the extent the Plan Trust distributes such earnings during the same taxable year. In such event, any amount earned by the Plan Trust Disputed Claims Reserve that is distributed to a holder during the same taxable year will be includible in such holder's gross income.

Distributions from the Plan Trust Disputed Claims Reserve will be made to holders of Disputed Claims when such Disputed Claims are subsequently Allowed, and will be made to holders of previously Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed. Such Distributions (other than amounts attributable to earnings) should be taxable to the recipient in accordance with the principles discussed above (see section IX.B.1. "Recognition of Gain or Loss – Generally").

Accordingly, each Holder of a Claim is urged to consult its tax advisor regarding the potential tax treatment of the Plan Trust Disputed Claim Reserve, distributions therefrom, and any tax consequences to such holder relating thereto.

## 5. Withholding

All Distributions to Holders of Allowed General Unsecured Claims under the Plan (whether by the Debtor, the Plan Trust, or the Plan Administrator) are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

## 6. The Creditors' Trust

As described in section 4.2.5 of the Plan, in connection with the Turner Settlement the Holders of Allowed General Unsecured Claims will also be beneficiaries of the Creditors' Trust. As provided in the Creditors' Trust Agreement, the sole purpose of the Creditors' Trust will be to liquidate its assets (which shall consist of the rights to the Committee Carve-out to be paid by Turner and all proceeds thereof, income thereon and payments on account thereof) for the benefit of Holders of Allowed General Unsecured Claims, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Creditors' Trust will not hold any assets of the Debtors or the Estates or any Plan Assets. The Plan Proponents note that as the Creditors' Trust is intended to qualify as a liquidating trust for federal income tax purposes, the federal income tax consequences to Holders of Class 5 Claims in respect of the Creditors' Trust is intended to be analogous to the tax consequences outlined in section IX.B above in respect of the Plan Trust.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and (ii) the preparation and presentation of an alternative plan or plans of reorganization.

### A. <u>Liquidation Under Chapter 7</u>

If no chapter 11 plan can be confirmed, the Bankruptcy Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors. A discussion of the effect that a chapter 7 liquidation would have on the recovery of Holders of Claims and Interests is set forth in section VII.C.4. hereof, "Best Interests Test." The Debtors and the Committee believe that liquidation under chapter 7 would result in (i) smaller Distributions being made to Creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations, and (iii) the possible failure to realize any recoveries from the Tyson Future Fight Income.

### B. <u>Alternative Plan of Reorganization</u>

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization of the Debtors or an orderly liquidation of their assets.

The Debtors and the Committee believe that the Plan enables the Debtors to successfully and expeditiously emerge from chapter 11, preserves their businesses and assets and allows Creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7 and a trustee need not be appointed. Accordingly, Creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to Creditors because a greater return is provided for in the Plan to Creditors.

## XI. CONCLUSION AND RECOMMENDATION

The Debtors and the Committee believe that Confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest

recoveries to Creditors. In addition, other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. Accordingly, the Debtors and the Committee urge Holders of impaired Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received not later than 5:00 p.m. Prevailing Eastern Time on _____, 2004.

Dated: June 24, 2004

      MICHAEL G. TYSON

    By:    */s/ Michael G. Tyson*
           Michael G. Tyson

      MIKE TYSON ENTERPRISES, INC.

    By:    */s/ Michael G. Tyson*
           Michael G. Tyson
           President, Secretary and Chief Financial Officer

      PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

    By:    */s/ Robert J. Feinstein*
           Debra I. Grassgreen (CA Bar No. 169978)
           Robert J. Feinstein (RF-2836)
           Malhar S. Pagay (CA Bar No. 189289)
           Maria A. Bove (MB-8687)
           780 Third Avenue, 36th Floor
           New York, NY 10017-2024
           Telephone: (212) 561-7700
           Facsimile: (212) 561-7777
           Attorneys for the Debtors and Debtors in Possession

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:     Darius Decorative and Antique Rugs, Chairperson

By:      */s/ Kerry Gotlib*
         Kerry Gotlib, duly authorized

BROWN RUDNICK BERLACK ISRAELS LLP


By:      */s/ Anthony L. Gray*
         Anthony L. Gray (AG 2823)
         One Financial Center
         Boston, MA 02111
         Telephone: (617) 856-8200
         Facsimile:  (617) 856-8201
         Attorneys for the Official Committee of Unsecured Creditors